No. 23-70003
_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT
_____

ANTHONY MEDINA,
*Petitioner-Appellant*

v.

BOBBY LUMPKIN, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,
*Respondent-Appellee*
_____

On Appeal from the United States District Court for the Southern District of Texas, Houston Division, Civ. Action No. 4:09-CV-03223
_____

## MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT

James William Marcus
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
512-232-1475
512-232-9197 (fax)
jmarcus@law.utexas.edu

Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

David Currie
Assistant Federal Defender
david_currie@fd.org

Victoria Inojosa
Research & Writing Attorney
victoria_inojosa@fd.org

Federal Public Defender's Office
Northern District of Texas
525 South Griffin Street, Ste. 629
Dallas, Texas 75202
214.767.2746 214.767.2886 (fax)

## STATEMENT REGARDING ORAL ARGUMENT

Medina has shown that the included issues should be certified for appeal and set for full merits briefing and oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF CONTENTS .......................................................... ii

TABLE OF AUTHORITIES...................................................vii

MOTION FOR CERTIFICATE OF APPEALABILITY..........................1

BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF APPEALABILITY ..................................................................2

STANDARD OF REVIEW...................................................2

STATEMENT OF FACTS .....................................................3

    A.    The Crime ..................................................................3

    B.    Medina denied being involved with the shooting. ........................6

    C.    Nacoste told police Holmes was the shooter and Holmes buried the gun......................................................................7

    D.    Holmes confessed to Nacoste and said he planned to blame Medina......................................................................8

    E.    Holmes was apprehended while fleeing from an armed carjacking. ...............................................................10

    F.    Police pressured witnesses to confirm Holmes's and Moore's stories. ...................................................................11

        1.  Jamie Moore.....................................................11

        2.  Johnny Valadez..................................................13

        3.  Veronica Ponce..................................................14

        4.  Scharlene Pooran................................................15

        5.  Regina Juarez ...................................................15

    G.    In March 1996, police recovered the gun and linked it to Holmes; prosecution witnesses subsequently contradicted their sworn statements to explain this away.................................................18

    H.    Guerinot and Millin were appointed as Medina's defense counsel six months before trial. ...............................................21

    I.    The Guilt Phase of Trial.........................................23

        1.  The State's Background Witnesses ......................23

       2. The State's Key Witnesses ....................................26

          a. Jamie Moore.............................................27

          b. Johnny Valadez.........................................28

          c. Dominic Holmes.......................................29

          d. Regina Juarez .........................................31

       3. The Defense Witnesses ...................................32

       4. Closing Arguments and Verdict ......................34

   J. The Punishment Phase ..........................................35

       1. Trial Counsel's Lack of Preparation.................35

       2. The State's Evidence.......................................37

       3. The Defense Witnesses ...................................38

       4. Punishment-Phase Closings............................39

POST-TRIAL PROCEEDINGS ............................................40

   A. Direct Appeal........................................................40

   B. State Habeas Proceedings.....................................40

   C. Federal District Court Proceedings .....................43

ARGUMENT ......................................................................46

   A. This Court should certify an appeal of Medina's claim that trial counsel were ineffective at the guilt phase. ................................46

       1. This is a substantial claim. ...................................46

          a. Trial counsel performed deficiently................46

          b. Medina was prejudiced. ...............................52

       2. Reasonable jurists could debate the district court's resolution of this claim...........................54

          a. Reasonable jurists could debate whether the state court adjudicated this claim on the merits............................54

          b. Reasonable jurists could debate the district court's application of § 2254(d)....................................58

             i. The district court erred by ignoring the state court's actual reasoning.........................................59

ii. The district court applied an incorrect legal standard .......................................................60

iii. The state court's determination that trial counsel was not ineffective for failing to investigate and interview witnesses was legally and factually unreasonable......61

c. The district court erred regarding trial counsel's failure to impeach witnesses. ......................................................66

d. The district court erred in failing to find that trial counsel was ineffective for not seeking limiting instructions regarding extraneous offenses. ...................69

e. The district court erred in refusing to permit fact development. ....................................................71

B. This Court should certify an appeal of Medina's claim that trial counsel were ineffective at the sentencing phase........................72

1. This is a substantial claim. ....................................................72

a. Trial counsel performed deficiently................................72

b. Medina was prejudiced. ....................................................75

2. Reasonable jurists could debate the district court's resolution of this claim...........................................................78

a. Reasonable jurists could debate whether the state court adjudicated this claim on the merits..............................78

b. Reasonable jurists could debate the district court's application of § 2254(d)....................................................78

i. The district court substituted its own factual theories when reviewing the state court's conclusions. ............79

ii. The district court applied an incorrect legal standard. ....................................................81

iii. The state court's determination that trial counsel was not ineffective for failing to investigate and interview mitigation witnesses was legally and factually unreasonable. ..........................................84

C. This Court should certify an appeal of Medina's claim that the State's misconduct violated his right to due process.................86

iv

1. This is a substantial claim. ...................................................86

   a. The State suppressed favorable, material evidence. ......86

      i. Witness(es) who saw a Black shooter. .........................87

      ii. Evidence impeaching Regina Juarez. ..........................87

         1) An undisclosed deal for Juarez's testimony. ...........88

         2) Statements or interview notes proving that Juarez lied under oath in her January 1996 witness statement or was prepared to lie at trial. .....................................88

         3) The State suppressed Juarez's rap sheet and then urged the jury to credit her testimony because she'd "never been in trouble before.".....................................89

      iii. Evidence impeaching Dominic Holmes. .....................90

         1) An undisclosed deal in exchange for Holmes's cooperation with the State. ..........................................90

         2) Statements or interview notes proving that Holmes lied in his sworn statement or was prepared to lie at trial. ...............................................................................92

         3) Holmes's statement to the police that Johnny Valadez had, or disposed of, the murder weapon........92

         4) The State suppressed Holmes's criminal record. ....93

      iv. Evidence impeaching Johnny Valadez. ......................93

      v. Evidence impeaching Maurice Argueta.......................94

      vi. Evidence impeaching Leon Guy .................................95

   b. The prosecution knowingly elicited false testimony and impressions to neutralize forensic evidence inculpating Holmes. .........................................................................96

   c. There is a reasonable probability that, but for the State's suppression of evidence, Medina would not have been convicted. Likewise, there is a reasonable likelihood that the State's knowing use of false testimony could have affected the outcome of Medina's trial. ...........................97

2. Reasonable jurists could debate the resolution of Medina's due process claim. .................................................. 99

    a. The district failed to consider the State's misconduct collectively. ................................................... 100

    b. Medina pled one due process claim, to which § 2254(d) is inapplicable. ................................................. 100

    c. Even if Medina's due process claim is potentially subject to § 2254(d), there was no qualifying state court adjudication. ............................................... 101

    d. Even if the due process claim was subject to § 2254(d), § 2254(d)(1) and (d)(2) exceptions are present. ................ 101

    e. Reasonable jurists could debate whether the district court erred in blaming Medina for his failure to present evidence suppressed by the State. ............................... 103

    f. Reasonable jurists could debate whether the district court erred in denying fact development for both Medina's due process claim and his cause and prejudice arguments. .................................................. 104

D. Conclusion. .............................................................. 106

CERTIFICATE OF SERVICE ........................................... 108

CERTIFICATE OF COMPLIANCE .................................... 108

# TABLE OF AUTHORITIES

**Federal Cases**                                            **Page(s)**

*Anderson v. Johnson,*
338 F.3d 382 (5th Cir. 2003) .............................................. 52

*Andrus v. Texas,*
140 S. Ct. 1875 (2020) ....................................................... 74

*Banks v. Dretke,*
540 U.S. 668 (2004) .................................................... 97, 103

*Barrientes v. Johnson,*
221 F.3d 741 (5th Cir. 2000) ......................... 55, 57, 58, 106

*Basso v. Stephens,*
555 F. App'x 335 (5th Cir. 2014) ...................................... 58

*Blankenship v. Estelle,*
545 F.2d 510 (5th Cir. 1977) ............................................. 96

*Bracy v. Gramley,*
520 U.S. 899 (1997) ......................................................... 106

*Brady v. Maryland,*
373 U.S. 83 (1963) .................................................... *passim*

*Bryant v. Scott,*
28 F.3d 1411 (5th Cir. 1994) ............................................. 50

*Buck v. Davis,*
580 U.S. 100 (2017) ........................................................... 60

*Charles v. Stephens,*
736 F.3d 380 (5th Cir. 2013) ............................................. 47

*Davis v. Alaska,*
415 U.S. 308 (1974) ..................................................... 69, 70

*District Attorney's Office for Third Judicial Dist. v. Osborne,*
557 U.S. 52 (2009) ............................................................. 56

*East v. Scott,*
 55 F.3d 996 (5th Cir. 1995) ............................................. 89

*Ford v. Wainwright,*
 477 U.S. 399 (1986) ................................................... 56, 57

*Freeney v. Davis,*
 737 F. App'x 198 (5th Cir. 2018) ...................................... 58

*Giglio v. United States,*
 405 U.S. 150 (1972) ..................................................... 97

*Goldberg v. Kelly,*
 397 U.S. 254 (1970) ..................................................... 56

*Gordon v. Braxton,*
 780 F.3d 196 (4th Cir. 2015) .......................................... 58

*Green v. Thaler,*
 699 F.3d 404 (5th Cir. 2012) .......................................... 58

*Hughes v. Vannoy,*
 7 F.4th 380 (5th Cir. 2021) ........................... 46, 49, 52, 62

*Johnson v. Williams,*
 568 U.S. 289 (2013) ................................................ 55, 74

*Kyles v. Whitley,*
 514 U.S. 419 (1995) ........................... 86, 97, 100, 102

*Lafler v. Cooper,*
 566 U.S. 156 (2012) ..................................................... 52

*Lewis v. Dretke,*
 355 F.3d 364 (5th Cir. 2003) .......................................... 83

*Lindsey v. King,*
 769 F.2d 1034 (5th Cir. 1985) ........................................ 99

*Medina v. Texas,*
 529 U.S. 1102 (2000) ................................................... 40

*Miller-El v. Cockrell,*
537 U.S. 322 (2003) .......................................................................2

*Napue v. Illinois,*
360 U.S. 264 (1959) ................................................................86, 96

*Neal v. Vannoy,*
78 F.4th 775 (5th Cir. 2023) ........................... 47, 51, 53, 60

*Nelson v. Davis,*
952 F.3d 651 (5th Cir. 2020) ................................................2

*Padilla v. Kentucky,*
599 U.S. 356 (2010) ......................................................................46

*Panetti v. Quarterman,*
551 U.S. 930 (2007) ................................................................56, 58

*Porter v. McCollum,*
558 U.S. 30 (2009) ................................................................47, 73

*Richards v. Quarterman,*
566 F.3d 553 (5th Cir. 2009) ..............................47, 48, 49

*Rompilla v. Beard,*
545 U.S. 374 (2005) ........................................ 46, 73, 81, 82

*Sears v. Upton,*
561 U.S. 945 (2010) ............................................... 73, 80, 83

*Strickland v. Washington,*
466 U.S. 668 (1984) ............................................... *passim*

*Strickler v. Greene,*
527 U.S. 263 (1999) .................................................................103

*Tassin v. Cain,*
517 F.3d 770 (5th Cir. 2008) ...........................................91

*United States v. Bagley,*
473 U.S. 667 (1985) ....................................................................96

*Valdez v. Cockrell,*
274 F.3d 941 (5th Cir. 2001) ............................................................ 58

*Vasquez v. Hillery,*
474 U.S. 254 (1986) ...................................................................... 101

*Wiggins v. Smith,*
539 U.S. 501 (2003) ................................................................ *passim*

*Wilson v. Sellers,*
138 S. Ct. 1188 (2018) .......................................................... 59, 62, 79

**State Cases**

*Carrol v. State,*
916 S.W.2d 494 (Tex. Crim. App. 1996) ............................................. 69

*Irby v. State,*
327 S.W.3d 138 (Tex. Crim. App. 2010) ............................................. 90

*Maxwell v. State,*
48 S.W.2d 196 (Tex. Crim. App. 2001) ............................................... 90

*Medina v. State,*
7 S.W.3d 633 (Tex. Crim. App. 1999) ................................................ 40

*Ex parte Medina,*
2009 WL 2960466 (Tex. Crim. App. Sept. 16, 2009) .................... 43, 44

*Prible v. State,*
175 S.W.3d 724 (Tex. Crim. App. 2005) ............................................. 70

*Redmond v. State,*
629 S.W.3d 534 (Tex. App.–Fort Worth, Mar. 21, 2021) .................... 90

*Ex parte Varelas,*
45 S.W.3d 627 (Tex. Crim. App. 2001) .................................... 51, 53, 71

**Federal Statutes**

28 U.S.C. § 2253(c) ...................................................................... 1

28 U.S.C. § 2254(d) ................................................................ *passim*

28 U.S.C. § 2254(e) ................................................ 45, 66, 106

**Rules**

TEX. R. EVID. 404(b) .............................................. 24, 25

TEX. R. EVID. 609 ............................................................ 69

TEX. R. EVID. 609(d) ...................................................... 90

**Constitutional Provisions**

U.S. CONST. amend. V ................................................ 19, 21

U.S. CONST. amend. VI ...................................................... 46

U.S. CONST. amend. XIV ...................................................... 2

**Other Authorities**

ABA Guidelines for the Appointment and Performance of
    Defense Counsel in Death Penalty ...................................... 47

## MOTION FOR CERTIFICATE OF APPEALABILITY

Petitioner-Appellant Anthony Medina requests a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c) because he has made a substantial showing that his constitutional rights were denied.

## BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF APPEALABILITY

Anthony Medina requests a COA to appeal the district court's denial of three claims: the denial of the effective assistance of counsel during both phases of his capital trial in violation of the Sixth and Fourteenth Amendments; and the deprivation of due process by the State's misconduct. This briefing supports Medina's motion seeking a COA and is directed to making that showing; it is not intended as briefing on the merits of appellate issues created by the district court's judgment.

## STANDARD OF REVIEW

An appeal should be certified when "jurists of reason could disagree with" the district court's rulings or "could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). This "standard is less burdensome in capital cases, as in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (internal quotations omitted).

# STATEMENT OF FACTS

## A.    The Crime

Early on January 1, 1996, a drive-by shooting occurred at Evaristo Rodriguez's home on Campden Hill in Southwest Houston. ROA.1780. Rodriguez's nine-year-old nephew David and fifteen-year-old niece Diane were killed. ROA.1780.

Police immediately concluded that the shooting was caused by a dispute between the H-Town Crips ("HTC") and their rival gang, La Raza 13 ("LRZ"). *Id.* Rodriguez's daughter dated HTC member Marco Martinez.[1] ROA.1792–93. A year earlier, HTC murdered LRZ member Hector Lopez. *Id.* Several attacks occurred on the Rodriguez home in July 1995 and police believed those incidents, and the New Year's Eve shooting, were committed by LRZ members as revenge for Lopez's murder. ROA.1780, 1790–93.

Nobody at the Rodriguez residence saw the shooter. Leon Guy, a passerby, stated that the hand holding the gun was white or Hispanic;

---

[1] Documentation and testimony frequently identify gang members by their street names, which are: Marco Martinez ("Blue"), Hector Lopez ("G-Money"), Candelario Guerrero ("Candyman"), Dominic Holmes ("Flaco"), Tony Medina ("Creeper"), Dallas Nacoste ("Wicked"), Johnny Valadez ("Pelon"), Veronica Ponce ("China"), and Scharlene Pooran ("India").

he later admitted he was "dead drunk" at the time. ROA.9958, 9663–64. The police subsequently received information that two Black men were involved and that a Black man was the shooter. ROA.1834, 2016. Carlos McNickles, a neighbor who trial counsel never interviewed and who did not testify at trial, reported seeing a "dark blue late 80's four-door Park Avenue-type car" with a Black man firing a "rifle that looked like an AK-47" from the passenger-side window. ROA.2022–26. The car was driven by a Black man with glasses. *Id.*

Investigators learned that a group of LRZ members gathered for a party at Candelario Guerrero's house near the Rodriguez residence on the night of the shooting. The group included:

> **Dominic Holmes:** One of two Black members of LRZ, ROA.1834, 2016, Holmes was a sixteen-year-old drop-out banned from all Houston Independent School District campuses since October 1994. ROA.1883. Recently released from the Texas Youth Commission ("TYC") for a weapons offense, ROA.10100–01, Holmes brought his "cousin" Jamie Moore, a non-LRZ member no one else knew, to the party. ROA.1894, 9958–59. Unbeknownst to the jury, Holmes had been arrested eleven times in the past three years. ROA.1883. Holmes was close friends with Lopez, the LRZ member murdered by HTC. ROA.2028. He had a tattoo in honor of Lopez, spoke frequently about how he was going to "do something" to HTC to avenge Lopez's murder, and insinuated in late December 1995 that LRZ had plans to do so. *Id.*

- **Jamie Moore:** A twenty-two-year-old Black man who wore glasses, Moore was a close friend of Holmes. ROA.10070, 10236–37. Moore was an ex-convict and former member of a different gang. ROA.9837–39. He drove to the party with Holmes in his late '80s dark-colored four-door Oldsmobile. ROA.9840–42.

- **Anthony Medina:** A twenty-one-year-old Latino male and long-time LRZ member. ROA.1852.

- **Dallas Nacoste:** The other Black member of LRZ, Nacoste was a sixteen-year-old high schooler. ROA.1880.

- **Alex Perez:** A nineteen-year-old LRZ member. ROA.1852.

- **Johnny Valadez:** A thirteen-year-old sixth grader and LRZ member. ROA.9966.

- **Veronica Ponce:** A thirteen-year-old seventh grader and LRZ member. ROA.1900.

- **Scharlene Pooran:** A sixteen-year-old dropout and LRZ member. ROA.1901.

- **Regina Juarez:** A fifteen-year-old ninth grader and LRZ member. ROA.1909.

The police also learned of a different party on nearby Ingomar Way, where two incidents involving LRZ members occurred. First, near midnight, some partygoers confronted LRZ members and several LRZ members drew weapons. ROA.1869. Second, around 3:00 or 3:30 a.m., a brawl broke out between several LRZ members and the partygoers. *Id.*

The Ingomar Way partygoers identified Holmes, Nacoste, Medina, and Perez as among the brawling LRZ members. ROA.1842–43. The police obtained arrest warrants for each on aggravated assault charges.

## B.    Medina denied being involved with the shooting.

Medina was arrested on January 5, 1996. ROA.1853. He told police that he attended the LRZ party at Guerrero's house and was present for both incidents at the Ingomar Way party. ROA.1856–57. Medina admitted involvement in the brawl during the second confrontation, and that he handled a gun that LRZ members referred to as the "AK" or "SKS." *Id.* The weapon was described as a long-barreled rifle with a knife at the end of it. ROA.1869.

Medina stated that in between the first and second confrontations at Ingomar Way—while the LRZ members were at Guerrero's house— Holmes "started talking about going and doing some dirt," which meant "to go and do a drive-by or some 'criming.'" ROA.1856. Holmes told Medina that "he knew where some people were," meaning "some other gang members," and asked Medina if he wanted to go with him. *Id.* Medina refused. *Id.* Holmes and Moore then left Guerrero's party in Moore's car. When they returned after a short while, both were "acting

real strange." ROA.1854. Medina asked Holmes "what was the matter" and Holmes said he "did not want to talk about it." *Id.*

The next day, Holmes told Medina "over and over" that he had "messed up" the previous evening. ROA.1857. Medina asked Holmes what he had done with the gun and offered to help Holmes dispose of it. *Id.* Holmes responded that "he had it put up" and "had it taken care of." *Id.*

## C. Nacoste told police Holmes was the shooter and Holmes buried the gun.

Nacoste was arrested on January 10, 1996. ROA.1880. Nacoste's sworn statement described Guerrero's party and returning to Guerrero's house after the first confrontation on Ingomar Way. ROA.1881–82. Holmes then arrived at Guerrero's house with Moore. *Id.* When Holmes arrived, "he was all pumped up" and said, "he had driven by this girls [sic] house that dates an 'HTC' member," whom Holmes identified as Martinez. ROA.1882. Nacoste continued:

> [Holmes] started asking for the "AK". He was asking everybody at the party for the gun. [Valadez] told [Holmes] that the gun was at his house. [Valadez] told [Holmes] how to get into his house and how to get the gun. [Holmes] then started talking about how he was going to do a drive-by at the house where [Martinez] was at. [Holmes] said that he was

going to "roll by" looking for [Martinez] and that he was going to start busting at them.

ROA.1882. Nacoste went home before the second confrontation at Ingomar Way. *Id.*

Two days later, on January 3, Valadez called Nacoste and told him "about the second fight over at" Ingomar Way and "about [Holmes] doing the drive-by and that he wasn't sure if he had hit anyone." *Id.* When Nacoste asked "about the 'AK,'" Valadez told him "they buried the gun somewhere in Westbury." *Id.* Nacoste concluded his statement by noting that: "[i]f [Holmes] finds out I told on him he will hurt me and my family." *Id.*

## D. Holmes confessed to Nacoste and said he planned to blame Medina.

Despite Medina's urging, trial counsel never interviewed Nacoste. In a 2001 affidavit, Nacoste described the events of January 1, 1996. Holmes specifically sought permission from Nacoste, a high-ranking LRZ member, to do a "drive-by" on the Rodriguez residence because there were "HTCs in front of the house." ROA.2015. Nacoste gave Holmes a green light to do the shooting with the proviso that "if he didn't see the HTCs he shouldn't do anything because the laws would come down hard on us

if they weren't gang members." *Id.* Holmes and Moore left in Moore's car "and took the SK [rifle] with them." ROA.2015. "When they returned a short while later, [Moore] wanted to make sure that all the spent shell casings were out of his back seat." *Id.*

After his January 10th interrogation, Nacoste was dropped off at a house where Ponce and Pooran were. ROA.2016. Holmes and Moore arrived, and they went to Regina Juarez's house. *Id.* Holmes told Nacoste that "he had messed up" and that "he didn't know how many people he had shot but he did see two or three fall." *Id.* Nacoste suggested that Holmes leave town because "the detectives said they were looking for a black man." *Id.*

Holmes said that he was mad at Medina because Medina "was trying to take control" of LRZ and "was just interested in making money." *Id.* Holmes suggested that Medina "would be a good person to blame because he was known and had a rap sheet." *Id.* Holmes said that Valadez "already knew what to say" and Nacoste should likewise "say [Medina] did it." *Id.* When Nacoste objected, Holmes "said he would kill [Nacoste], [Valadez], and anybody else that wouldn't help him." *Id.*

## E. Holmes was apprehended while fleeing from an armed carjacking.

Just after Nacoste's interview on January 10, the Houston Police Department issued an alert describing Holmes as "suspected of being the shooter" in "the drive-by shooting that took place in Houston New Year's Eve." ROA.1945. In boldface type, the alert warned: "**Consider the suspect to be armed and dangerous.**" *Id.* Less than five hours later, Holmes carjacked a Chevrolet Suburban while armed with a rifle. ROA.1875–76. He led police on an extended high-speed chase before being apprehended. *Id.*

Holmes told a magistrate judge the "officers told him that if he told them what happened they would probably help out and see what they could do for him." ROA.1950. Holmes then gave a statement identifying Medina as the shooter.

According to Holmes, the shooting occurred after the second confrontation at Ingomar Way. ROA.1886–87. Holmes claimed that he, Moore, Medina, Perez, Valadez, Ponce, and Pooran piled into Moore's car. ROA.1886–87. Medina directed Moore to the Rodriguez home, where he "fired about six or seven times." ROA.1887. Holmes volunteered his own familiarity with the gun, noting that "[i]f you pull the trigger on the A.K.

10

it fires three or four shots," but "[i]f you pull the trigger twice then it fires eight." *Id.* Holmes claimed he had not talked to Medina or anyone else "about what happened that night" and that he did not know what Medina purportedly "did with the A.K." *Id.* At some point, however, Holmes suggested that Valadez may have disposed of the gun. ROA.1897.

## F. Police pressured witnesses to confirm Holmes's and Moore's stories.

### 1. Jamie Moore

Holmes's friend Moore was the first person investigators interviewed after Holmes. ROA.1889. On January 11, 1996, Moore came to the police station in his own car. Subsequent testing revealed gunpowder residue on both the front and rear side-passenger doors, confirming that Holmes's car had been recently used in at least one drive-by shooting. ROA.1905.

Investigators told Moore that "Holmes had implicated him as being the driver of the car at the time of the shooting." ROA.1890. Moore immediately "began sobbing and stated 'I did not know that he was going to shoot them kids'[,] '[w]hat is going to happen to me if I tell what he did' [and] 'he will shoot me and my family.'" *Id.*

Moore then asked to call his mother and his lawyer. *Id.* Investigators left him alone with a telephone for fifteen minutes. *Id.* When they returned, Moore denied calling anyone and said that he was ready to give a statement. *Id.*

Although Holmes stated the shooting occurred after the second confrontation at Ingomar Way, Moore claimed the shooting occurred after an earlier trip to a "house that belonged to one of the little Mexican girls." ROA.1893. After they left this house, an unidentified male voice guided him to the Rodriguez home. *Id.* Moore claimed Medina unexpectedly produced the "AK" and shot out the window. *Id.* Moore described the second confrontation at Ingomar Way and said that afterwards "the little dude [Valadez] threw the gun onto the back of the black truck." ROA.1894.

Moore stated that around 2:30 p.m. on January 10, the day before his interview, he and Holmes picked up Ponce and Pooran and took them to a house in the Hiram Clark area, where Juarez lived. *Id.*; ROA.1896. Moore said that "the bald headed Black dude" was also there. *Id.* This was the same day Nacoste said he saw Holmes, Moore, Ponce, and Pooran together and heard Holmes's confession to the shooting, his plans to

blame Medina, and his threats to kill anyone who wouldn't help him. ROA.2016.

### 2. Johnny Valadez

The police next picked up thirteen-year-old Johnny Valadez from middle school. ROA.1895. Valadez's mother initially gave the police permission to interview him but, when they were transporting Valadez to the station, she withdrew her consent and insisted on being present. ROA.1896.

Without waiting for Valadez's mother, an investigator who was "familiar with all the names of the other persons involved in this incident" interrogated Valadez. *Id.* The investigator "went over with [Valadez] all the names of the other persons involved and the information [they] had concerning his involvement." *Id.* The investigator also "discussed with [Valadez] the fact that he may have the murder weapon." *Id.*

After the investigator's priming, Valadez described the shooting in highly equivocal language, repeatedly prefacing his purported recollections with the words "I think." ROA.1899. Valadez also equivocated on whether he had seen the gun. *Id.*

Valadez, who trial counsel never interviewed, later described his interrogation as being "coached" and "coaxed" by the police: the investigators "knew what they wanted me to say." ROA.1952. The investigators wanted Valadez to implicate Medina and asked him questions like "then this happened, right?" *Id.* Valadez said he signed his statement because he was scared. *Id.*

### 3. Veronica Ponce

Police next interviewed Veronica Ponce and Scharlene Pooran. Ponce was a thirteen-year-old seventh grader. ROA.1900. Although she provided police officers with her mother's name and phone number, they did not contact her. *Id.* Without a parent or lawyer present, the investigators extracted a statement from Ponce that she had been in the car and that Medina was the shooter. ROA.1900–01.

Ponce later described the investigators as coercive and threatening. ROA.1952. She told the investigators that she was not in the car. *Id.* The investigators, however, knew what they wanted her to say and told her that her friends had already put her in the car. *Id.* The investigators told her that Medina was the shooter and threatened to charge her with capital murder if she did not cooperate. *Id.* Ultimately, Ponce "didn't

know what [she] was signing" when she signed her 1996 statement. *Id.* Ponce later told Juarez that the police had hit her during the interrogation. ROA.1955.

### 4. Scharlene Pooran

While Ponce was purportedly admitting to being in the car, sixteen-year-old Pooran was telling investigators that Ponce was not in the car. ROA.1902. Pooran stated that after the shooting they returned to Guerrero's house and then went to Ingomar Way, where the second confrontation occurred. *Id.* She said that the last time she saw the "AK" was at Guerrero's house and that she "d[id] not know where the gun is at this time." *Id.*

### 5. Regina Juarez

While police rounded up suspects and witnesses, Juarez went to Oklahoma. ROA.1910. Juarez returned on January 15. ROA.1907–08. The next day, her mother brought her to the police station for an interview. *Id.* At the time, Juarez was a 15-year-old ninth grader. ROA.1909.

Juarez claimed that the group had already left to commit the shooting by the time she arrived at Guerrero's house and that Medina

later admitted to being the shooter. ROA.1907–09. Juarez described the second confrontation at Ingomar Way and claimed Moore then took them to Perez's house. *Id.* While at Perez's house, Juarez claimed she "saw the gun by the banks of the bayou and [thought] they either threw it into the water or [Perez] did something with it." ROA.1910. The next day, police deployed a team of scuba divers to scour the bayou site Juarez had described. ROA.1906. They found nothing. *Id.*

Long after trial, Juarez explained that the investigators pressured and scared her into cooperating. ROA.1955. She also revealed that she testified at trial pursuant to an undisclosed deal. The prosecutor threatened to criminally charge her but agreed to refrain if she testified to the State's version of events. ROA.1579.

The jury also never learned that Juarez was facing additional pressure to blame Medina. Juarez's ex-boyfriend, Raymond Becerra, whom trial counsel never interviewed, described how Juarez confided to him that Holmes had been the shooter and that Holmes had threatened to kill her if she did not implicate Medina. Juarez told Becerra that Holmes, Valadez, and Moore had left Guerrero's party "with an AK," using Moore's car for the drive-by because it was "a car that people in the

neighborhood don't know." ROA.2035–36. A few days later, Holmes came to Juarez's home armed with a pistol and told her "there will be a 187" if she revealed what really happened, meaning "there is going to be a murder." *Id.* Juarez said that Holmes "told her that he would 'fuck up her world' and 'hurt her family.'" *Id.*

Becerra also described a meeting of LRZ leaders where Holmes sought to be promoted within the gang's hierarchy because "he got rid of [Medina]" by pinning the shooting on him. *Id.* Holmes described Medina as a "sell out" for "running his mouth about wanting to get out of the gang." *Id.*

In January 1996, Juarez also told Ricardo Villanueva that Holmes was the shooter. Villanueva, another witness never interviewed by the defense, called Juarez from jail. ROA.2031. After Juarez told Villanueva what Holmes had done, Holmes himself got on the phone and bragged about how he "smoked those fools," repeatedly emphasizing: "that shit was cool." *Id.* Holmes explained that it would be easy "to put it on" Medina, because he was "already 'labeled' by the police and they think he's a threat to society so they'll believe it." ROA.2031–32.

The jury also never learned that Juarez had a history of interfering with the criminal justice process. A year earlier, she was jailed for 11 days after making terroristic threats against a witness in another criminal case. ROA.1998. The witness had "got [Juarez's] friend into trouble," so Juarez threatened to kill her. ROA.1955. The witness's mother reported Juarez to the police. *Id.*

**G.    In March 1996, police recovered the gun and linked it to Holmes; prosecution witnesses subsequently contradicted their sworn statements to explain this away.**

In early March, a confidential informant reported to the Harris County District Attorney's Office ("HCDAO") that the murder weapon was buried at Pooran's house. ROA.1930. Investigators found a package containing two automatic rifles, two magazines, and some cartridges. ROA.1933–34. The guns were wrapped in plastic bags and secured with electrical tape. *Id.* Ballistic testing showed that one of the rifles was used in the drive-by. ROA.1935–36.

No useable prints were found on the murder weapon itself, but palmprints were discovered on the plastic bags in which the guns were wrapped. ROA.1934. On March 13, 1996, investigators matched one of

the palmprints to Holmes. ROA.1435–36, 9564. Medina's palmprint was tested and excluded. ROA.1435–36, 1460, 1943.

Medina's case was presented to a grand jury on the day after police linked Holmes to the murder weapon. ROA.1436. Ponce and Pooran both disavowed their statements to investigators and testified Medina was not the shooter.[2] ROA.1942, 10195–96. The State responded by charging Ponce and Pooran with aggravated perjury.[3] ROA. 1775, 1937. Because the perjury charges were still pending at the time of Medina's trial, Ponce and Pooran gave notice that they would invoke their Fifth Amendment rights if called as witnesses. ROA.10195–96. The trial court denied Medina's request that they be granted immunity. *Id.*

The State dealt very differently with other witnesses who demonstrably lied to investigators. Holmes and Juarez were allowed to materially alter their testimony without legal consequence. Each would testify at trial—contrary to prior sworn statements—that they had

---

[2] Medina requested access to this exculpatory evidence in both state and federal postconviction proceedings. He has never received it.

[3] On May 7, 1996, after the aggravated perjury charges were filed, Ponce gave another statement insisting that, contrary to her earlier sworn statement, she was not in the car at the time of the shooting but that, contrary to her grand jury testimony, Medina had confessed to her several days after the shooting. ROA.1942.

disposed of the murder weapon before their initial police interviews. The trial transcripts reveal that this new version of events was developed during additional interviews with the prosecutors. ROA.10093–94. Records of those interviews have been withheld from Medina.

Holmes's and Juarez's new versions of events diverged significantly from each other and were contradicted by other evidence. Juarez, whom Holmes had threatened, claimed that only she and Pooran wrapped the guns and they disposed of them by throwing them over a fence. ROA.10151–54. Juarez added Holmes to the story only on cross-examination but said—contrary to the physical evidence—that he did not handle or wrap the weapons. ROA.10172. Juarez also claimed that Medina called her the day after he was arrested and told her to dispose of the gun. ROA.10150–51. But on the day he was arrested, Medina had already correctly told police that Holmes had disposed of the gun. ROA.1857.

At trial, Holmes initially denied disposing of the weapon. ROA.10093. After a reminder from the prosecutor that "we had a discussion about this several months ago," Holmes reversed course and claimed that he personally wrapped the guns. ROA.10093–97. In

Holmes's version, Juarez was not involved at all. *Id.* Holmes testified that after the crime, he next saw the gun a week after the shooting, when he wrapped it in plastic and disposed of it at Pooran's house. ROA.10094–95. But Moore's sister's neighbor—who trial counsel never interviewed and who did not testify—saw Holmes with the gun at Moore's sister's apartment shortly after the shooting. ROA.2028–29.

## H. Guerinot and Millin were appointed as Medina's defense counsel six months before trial.

The trial court appointed Gerard Guerinot as first chair and Jack Millin, a man terminally ill with stomach cancer, as second chair. Guerinot was "a lawyer best known for losing," his clients were more than twice as likely to receive a death sentence compared to the overall rate of death sentences in Harris County at the time. ROA.1439–41. He stopped receiving appointments to capital cases after the 2001 Fair Defense Act required Texas counties to certify counsel as competent to handle capital cases. *Id.* Twenty Guerinot clients were sent to death row. *Id.*

Medina's trial started just six months after Guerinot was appointed. ROA.1416. Between the time of his appointment and the beginning of trial, Guerinot tried three unrelated capital cases to verdict. ROA.1442–45. Each resulted in a death sentence. *Id.* In that time span,

Guerinot also tried one non-capital murder case and an aggravated sexual assault of a child. *Id.* Guerinot carried an additional 174 criminal cases, while also maintaining a part-time job as the City Attorney for Humble, Texas. ROA.2371, 2376–2418.

Millin tried two capital cases and an aggravated sexual assault case between the time of his appointment and Medina's trial. ROA.1444–46. Both capital trials resulted in death sentences. *Id.* Throughout, Millin's health was in serious decline as he fought terminal stomach cancer. Before trial, Millin had a shunt placed in his chest through which he received nutrients and medication. ROA.1960, 1963. Millin missed entire afternoons of Medina's trial to receive chemotherapy. *Id.* Millin died less than two months after Medina was sentenced to death. ROA.1963, 2253.

Three months after his appointment, Guerinot retained investigator John Castillo and his associate Pam Bosse-Hamilton as investigators. ROA.1971. Castillo and Bosse-Hamilton worked on Medina's case twice over the following month; once when one of them spoke to Medina, and once when one spoke to Medina's sister. *Id.*

The investigation resumed six days before jury selection, when the investigators first attempted, unsuccessfully, to find witnesses. *Id.* The

following day, they interviewed eight witnesses by telephone. *Id.* They interviewed two more by phone the day after that. *Id.* On the Saturday before voir dire, they took "[v]ideo and still photos of [the] scene area." *Id.* With that accomplished, the defense deemed its guilt-phase investigation complete. *Compare* ROA.1988–91 *with* ROA.1971–72. All told, Medina's investigators spent just 30 hours investigating for both phases of the trial. ROA.1971–72.

The prosecution noticed 28 guilt-phase witnesses; the defense spoke to just three. ROA.1971–72. The defense failed to interview key prosecution witnesses—including Holmes, Juarez, and Valadez—and compelling defense witnesses, including Nacoste, McNickles, Crawford, Becerra, and Villanueva.

## I.  The Guilt Phase of Trial

### 1.  The State's Background Witnesses

State's witnesses testified about the HTC-LRZ feud and the local gang culture. Marco Martinez testified to an ongoing conflict between him and Medina. But Martinez testified that he had never spoken to Medina and that Medina had never threatened him. ROA.9798, 9803. He claimed that when they were younger, he and Medina used to "giv[e] each

other dirty looks or, you know, stuff like that." ROA.9759. In the year prior to the shooting, Martinez saw Medina only once; Martinez drove by Medina's house, the two exchanged gang signs, and Medina briefly brandished a weapon. ROA.9759–63.

The State introduced evidence of other attacks on the Rodriguez residence. In July 1995, the Rodriguez home was the target of a different drive-by shooting. ROA.9822–23. On another night, someone threw a Molotov cocktail at the house. *Id*. The windows of Rodriguez's car were smashed at one point, and both the car and the garage were "tagged" with gang graffiti. ROA.9595–97.

Medina was in bootcamp when the attacks occurred and not responsible for them. ROA.10362. The State's pretrial disclosures nonetheless identified them as "[e]xtraneous offenses, wrongs, or bad acts committed by the defendant." ROA.1995. Under Texas law, extraneous offenses of this kind are only admissible if the State proves them beyond a reasonable doubt and may only be considered for a limited purpose, such as motive. TEX. R. EVID. 404(b). Yet, Guerinot inexplicably failed to request any limiting instructions concerning these extraneous offenses.

ROA.1966. Guerinot later admitted he had performed deficiently in this regard. *Id.*

Maurice Argueta,[4] one of the Ingomar Way partygoers, testified that Medina fired the "AK" just before the brawl began. ROA.9923–24. When he was interviewed by police, however, Medina admitted to handling the weapon during the Ingomar Way brawl. ROA.1856–57. When asked to identify Medina, Argueta initially testified that Medina was *not* in the courtroom. ROA.9910. The prosecutor then identified Medina for him. *Id.* "Well, now I know who he is," Argueta stated, before explaining "I didn't recognize him at first." ROA.9912. Guerinot did not object to this improper identification. Nor did Guerinot impeach Argueta, a self-described family-oriented peacemaker, with his prior criminal record which included convictions for elder abuse and tampering with a government record. ROA.2059, 2061, 2066. Guerinot likewise failed to cross-examine Argueta as to the fact that he was under indictment for cocaine possession and sexual assault. ROA.2061, 2068.

---

[4] Argueta's name was erroneously recorded as "Arguenta" in the court transcriptions.

Leon Guy testified that he saw the hand of the shooter and it was "white or Mexican." ROA.9658. In addition to admitting to being "dead drunk" at the time, Guy also testified that the car he saw was a light-colored two door. ROA.9663, 9665. When shown a picture of Moore's car—which everyone agreed was used in the shooting—Guy said it did not resemble the car he saw. ROA.9665. He ultimately admitted he could only tell the jury that he "heard some gunshots go off." ROA.9669. Guerinot did not impeach Guy with his lengthy criminal record, which included felony convictions for burglary and robbery. ROA.2083–89. Nor did Guerinot cross-examine Guy about the fact that he was on parole at the time of the shooting.

The State introduced letters that Medina had written while in pretrial detention expressing remorse for his lifestyle and bad things he had done, but not admitting to the shooting. ROA.10187–91.

## 2. The State's Key Witnesses

The State's case ultimately came down to the testimony of Holmes, Moore, Valadez, and Juarez. ROA.1557–58.

### a. Jamie Moore

Moore admitted to being a convicted felon and former member of the Rolling 60's Crips. ROA.1655–57. Moore's testimony contradicted his sworn statement to the police. For instance, Moore told police that Valadez had disposed of the murder weapon. ROA.1894–95. But at trial, Moore testified that Holmes discussed disposing of the murder weapon. ROA.9874. Moore also told police that the shooting occurred while driving back to Guerrero's party after going to a "house that belonged to one of the little Mexican girls." ROA.1893. But at trial, Moore testified the drive-by occurred when they were leaving Guerrero's party. ROA.9850–51.

Guerinot did not point out these inconsistencies. Instead, Guerinot attacked insignificant aspects of Moore's characterizations of the gun, including whether the shade of red Moore described truly matched the color of the gun's stock. ROA.9888–89. Guerinot also failed to cross-examine Moore about being on parole, which gave him a strong incentive to testify favorably for the State. ROA.2029, 2070–74 (showing Moore was sentenced to 10 years in prison in 1992). Guerinot instead established that he and Moore had never spoken before trial. ROA.9878.

Apparently unaware that Moore was one of the three State's witnesses that his investigators managed to telephone before trial, ROA.1971, Guerinot also sought Moore's admission that "everybody you've talked to about this was from the State." ROA.9878–79.

### b. Johnny Valadez

Valadez was fourteen years old and incarcerated in TYC when he testified. ROA.9966–67. Contrary to his sworn statement to the police, Valadez testified that there had been seven—not six—people in the car. *Compare* ROA.9981 *with* ROA.1898. The newly added occupant was Juarez. *Id.* Valadez testified that the seven left Guerrero's party in Moore's car with Medina in the backseat. ROA.9981.

Because his testimony conflicted with the State's theory that Medina fired from the front seat of the car, the State impeached Valadez with his sworn statement to police that Medina was sitting in the front. ROA.9982–83. Valadez then explained for the first time that Moore pulled the car over just before the drive-by, allowing Medina to switch from the back to the front seat. ROA.9984. Valadez testified that "[w]hen they stopped to switch, I think they got the gun from the trunk." *Id.* Despite his testimony that he saw Medina take the gun from the trunk,

that he saw Medina switch to the front-passenger seat, and that he saw Medina cock the gun, Valadez stated that he was unaware that Medina was going to shoot the gun. ROA.9989–90.

According to Valadez, the group drove back to Guerrero's party after the shooting. ROA.9991. Valadez remembered for the first time at trial that Medina allegedly said he thought he had shot a girl and "saw fat meat flying off," a highly graphic and aggravating detail that was absent from his sworn statement to police. ROA.9991–92.

Guerinot did not cross Valadez, or any other witnesses, about the car stopping just before the shooting to retrieve the gun from the trunk of Moore's car. ROA.9981, ROA.1898–99. If true, the occupants of the car—and particularly the driver, Moore—knew that they were about to commit a drive-by shooting. Nor did Guerinot cross Valadez on his addition of Juarez to the car during the drive-by, something which she vehemently denied.

### c.   Dominic Holmes

Contrary to Moore and Valadez, Holmes testified that the shooting occurred after the brawl at Ingomar Way. ROA.10074–81. Holmes could not remember where or for how long they drove after the fight, or whether

they drove to another place before the shooting. ROA.10081–83. He could not remember how the gun got into the car. ROA.10084. And Holmes could not remember if the car stopped so that someone could get a gun from the trunk. *Id.*

But when it came to the shooting, Holmes was able to remember specific cars at the scene, along with their respective colors and where they were parked, as well as particular people and the clothing they wore—none of which was in his sworn statement to police. ROA.10084–85.

Holmes initially denied disposing of the weapon. ROA.10093. After prompting from the prosecutor that he and Holmes "had a discussion about this several months ago," Holmes testified that he wrapped the guns at Pooran's house. ROA.10093–96.

Guerinot did not cross Holmes with his statement to police swearing that he did not know what had become of the murder weapon and had never talked with anyone about what happened that night. ROA.1887. For all the jury knew, Holmes had been truthful about disposing of the murder weapon from the beginning. Nor did Guerinot

emphasize the new details in Holmes's account or the inconsistencies between his and Valadez's versions of events.

Instead, Guerinot inexplicably accused Holmes of smoking crack before the shooting occurred. ROA.10102. Crack made no appearance in the record until this point in the trial. Guerinot then had Holmes repeat his direct testimony before accusing Holmes of being the shooter, which Holmes denied. ROA.10109.

### d. Regina Juarez

Juarez testified that, on the night of the shooting, she went to Guerrero's party with Pooran, Ponce, and Medina. ROA.10134. Contrary to Valadez, Juarez testified that she was not in the car when the shooting occurred. ROA.10135–37. Rather, she testified that Medina later told her that he had shot some people. ROA.10139.

Juarez testified that she and Pooran disposed of the murder weapon at Medina's request. ROA.10150–54. She also testified that two months later, on March 7, Medina called her from jail and asked her to frame Holmes for the shooting, which she briefly agreed to do. ROA.10155.[5]

---

[5] The State never produced a recording or transcript of this alleged call.

Guerinot did not cross Juarez with her statement to police, in which she swore under oath that she had not disposed of the murder weapon, ROA.1910, and misled HPD into dispatching a team of divers for a fruitless effort to recover the weapon from the bayou. *Id.*, ROA.1906. Nor did he ask whether she had ever threatened a potential witness in a criminal case. Guerinot only noted that he and Juarez had never spoken before and accused her of having attempted suicide. ROA.10158–59.

Guerinot also asserted that Holmes told Juarez that he had done the drive-by shooting. Juarez denied this. ROA.10162. Guerinot repeated his accusation, stating that Juarez had previously told other people that Holmes told her that he had done the drive-by; Juarez denied this, too. ROA.10162–63.

### 3.    The Defense Witnesses

The six defense witnesses were family members, people recruited by Medina's family, and Medina himself. Absent the efforts of Medina's family, there would have been no defense.

Medina's sister, Angie, testified that she spoke with Holmes shortly after the shooting and Holmes said the police "had to know it was him."

ROA.10207. Angie clarified that Holmes was referring to himself. ROA.10210.

Medina's father testified that, when Martinez drove by Medina's house flashing gang signs, Medina had not brandished a weapon. ROA.10223–24.

Domingo Valle and Rene Reyna both testified that Holmes asked them whether they knew what he "did to those C's" and told them he "put them hoes to rest." ROA.10238. Valle and Reyna interpreted that to mean Holmes had committed the drive-by. ROA.10238, 10252. The prosecutor emphasized the ambiguity of Holmes's statement, noting that Holmes had not specifically mentioned a "drive-by shooting" or "Campden Hill." ROA.10244–45.

Perez testified to being with Medina all evening and that they were not involved in the shooting. ROA.10280–86.

Finally, Medina recounted the events of the night of the shooting, including the party at Guerrero's and the Ingomar Way brawl. ROA.10311–60. Medina denied involvement with shooting, *id.*, noted that he was in bootcamp at the time of the July 1995 attacks on the Rodriguez home, and explained that he expressed regret in his letters

because his probation had been revoked and he was facing jail time. ROA.10362–65.

In rebuttal, the prosecution called an HPD officer assigned to the "southwest divisional gang unit" who opined that Medina was "not truthful." ROA.10442–44.

### 4.    Closing Arguments and Verdict

The core issue during closing arguments was the credibility of the witnesses. The prosecution insisted the jury should believe Holmes, Moore, Valadez, and Juarez, even though they all testified "different about different times and places and some of the details." ROA.10497. The State argued that these four witnesses had every reason to pretend they knew nothing and had no conceivable reasons for implicating Medina. ROA.10497–98, 10503, 10516. The State opined that—despite their conflicting testimonies—Holmes, Moore, Valadez, and Juarez were "brave kids to come here and have to finger this defendant." ROA.10516. The prosecutor emphasized that the defense had "no explanation of why . . . the three guys in the car would blame one of their friends, one of their gang members, except he did it." ROA.10498–99. The prosecutor placed special emphasis of the credibility of Juarez, asserting that the jury

should believe her because "she's never been in trouble before." ROA.10507. That was categorically untrue. Juarez already had a substantial rap sheet, including a conviction for threatening to kill a witness in a criminal case. ROA.1955, 1988–99. Guerinot failed to object to the prosecutor's false statement.

The jury deliberated for ten hours and sent out two notes asking questions, but eventually convicted Medina of capital murder. ROA.10518–23.

## J.    The Punishment Phase

Because trial counsel took essentially no steps to prepare for sentencing, the jury heard little mitigation.

### 1.    Trial Counsel's Lack of Preparation

Though terminally ill, Millin bore all responsibility for preparing the sentencing phase defense. ROA.1988–89. Medina's father repeatedly called Guerinot to assist with trial preparations, but never heard back. ROA.1962. He did not know that there was another attorney on the case until he met Millin at trial. *Id.* Likewise, Medina's sister repeatedly attempted to contact investigator Castillo, but her messages went

unanswered. In May, Medina wrote to Castillo, stating that his sister had been trying to reach him. ROA.1983–86.

Just 26 days before trial—156 days after counsel were appointed— defense counsel filed most of their pretrial motions in Medina's case, including a motion for an independent mental-health expert to evaluate Medina. ROA.1450. Millin argued that deprivation of a mental-health expert would violate Medina's constitutional right to effective representation. *Id.* The court agreed and granted the motion but Millin never hired an expert, thus Medina was never evaluated. ROA.2292.

During voir dire, Millin asked defense investigators to find "character witnesses." ROA.1971. The defense investigators contacted "several" unidentified "character witnesses" four days before opening arguments. ROA.1972. They did no additional work on Medina's case after this. *Id.*

After Medina was convicted, Millin informed Medina's father that he would have to testify at sentencing and that Millin would "ask [him] some questions about Anthony's childhood." ROA.1963. No one told him what questions the defense would ask him, and he was not prepared for cross-examination. *Id.* Medina's family realized that neither Guerinot

nor Millin were prepared to call any other witnesses. ROA.1962. Medina's family located and drove all the witnesses who testified in Medina's defense to the courthouse themselves. ROA.1963.

### 2. The State's Evidence

The punishment phase lasted less than a day. The State called eight witnesses. A rival gang member testified that Medina and another LRZ member had driven by his house and Medina had fired a weapon from the car. ROA.10610–18. No one was injured in the incident. *Id.*

Medina's former acquaintance testified that the two had gotten into mischief together, slashing tires and pushing cars through intersections. ROA.10539–58. A police officer testified that he arrested Medina in 1993 for car thefts. ROA.10559–64. Two individuals testified their cars had been stolen from their homes and were subsequently destroyed by fire. ROA.10592–607.

A probation officer described the terms of Medina's probation for the offenses. ROA.10574–75. Medina had been trying to make restitution payments, had paid his child support, and filed a petition to legitimize his child. ROA.10582. She nonetheless noted that Medina was behind on

his restitution and had not fully legitimized his child by the deadline. ROA.10571–72.

The State also presented two victim impact witnesses. ROA.10629–49.

### 3.   The Defense Witnesses

The entire defense case lasted just *sixty-five minutes*. ROA.10653; 10727. Seven witnesses testified, all unprepared and most with just a few hours' notice. ROA.1963, 2253, 2256, 2259, 2262. Millin elicited scant information from his witnesses:

- Medina was a respectful son, ROA.10657, 10661, 10671–72, 10683–84, 10692–94, 10697–98, 10711;

- Medina loved, and got along with, children, ROA.10693, 10713;

- The Medinas were a close family, ROA.10661, 10670–71, 10714;

- Medina did not start getting in trouble until he was 14 years old, ROA.10657, 10686, 10711–12.

The State exploited these characterizations. If Medina came from a great family with every opportunity, the State argued, there was no mitigating reason for his behavior. ROA.10664, 10689, 10703–04, 10720–21. The State argued that, other than a childhood stutter, Medina suffered no adversities in life and came from a stable home. ROA.10663–

65. And it highlighted that no one in the family knew about their respectful son's double life as a gang leader. ROA.10665–66, 10675–77, 10686–88, 10700–03, 10716, 10724–25.

### 4. Punishment-Phase Closings

During closing arguments, the defense attempted to argue themes for which they had no evidence, which only highlighted the absence of mitigating evidence. While acknowledging "I'm not any sociologist or anything like that," Millin hypothesized that Medina's childhood stuttering could have left "a psychological scar." ROA.10756–57. Having failed to consult a mental-health expert, however, Millin had no evidence to support his hypothesis.

Millin also attempted to argue that Medina's clean custodial record suggested he would not be a future danger in prison. ROA.10746–47. But the defense had not introduced any evidence concerning Medina's behavior in custody. Consequently, the court sustained the prosecution's objection to Millin's argument and ordered him to "stay in the record." ROA.10747.

Despite receiving almost no mitigation evidence, the jury deliberated for two days before sentencing Medina to death. ROA.10536, 10783.

## POST-TRIAL PROCEEDINGS

### A.    Direct Appeal

The Texas Court of Criminal Appeals ("TCCA") affirmed Medina's conviction and sentence on October 6, 1999. *Medina v. State*, 7 S.W.3d 633 (Tex. Crim. App. 1999). The United States Supreme Court denied his petition for writ of certiorari on May 1, 2000. *Medina v. Texas*, 529 U.S. 1102 (2000).

### B.    State Habeas Proceedings

Medina's state habeas application made numerous allegations supported by extensive extra-record evidence. His allegations that trial counsel were ineffective at both phases were supported by:

- Declarations from numerous available witnesses who were never contacted by the defense, ROA.1630;

- Documentation that the defense conducted only a cursory, eve-of-trial investigation, ROA.7549–50;

- Evidence that counsel ignored the family's attempts to contact them and assist the defense, ROA.7552;

- Evidence that counsel did not meet with his family until the trial, *id.*;

- Evidence that Medina's family gathered the scanty defense witnesses presented at trial after they realized counsel had not secured any witnesses, ROA.7552–53;

- Evidence that counsel's "superficial and slipshod investigation," was due to counsel's marathon of unrelated death penalty trials, which consumed most of the six months between appointment and trial, ROA.7193–98;

- An affidavit from Guerinot admitting he mistakenly failed to request a limiting instruction with respect to extraneous offenses, ROA.7533;

- An affidavit documenting that, during the post-conviction process, Guerinot was completely unfamiliar with Dallas Nacoste—a critical defense witness identified in police reports whom Medina had asked counsel to contact, ROA.6302–03,[6] 6235.

The State contested Medina's factual allegations at every turn. It waved away Medina's overwhelming evidence that trial counsel were too busy to adequately prepare for trial. The State instead asserted that trial counsel strategically declined to present evidence after performing a thorough pretrial investigation. ROA.6792.

---

[6] Six months later, Guerinot signed an affidavit claiming that he did not call Dallas Nacoste to testify because he did not believe Nacoste was a credible witness. ROA.6831.

The State's only evidence of the allegedly thorough investigation was Guerinot's affidavit asserting that he spent a "long time investigating the case" and his numerous omissions were all strategic. ROA.6829–32. The affidavit repeatedly misspelled second-chair defense counsel's surname "Millin" as "Mullin." ROA.6829. The State misspelled Millin's surname in the same way throughout all pleadings. ROA.6806. Clearly, the State wrote Guerinot's affidavit for him.

After the State filed its answer, Medina filed his second motion for discovery and a hearing in which he identified numerous contested issues of material fact—such as the actual scope and depth of counsel's investigation—incapable of resolution without compulsory process and a hearing. ROA.7679–7729.

Instead of addressing Medina's motions, the court rubberstamped a prosecution-authored order—relying on the untested and unadmitted affidavits of prosecutors and trial counsel—finding no "controverted, previously unresolved factual issues material" to the case, and ordering the parties to submit proposed findings fact and conclusions of law. ROA.6927.

The State's proposed findings and conclusions were categorically partisan. They deemed all of the State's evidence "credible" and all of Medina's "conclusory," "vague," or "unpersuasive." *See, e.g.*, ROA.6986. Upon receiving the State's proposed findings, the trial court conformed to its practice in every contested capital habeas case before it: it adopted all the State's proposed findings of fact and conclusions of law *verbatim*.[7] ROA.6949–7004. The trial court never acknowledged or ruled on Medina's motions for factual development.

The TCCA subsequently adopted the State's findings and denied relief. *Ex parte Medina*, 2009 WL 2960466 (Tex. Crim. App. Sept. 16, 2009).

## C.   Federal District Court Proceedings

Medina filed a federal habeas petition on October 5, 2009, and—after new counsel substituted into the case—an amended petition on May 31, 2011. ROA.17, 683. Subsequently, Regina Juarez acknowledged for the first time that she testified pursuant to a deal with the State.

---

[7] As noted in the district court, the trial court from which Medina's case arises had entered twelve sets of findings of fact and conclusions of law in contested capital habeas corpus cases since the 1995 adoption of Texas's capital postconviction procedure. *See* ROA.4085–87. In all, the prosecution had proposed 1,466 findings of fact and conclusions of law in contested cases, and state court adopted all of them *verbatim*. *Id.*

43

ROA.2488. She also acknowledged that her trial testimony was false. *Id.* Medina thus amended his petition on March 13, 2013. ROA.1403–1769.

The district court stayed Medina's case and ordered him to exhaust available remedies in state court. ROA.3790. Because the district court denied Medina's request to resolve the parties' dispute over which claims were properly exhausted, ROA.3814–16, Medina filed an over-inclusive habeas application in state court in 2015. ROA.5598–5902.

The TCCA dismissed Medina's application without reviewing the merits of the claims. ROA.5570–71. Four judges concurred, explaining that the claims had been "completely and thoroughly reviewed and rejected" in a prior proceeding. ROA.5573.

Upon returning to federal court, Medina argued that all claims had been exhausted, that the § 2254(d) relitigation bar did not apply to his claims, and that federal review of his claims was not otherwise procedurally barred. ROA.4039–4180, 4262–4324.

Medina also moved for discovery and a hearing. ROA.4337–79, 4439–86. Medina explained that he had exhausted all available self-help remedies, including Texas's Public Information Act ("PIA"). ROA.4371–74; *see also* ROA.4119–39 (demonstrating that the HCDAO has

repeatedly failed to disclose *Brady* information in response to PIA requests but divulged it when compelled by a court). Medina's discovery requests related to the merits of his claims, the applicability of § 2254(d), and the existence of cause and prejudice to overcome any procedural defaults. *Id.* He noted that neither § 2254(d) nor § 2254(e) bar petitioners from developing evidence regarding procedural issues. ROA.4340–41 (citing *Barrientes v. Johnson*, 221 F.3d 741, 768 (5th Cir. 2000)).

The district court subsequently granted summary judgment for Respondent, denied all of Medina's pending motions, and denied any COA. ROA.4662–4754.

Medina timely moved the district court to amend its judgment, noting that the district court had misread the record in several significant respects. ROA.4758–92. In response, the Respondent, *inter alia*, conceded both that the court had erred and—after years of arguing to the contrary—that Medina's guilt-phase ineffectiveness claim was properly exhausted. ROA.4813–17. Despite these concessions, the district court denied Medina's motion. ROA.4828–33. Medina then filed his notice of appeal. ROA.4834–36.

# ARGUMENT

## A. This Court should certify an appeal of Medina's claim that trial counsel were ineffective at the guilt phase.

### 1. This is a substantial claim.

Medina has made a substantial showing that he was denied his Sixth Amendment right to effective counsel at the guilt phase.

#### a. Trial counsel performed deficiently.

A defendant is denied the effective assistance of counsel when "counsel's performance was deficient" and the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance occurs when "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The Supreme Court has established that "norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable.'" *Padilla v. Kentucky*, 599 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). According to those standards, "'[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case.'" *Hughes v. Vannoy*, 7 F.4th 380, 388 (5th Cir. 2021) (quoting *Rompilla v. Beard*, 545 U.S. 374 (2005)).

Counsel's investigation should include, at a minimum, interviews of "eyewitnesses or other witnesses having purported knowledge of the events surrounding the offense itself." AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES § 11.4.1(D) (1989). "[T]rial counsel must not ignore 'pertinent avenues of investigation' or even a single, particularly promising investigation lead." *Charles v. Stephens*, 736 F.3d 380, 390 (5th Cir. 2013) (quoting *Porter v. McCollum*, 558 U.S. 30, 40 (2009)).

If trial counsel's "[p]urportedly tactical decisions" are "not preceded by reasonable investigations," they "are not sufficiently informed and thereby not entitled to the 'deference typically afforded' to trial counsel's decisions." *Neal v. Vannoy*, 78 F.4th 775, 790 (5th Cir. 2023) (quoting *Escamilla v. Stephens*, 749 F.3d 380, 392–93 (5th Cir. 2014)). Where the circumstances demonstrate that counsel's purported strategic choice is a "'post-hoc rationalization' rather than a genuine account of her decision-making process," trial counsel's actions are not afforded deference. *Richards v. Quarterman*, 566 F.3d 553, 569 (5th Cir. 2009) (quoting *Wiggins v. Smith*, 539 U.S. 501, 526–27 (2003)).

Counsel tried Medina's case only six months after their appointment. ROA.1416. During those six months, Guerinot tried three other unrelated death penalty cases to verdict, as well as another murder case and an aggravated sexual assault case. ROA.1442–43. Millin tried two capital cases and an aggravated sexual assault case. *Id.* The defense's guilt-phase investigation consisted of ten phone calls over two days and a visit to the crime scene, all on the eve of jury selection. ROA.1971. Of the 28 people on the State's witness list, the defense contacted three. *Id.*

Counsel never contacted Dallas Nacoste, even though he gave police a statement implicating Holmes, accurately reported that Holmes had buried the murder weapon, and Medina identified Nacoste as someone to interview. ROA.1882, 2012. Unlike the prosecution's witnesses, Nacoste truthfully told police about the whereabouts of the murder weapon months before it was recovered. ROA.1882. Nacoste later heard Holmes confess to the shooting, plan to blame Medina for it, and threaten to kill anyone who got in his way. ROA.2015–17; *supra* at 8–9.

Trial counsel never contacted Becerra, who could have testified that Holmes sought promotion within LRZ for having pinned the shooting on Medina and threatened to kill Juarez and her family if she did not go

along with his plan. ROA.2034–37. Villanueva, who could have testified that Holmes confessed to the shooting, was not contacted either. ROA.2031–32; *supra* at 17. Nor did counsel interview Crawford, Holmes and Moore's friend, who could have testified that Holmes repeatedly expressed a desire to avenge the death of Lopez and who saw Holmes with a long rifle shortly after the shooting. ROA.2028–29. Finally, trial counsel did not interview eyewitness Carlos McNickles, who lived near the Rodriguez residence and, while on the phone with Chasity Hamilton, saw a Black man firing an AK-type rifle out of a car matching the descriptions of Moore's that was driven by a Black man wearing glasses. ROA.2022–23; *see also* ROA.2025–26 (affidavit of Chasity Hamilton confirming that she heard gunshots while talking to McNickles). Trial counsel's pretrial investigation thus "fell below an objective standard of reasonableness and was constitutionally inadequate." *Richards v. Quarterman*, 566 F.3d 553, 570 (5th Cir. 2009) (state court unreasonably determined that trial counsel's performance was not deficient for failing to interview witnesses); *see also Hughes*, 7 F.4th at 389 (same).

Trial counsel also performed deficiently by failing to interview and subsequently impeach the State's key witnesses with their previous

statements. All parties agreed that Medina's case turned on the credibility of the witnesses, thus pretrial interviews of the key witnesses were compulsory:

> [Counsel] should have interviewed the eyewitnesses. Because there was no physical evidence connecting [the defendant] with the crime, the eyewitness identification of [the defendant] at the crime scene was the cornerstone of the state's case in chief. Consequently, information relevant to [the defendant's] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony.

*Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994). Pretrial interviews of the prosecution's key witnesses would have revealed, *inter alia*, that their trial testimony would conflict with their prior sworn statements and thus counsel would have been prepared to impeach their credibility.

When Juarez testified to hiding the murder weapon, counsel failed to cross her with her sworn statement to police that the gun was likely in a bayou. ROA.1906, 1910, 10158–74, 10177. Counsel also failed to cross Holmes with his sworn statement that he had not seen the murder weapon since the night of the shooting and had no knowledge of its whereabouts. ROA.1887, 10099–113. Counsel's omission left the jury unaware that Holmes and Juarez had lied under oath, the prosecution

knew they lied, and yet they escaped punishment for their perjury. Trial counsel likewise failed to impeach witnesses with their criminal histories or cross-examine them concerning their pending charges or parole status.

Instead, trial counsel blindly lobbed accusations at the witnesses. *See, e.g.*, ROA.10109 (accusing Holmes of committing the murder, which Holmes simply denied). That was deficient performance. *See, e.g.*, *Neal*, 78 F.4th at 795 (holding that the state court unreasonably determined trial counsel was not ineffective where he "shouted at" an alternative suspect and "accused him of being the killer," but "fail[ed] to address the contradictions in" his testimony or show that he had "lied repeatedly").

Finally, counsel himself admitted that he was deficient for failing to request appropriate limiting instructions regarding the July 1995 attacks on the Rodriguez home. ROA.1966; *supra* at 41. This failure was egregious because the prosecution informed counsel that they intended to introduce those specific attacks as extraneous bad acts by Medina. *See also Ex parte Varelas*, 45 S.W.3d 627, 623 (Tex. Crim. App. 2001) (counsel performed deficiently in failing to request limiting instructions concerning extraneous offense evidence).

### b. Medina was prejudiced.

"To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). Viewed cumulatively, counsel's deficient performance prejudiced Medina.

The jury did not hear from Nacoste, Becerra, and Villanueva that Holmes had confessed to the shooting and threatened other witnesses if they did not blame Medina. *Supra* at 8–9, 16–17; *see Hughes*, 7 F.4th at 391 (state court unreasonably concluded that defendant was not prejudiced by failure to present testimony that would have impeached purported eyewitness). The jury also did not hear from an eyewitness whose descriptions incriminated Holmes and Moore, not Medina. *See Anderson*, 338 F.3d at 393–94 (holding that the state court was unreasonable when it concluded that counsel did not prejudice defendant by failing to present eyewitness testimony that could have rebutted testimony of State's two eyewitnesses).

The jury never learned that Holmes and Juarez had lied under oath to the police about the murder weapon. *See Neal*, 78 F.4th at 795 (holding

that the state court was unreasonable when it determined that counsel did not prejudice defendant by failing to show that the State's star witness and alternative suspect lied to police). In addition to undermining their credibility, exposing the State's witnesses' lies to authorities and their criminal histories and pending charges, would have shown their motives to testify favorably for the State. Finally, counsel's failure to request limiting instructions concerning the July 1995 attacks on the Rodriguez home deprived Medina of the reasonable doubt standard Texas law requires before juries can consider extraneous offense evidence. *Ex parte Varelas*, 45 S.W.3d at 635–36 (defendant prejudiced by counsel's failure to request limiting instructions concerning extraneous offense evidence).

Each of these omissions occurred in a case that, by the State's own admission, was a close one. *Strickland*, 466 U.S. at 695–96 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors than one with overwhelming record support."). In Medina's case, the jury deliberated on guilt for over ten hours. The prosecutor recognized this during punishment-phase arguments, stating that "somebody had a problem at the guilt stage of

this case. I know that." ROA.10761. In unrelated court proceedings, the prosecutor would later testify that, "as far as identifying the shooter," Moore, Holmes, Valadez, and Juarez were "all we had." ROA.1557–58. He went on to say that, if the jury had not credited their testimony, "[Medina] would have been found not guilty." *Id.*

### 2. Reasonable jurists could debate the district court's resolution of this claim.

The district court rejected this claim for three reasons. First, it rejected most of Medina's claim on the ground that it had been adjudicated in state court and the state court's decision was not unreasonable. Second, the district court rejected other parts of Medina's claim as unexhausted. Finally, the district court failed to address some parts of Medina's claim. Reasonable jurists could debate each of the district court's holdings.

### a. Reasonable jurists could debate whether the state court adjudicated this claim on the merits.

Medina presented substantial argument demonstrating that the state court proceedings did not satisfy the prerequisites for triggering the § 2254(d) relitigation bar because they did not qualify as an adjudication on the merits and violated due process. ROA.2933–47, 3914–61. The

district court failed to address Medina's arguments and instead rejected them as having "no basis in law" in a terse footnote. ROA.4675 n.15. At minimum, the district court's summary rejection of Medina's arguments—which were grounded in Supreme Court precedent—was debatable.

Section 2254(d) applies to claims adjudicated on the merits in state courts. *Johnson v. Williams*, 568 U.S. 289, 302 (2013). In *Johnson*, the Court explained:

> A judgment is normally said to have been rendered "on the merits" only if it was "delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments." Black's Law Dictionary 1199 (9th ed. 2009) (emphasis added). And as used in this context, the word "merits" is defined as "*[t]he intrinsic rights and wrongs of a case* as determined by *matters of substance,* in distinction from matters of form." Webster's New International Dictionary 1540 (2d ed. 1954) (emphasis added).

*Id.* When a petitioner presents claims in state court, a rebuttable presumption exists that the state court adjudicated them on the merits. *Id.* at 301–03. That presumption is rebutted by showing that the proceedings failed to satisfy the *Johnson* definition of a merits adjudication or that "the factfinding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a

minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007) (quoting *Ford v. Wainwright*, 477 U.S. 399, 423–24 (1986)).

In addition to requiring an adjudication on the merits, application of § 2254(d) likewise requires that state courts comply with due process. ROA.2934, 3960–61. While due process protections are lower in post-conviction proceedings than at trial, *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009), the "fundamental requisite of due process of law is the opportunity to be heard." *Ford*, 477 U.S. at 413 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)); *see also Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (explaining that "rudimentary due process" requires "an effective opportunity" to present one's case, including "by confronting adverse witnesses").

Here, Medina rebutted the presumption that § 2254(d) applied to his claims by showing that the state court procedures were "seriously inadequate for the ascertainment of the truth." *Panetti*, 551 U.S. at 954; ROA.2937–46, 3916–31, 3958–59, 3960–61. Medina requested discovery and an evidentiary hearing to resolve his fact-intensive claims in state court. ROA.2938. But rather than providing any semblance of due

process, the state court abdicated its judicial role to the prosecutor. ROA.3916–22.

Rather than engaging in the substance of Medina's arguments, the district court rejected them in a short footnote:

> Medina raises lengthy arguments which, essentially, contend that the state court adjudication should not merit federal deference because it was too flawed, superficial, or favorable to the State. AEDPA predicates federal deference on the existence of a state adjudication without commenting on the quality of state review. Medina's arguments about the inapplicability of AEDPA deference have no basis in the law. *See Freeney v. Davis*, 737 F. App'x 198, 206 (5th Cir. 2018); *Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012); *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001).

ROA.4675 n.15.

This ruling was debatable for two reasons. First, the district court's footnote failed to acknowledge that the presumptive adjudication on the merits may be rebutted by evidence that a "court" failed to "hear[] and *evaluate[]* the evidence and the parties' substantive arguments," *Johnson*, 568 U.S. at 301–03, or that state court proceedings must comport with due process, *Ford*, 477 U.S. at 413. Contrary to *Johnson* and *Panetti*, the district court essentially created an irrebuttable

presumption of a merits adjudication and rendered the Due Process Clause wholly inapplicable to state post-conviction proceedings.

Second, the cases the district court cited do not foreclose Medina's argument, even in this Circuit. *Freeney* and *Basso* are unpublished opinions. And *Green* and *Valdez* were issued prior to the Supreme Court's *Johnson* decision. The Fourth Circuit has recognized the validity of Medina's legal position. *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) ("A claim is not adjudicated on the merits when the state court makes its decision on a materially incomplete record. A record may be materially incomplete when a state court unreasonably refuses to permit further development of the facts of a claim.") (internal citations and quotations omitted). At minimum, this issue deserves encouragement to proceed further on appeal to permit full consideration.

### b. Reasonable jurists could debate the district court's application of § 2254(d).

The district court held that § 2254(d) precluded merits review of the portion of Medina's claim concerning counsel's failure to prepare for trial. ROA.4705. Reasonable jurists could debate the district court's decision for several reasons.

First, the district court only considered whether the ultimate result reached by the state court was unreasonable. In doing so, it improperly divorced the state court's final conclusion from the factual and legal determinations that conclusion was premised upon. Second, the district court applied an incorrect legal standard to this part of Medina's claim. Based on this standard, the district court held that Medina could only establish prejudice if he presented evidence that was "shocking and starkly different" from the evidence presented at trial. *Id.* (citing *Sorto v. Davis*, 672 F. App'x 342, 350 (5th Cir. 2016)). Finally, reasonable jurists could debate whether the state court's factual and legal conclusions were reasonable.

### i.     The district court erred by ignoring the state court's actual reasoning.

In *Wilson v. Sellers*, the Supreme Court held that, when assessing the reasonableness of a state court's factual or legal determinations under § 2254(d), a federal court must "train its attention on the particular reasons" the state court specified for rejecting the claim. 138 S. Ct. 1188, 1191–92 (2018). But here, the district court simply held that the state court reasonably denied "this portion of [Medina's] *Strickland* claim." *Id.* *Wilson*'s instruction to focus on the state court's "particular reasons" for

rejecting the claim could lead reasonable jurists to debate the district court's ruling.

### ii. The district court applied an incorrect legal standard.

The district court held that Medina's *Strickland* claim was "not viable" unless he adduced "evidence that is 'shocking and starkly different than that presented at trial.'" ROA.4705 (citing *Sorto*, 672 F. App'x at 350). This is not the *Strickland* prejudice standard. The actual standard is significantly lower: Medina need only show—by less than a preponderance of the evidence—that there is a reasonable probability that "at least one juror" would have voted to acquit. *Buck v. Davis*, 580 U.S. 100, 119–120 (2017); *see also Neal*, 78 F.4th at 795. Reasonable jurists could debate whether the district court applied an inappropriately high standard.

Even assuming the district court applied the correct standard, the evidence Medina presented in post-conviction was "shocking and starkly different" from what the jury heard at trial. In post-conviction, Medina presented evidence that:

- an eyewitness described a shooter that looked like Holmes, ROA.2022–26;

- Holmes expressed a strong desire to exact revenge on HTC, ROA.2028;

- Holmes repeatedly confessed to the shooting, ROA.2016, 2031–32, 2035–36;

- Holmes planned to frame Medina, ROA.2016, 2031–32, 2034–36;

- Holmes threatened to kill anyone who interfered with his plan to frame Medina, including Valadez and Juarez, ROA.2016, 2035–36;

- Holmes lied to police and in his trial testimony about disposing of the murder weapon, ROA.1887, 2028–29, 10093–97; and

- Juarez lied to police and in her trial testimony about disposing of the murder weapon, ROA.1910, 1579, 10151–54.

### iii. The state court's determination that trial counsel was not ineffective for failing to investigate and interview witnesses was legally and factually unreasonable.

The district court did not engage with Medina's arguments concerning the unreasonableness of the state court's factual findings, but instead simply recited them. Reasonable jurists could debate the district court's decision.

The state court record contained evidence that Guerinot had never heard of Nacoste and had never seen his statement, which both courts ignored. ROA.2019–20. In his prosecution-drafted affidavit, Guerinot

gave no reason for failing to interview Nacoste. He nonetheless purported to have made a strategic decision not to call Nacoste as a witness because Nacoste's "credibility was even lower than other witnesses." ROA.6981. Guerinot gave no explanation for Nacoste's purported lack of credibility.

Defending his purportedly strategic decision not to interview a key witness, Guerinot explained that he "was able to call other witnesses in an attempt to blame [Holmes]." ROA.6831. Both the state court and district court blindly credited this assertion. ROA.6981, 4703. But without interviewing Nacoste, Guerinot could not have known whether Nacoste would make a credible witness. Nor could he have known the ultimate value of Nacoste's testimony. Indeed, this Court has

> squarely rejected the argument made by the State here—that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses would not have been credible. Acknowledging that a lack of credibility might support a strategic decision not to call a witness to *testify* at trial, we explained that a witness's character flaws cannot support a failure to *investigate*. Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."

*Anderson*, 338 F.3d at 392 (quoting *Bryant*, 28 F.3d at 1419) (emphasis in original); *see also Hughes*, 7 F.4th at 389 (counsel could not have strategically decided not to interview a witness based on the apparent

credibility of her witness statement). If anything, Nacoste—who was the first to tell police that Holmes had buried the murder weapon—was more credible than any of the witnesses Guerinot presented. ROA.1882.

The state court and district court also stated that "Nacosti's [sic] habeas affidavit gives essentially the same version of the offense that he gave in his statement to police." ROA.6980, 4703. That is plainly incorrect. Beyond adding detail concerning the night of the shooting, Nacoste's affidavit also recounts critical events that occurred *after* he gave his police statement. Specifically, Nacoste describes Holmes's confession to the crime, his plan to blame Medina, and his threat to harm anyone who did not go along with his plan. ROA.2016.

Guerinot also failed to interview other key witnesses, such as McNickles, Becerra, Villanueva, or Crawford. ROA.2023, 2029, 2032, 2037. The state court's findings concerning those witnesses focus solely on prejudice. ROA.6980–81.

The state court summarily dismissed McNickles's eyewitness testimony regarding a Black passenger shooting a gun from a car resembling Moore's because it "does not exculpate" Medina. ROA.6980. That is plainly unreasonable. The district court attempted to diminish

McNickles's significance by erroneously describing him as saying "that an hour and a half *before* the murders, two men were joyriding and firing a weapon in a *different* street in a *different* vehicle than that seen by witnesses at the shooting." ROA.4703–04 (emphasis added).

McNickles did not state that he saw the car at 1:00 a.m., he saw the car "some time after 1:00 a.m." ROA.2022, 6980. Although McNickles did not live on the Rodriguez's street, he lived nearby, in the same subdivision, and on a street that terminates into Campden Hill, where the crime occurred. McNickles's description of the car, a "late 80's dark blue four-door Park Avenue-type car" almost exactly matches Moore's car, which was a black, four-door 1989 Oldsmobile Eighty-Eight Royal. ROA.2022. His description of the driver as a Black man with glasses also fits Moore. Reasonable jurists could debate the district court's conclusion that McNickles's testimony was not exculpatory and whether it violated *Wilson* by inventing a new, erroneous rationale to support the state court's finding. *See supra* at 59.

The state and district court also unreasonably dismissed Becerra's and Villanueva's affidavits as merely "corroborate[ing] Regina Juarez's trial testimony that she agreed at one point to participate in a plan to

blame 'Flaco' Holmes for the shooting." ROA.6981, 4704. Villanueva and Becerra did not corroborate Juarez's testimony. They both stated that, in January, Juarez told them that Holmes had admitted to the shooting. ROA.2031–37. Juarez testified that Medina's purported plan to blame Holmes occurred two months later, in March. ROA.10155. Moreover, Villanueva stated that Holmes confessed directly to him, ROA.2031, and Becerra stated that Holmes sought promotion within the gang "for getting [Medina] locked up." ROA.2036.

Finally, Jason Crawford reported that Holmes said LRZ had something planned for HTC. ROA.2028. Both the state court and district court concluded that this was "as incriminating to [Medina] as it is to other LRZ gang members." ROA.4704. But this ignores the rest of Crawford's affidavit describing Holmes as particularly close to Lopez, his tattoo in Lopez's honor, and his repeated statements expressing a personal desire to exact revenge on HTC. ROA.2028. Those facts are not "as incriminating to" Medina as they are to Holmes.

Crawford also swore in his affidavit that he saw Holmes with a rifle wrapped in a towel at Angie Moore's house shortly after New Year's. ROA.2028–29. The state court and district court found that Crawford's

statement merely "corroborates trial testimony that [Holmes] along with others, helped hide the guns." ROA.6981, 4704. But Crawford's statement does not corroborate Holmes's trial testimony that he did not see the gun after the shooting until he helped bury it at Pooran's house. ROA.10094–95. If Crawford saw Holmes with the murder weapon at a different location before the gun was buried, Holmes lied on the stand.

Reasonable jurists could debate whether the district court erred by impliedly finding that the state court factual findings were not unreasonable.[8] Reasonable jurists could also debate whether the state court's legal conclusion that trial counsel was not ineffective was contrary to or involved an unreasonable application of clearly established federal law. 28 U.S.C. §2254(d)(1).

### c.  The district court erred regarding trial counsel's failure to impeach witnesses.

Holmes, Juarez, Moore, and Valadez all testified inconsistently with their sworn statements to police. *See supra* at 27–32. This was especially true with respect to Holmes and Juarez, who both denied

---

[8] Although the district court did not discuss it in connection with this claim, the above discussion also shows why reasonable jurists could debate whether Medina has rebutted the presumption that the state court's factual findings were correct by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

seeing the murder weapon after the night of the shooting. ROA.1887, 1910. The district court either ignored these allegations or incorrectly deemed them unexhausted. Either way, reasonable jurists could debate the district court's resolution of the allegations.

Holmes swore to police that he had not seen the rifle after the shooting. ROA.1887. This changed once his palmprints were found on the bag in which the murder weapon was buried. ROA.10094–95. Medina alleged trial counsel failed to impeach Holmes with these facts. ROA.1530–31. The district court nonetheless ignored the allegation. For the reasons set forth in Section A(1), *supra*, reasonable jurists could debate whether trial counsel performed deficiently when he failed to cross Holmes on his lies about the murder weapon.

Juarez, too, lied to the police. She swore that the gun was likely disposed of in a bayou, causing the police to dive for it. ROA.1906, 1910. After the weapon was discovered, Juarez testified she that she buried the murder weapon with Pooran and Holmes. ROA.10151–54.

The district court held that "despite ample opportunities to do so," Medina never exhausted his argument that Guerinot should have crossed Juarez with her inconsistent sworn statement. ROA.4705 n.32. As

Medina did in fact make these allegations in his 2015 state habeas application, ROA.5698–5703, reasonable jurists could debate the district court's procedural decision.

With respect to Guerinot's failure to impeach witnesses with their criminal records or cross-examine them with pending charges or parole status, the district court cited the state court's findings that Guerinot, despite being "aware of the criminal histories of the witnesses," purportedly made a "strategic decision to impeach each witness based on that witness's testimony and action." ROA.4706, 6930. Impeaching a witness based on their "testimony and action" is hardly mutually exclusive with impeaching him with his criminal history. Moreover, Guerinot's affidavit does not describe any strategic reason for not using the witnesses' criminal histories. ROA.6830 (stating only that he reviewed the criminal histories and "attempted to impeach each witness based on that witness's testimony and actions"). And in closing, counsel actually *emphasized* the criminal histories of some State's witnesses, virtually all of which the State had elicited on direct. ROA.10475, 10482.

As to Guerinot's failure to cross-examine witness concerning their pending charges and parole status, the district court noted only that

"prior arrests and juvenile records" cannot be used for impeachment purposes under Texas Criminal Rule of Evidence 609. ROA.4706. Cross-examining a witness concerning pending charges and parole status is different from generally impeaching a witness's credibility under Rule 609. Pending charges or parole gives a witness a reason to testify favorably for the state. For precisely this reason, "[t]here exists a long line of federal and state authority holding a pending criminal charge is an appropriate area of cross-examination." *Carrol v. State*, 916 S.W.2d 494, 499 (Tex. Crim. App. 1996); *see also Davis v. Alaska*, 415 U.S. 308, 319 (1974) (Confrontation Clause requires that even juvenile parole status can be subject of cross-examination). The district court said nothing about Guerinot's failure to object when the prosecutor falsely stated in closing that Juarez had "never been in trouble before." ROA.10507. Reasonable jurists could debate all of the above determinations.

    **d.**    **The district court erred in failing to find that trial counsel was ineffective for not seeking limiting instructions regarding extraneous offenses.**

Although the State informed trial counsel that it would be presenting extraneous-offense evidence concerning the July 1995 attacks

on the Rodriguez home, counsel did not request limiting instructions, even though Medina, who was incarcerated, could not have committed those attacks. ROA.10361–62. Guerinot admitted to having no strategic reason for this omission. ROA.1966. Guerinot also agreed the defense would have been entitled to the instructions if requested. *Id.* The state court simply ignored Guerinot's confession of error.

The district court held that counsel's failure to request limiting instructions was not deficient because the defense was not entitled to the limiting instructions. ROA.4711. Reasonable jurists could debate the district court's ruling.

The district court characterized the July 1995 attacks as "same transaction contextual evidence" for which limiting instructions are not required. *Id.* But no party to the state or federal proceedings had suggested that the extraneous-offense evidence was admitted as same-transaction evidence. Texas law makes clear that it cannot be. *See, e.g.*, *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005) (defining same transaction contextual evidence as events that are "intermixed, blended, or connected [with the charged offense] so as to form an indivisible criminal transaction").

In response to Medina's Motion to Alter or Amend Judgment, the district court emphasized its alternative conclusion that Medina had not shown prejudice. ROA.4833. But, given the similarity between the July 1995 attacks and the New Year's Eve shooting, that decision is likewise reasonably debatable. *Ex parte Varelas*, 45 S.W.3d at 623 (holding that defendant was prejudiced when trial counsel failed to seek limiting instructions concerning evidence of extraneous offenses similar to charged offense and against same victim).

### e. The district court erred in refusing to permit fact development.

Medina diligently sought factual development of this claim throughout the state and federal proceedings. In state court, Medina filed two motions for discovery and evidentiary hearing, ROA.6685–6701, 7679–7729. The second motion was targeted to his allegations of ineffective assistance of counsel and many areas in which Guerinot's affidavit contradicted the record evidence. ROA.7679–7729. The state court did not grant any factual development.

Medina renewed his request for discovery and an evidentiary hearing in federal court. ROA.4337–4378, 4439–4485. The district court denied discovery on the ground that "Medina has not shown that he has

met the requirements of § 2254(d)(1)." ROA.4751. As set forth above, reasonable jurists could debate that conclusion.

Medina has raised a substantial claim that trial counsel were ineffective at the culpability phase of his trial, and reasonable jurists could debate the district court's resolution of this claim.

## B. This Court should certify an appeal of Medina's claim that trial counsel were ineffective at the sentencing phase.

### 1. This is a substantial claim.

Under *Strickland*, Medina must show deficient performance and prejudice. 466 U.S. at 688, 694. The Supreme Court has explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Medina presented a substantial claim that trial counsel did neither and that he was prejudiced by that failure. ROA.1600–81.

### a. Trial counsel performed deficiently.

The district court recognized that Medina made "a facially compelling argument that trial counsel's investigation was too superficial and slipshod to comply with constitutional standards." ROA.4731. The court acknowledged that testifying witnesses "had little or no contact with the defense" and that trial counsel appeared to limit their mitigation

investigation "to a few courtroom hallway conversations." ROA.4731; *see also* ROA.4732 ("Billing records also suggest that the defense spent a limited amount of time investigating."). This superficial and slipshod investigation was the inevitable product of trial counsel's excessive caseloads and assigning sole responsibility for a capital sentencing phase defense to a lawyer dying of cancer. ROA.1988–89.

A reasonable lawyer would have investigated Medina's home life, his school performance, and his history of gang involvement before developing a sentencing-phase defense. *See Porter*, 558 U.S. at 39; *Wiggins*, 539 U.S. at 527; *Sears v. Upton*, 561 U.S. 945, 953 (2010) (holding that a defendant may still be prejudiced by counsel's failure to perform a reasonable mitigation investigation even if counsel's defense theory at trial was reasonable in the abstract). As trial counsel recognized, a mental health evaluation was necessary for constitutionally effective representation in Medina's case. ROA.1450, 2292; *see Rompilla*, 545 U.S. at 392–93; *Wiggins*, 539 U.S. at 523–24. Yet, counsel waited until the eve of trial to request and obtain funding for an evaluation and then failed to procure one.

As explained *supra* at 35–36, trial counsel waited until the days before trial to begin a sentencing phase investigation, by which time it was too late. Although trial counsel called several witnesses to the stand, "the record leaves no doubt that counsel's investigation to support that case was an empty exercise." *Andrus v. Texas*, 140 S. Ct. 1875, 1882 (2020); *see* ROA.1958, 2253–63. Trial counsel did not meet Medina's father until trial began, and he did not meet Medina's mother until she took the stand. ROA.1958, 1962; *see Wiggins*, 539 U.S. at 526–27; *see also Andrus*, 140 S. Ct. at 1882. Except for some brief pretrial discussion, trial counsel did not meet with any of the witnesses until partway through the sentencing phase. ROA.1958–60, 2253–63; *see Williams*, 529 U.S. at 395 (noting that "counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial."). And counsel did not prepare the witnesses or go over their testimony before calling them to the stand. ROA.1958–60, 2253–63; *see Williams*, 529 U.S. at 395. The sixty-five minute sentencing phase defense did not reflect an absence of mitigation; it reflected counsel's superficial and slipshod investigation.

### b. Medina was prejudiced.

Medina made a substantial showing that, had counsel adequately investigated Medina's background, there is a reasonable probability he would not have been sentenced to death. *See Strickland*, 466 U.S. at 694.

Throughout Medina's childhood, his father "was always drunk," ROA.2272, 2254, 2260, 2286, bottles of liquor were always lying around the house, ROA.2254, and his father's drinking created an unstable environment, ROA.2254. Medina's mother coped by self-medicating with marijuana. ROA.2260.

Witnesses described the volatile environment in Medina's childhood home. ROA.2254. For example, when Medina was eight, his parents' altercation erupted into a front-yard screaming match. ROA.2273. Medina's aunt locked herself, her children, and Medina in a bedroom. *Id.* While the children barricaded themselves in the room with a dresser, Medina's father threw his mother on the ground outside and banged her head on the sidewalk. ROA.1959. That night, the kids slept in the barricaded bedroom, Medina's parents slept in the living room, and Medina's mother kept a gun under her pillow and told her husband that "if he came near [her], [she] would shoot." *Id.* Had defense counsel only

asked, numerous family members would have told them about Medina's chaotic childhood home. *Id.*, ROA.2254, 2259, 2274, 2281, 2287.

Because of their substance-abuse issues, Medina's parents were emotionally and physically absent throughout his childhood. ROA.2307–08. Other relatives recognized Medina's need for support and a safe environment. His aunt, Eva Uribe, who trial counsel did not interview before she testified, drove Medina to a school in a different neighborhood because she "had concerns about the environment he was growing up in." ROA.2253, 10681. Teachers at the school felt the same concerns and did their best to support Medina. ROA.2265–66. Medina responded positively to these attempts; on one occasion, Medina rode his bike ten miles through dangerous neighborhoods just to spend the afternoon with his teacher and her family. ROA.2283–84. Although the teachers would have testified in his defense, counsel never reached out to them. ROA.2266, 2284.

Ultimately, the sporadic efforts of teachers and extended family could not compete with the gangs surrounding Medina's home. "Graffiti was real heavy," and "the gang presence was apparent." ROA.2256–57, 2272. Medina and his friends routinely endured gang members chasing

and shooting at them. ROA.2269. The neighborhood was so violent that Medina's extended family was afraid to visit him there. ROA.2260.

At the age of twelve, Medina was targeted in a drive-by shooting after a fight. ROA.2309–10. Medina's best friend—an older teenager and Medina's first male role model—pushed him out of the way and was shot and killed instead. ROA.2310. Medina did not tell his parents; instead, he simply went home and got rid of the bloody clothes. *Id.*

Medina's need for a comprehensive adult intervention to cope with the trauma of his friend's death went unmet. ROA.2314–15. A postconviction mental health evaluation revealed that Medina suffers from PTSD. ROA.2311.

In the absence of a safe environment, Medina sought protection from a gang. Medina's neighbors recalled that the gangs would pressure neighborhood children to join. ROA.2269. The children joined for survival; "[i]f you were not in a gang, you were a 'nobody' and you were an easy target." ROA.2277. For Medina, LRZ became more than a form of protection; it became his surrogate family. ROA.2280, 2315. Both Medina's friends and a retained mental-health expert were able to

connect Medina's gang activity with his trauma and basic need for love and acceptance. ROA.2315.

The jury deliberated for two days despite counsel's anemic and superficial presentation. ROA.10536, 10783. Had counsel adequately prepared a case for life, it is reasonably likely that one juror would have answered a special issue in Medina's favor.

### 2. Reasonable jurists could debate the district court's resolution of this claim.

#### a. Reasonable jurists could debate whether the state court adjudicated this claim on the merits.

For the same reasons as explained in Section A(2)(a), *supra* at 54–58, it is debatable whether the state court adjudicated this claim on the merits and whether § 2254(d) applies.

#### b. Reasonable jurists could debate the district court's application of § 2254(d).

The state court concluded that trial counsel were effective, finding no deficient performance or prejudice. ROA.7000–02. As with the guilt-phase ineffectiveness claim, the district court considered only whether the state court's ultimate conclusion was unreasonable without assessing the state court's actual reasoning. The district court then applied incorrect legal standards to Medina's claim. Reasonable jurists could

debate whether the state court's factual and legal conclusions were reasonable.

### i. The district court substituted its own factual theories when reviewing the state court's conclusions.

The district court misapplied § 2254(d) when it filled "large gaps in the evidentiary record" with its own speculation. ROA.4732. Analysis under § 2254(d) requires scrutiny of the state court's actual reasoning. *Wilson*, 138 S. Ct. at 1192 (when applying § 2254(d), "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable"). Here, the district court repeatedly speculated about what trial counsel may have done or thought, rather than relying on what the state habeas court actually found.

According to the district court, "[t]he possibility remains that [when] counsel spoke with Medina, Medina conveyed [the story of his best friend's death], and trial counsel made a strategic decision to pursue a different defensive path." ROA.4733. There is no basis in the record for the district court's speculation. To the contrary, the district court

recognized that trial counsel's "superficial and slipshod" penalty phase investigation consisted of last-second courthouse meetings.

The state court held that trial counsel "performed his duties and thoroughly prepared for punishment." ROA.6982. The court below never determined whether those conclusions were reasonable in light of the state court record. To the extent it did so based only on speculation, reasonable jurists could debate whether it erred.

Similarly, the district court erred when it precluded federal review under § 2254(d) based on speculation that, had trial counsel known about Medina's chaotic home life or the murder of Medina's best friend, they still could have decided to withhold that evidence. ROA.4734–39. This was not a basis for the state court decision. Moreover, the theoretical possibility that counsel might have made a strategic decision after conducting a professionally reasonable investigation is irrelevant. *Sears*, 561 U.S. at 953 (stating that the reasonableness of a legal theory "does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [the defendant]."). Here, trial counsel could not have made informed strategic decisions about the defense case for life because

the defense investigation was "too superficial and slipshod to comply with constitutional standards." ROA.4731. *See also Wiggins*, 539 U.S. at 528; ROA.2113–18.

### ii. The district court applied an incorrect legal standard.

The district court also misapplied the *Strickland* standard itself. First, the district court faulted Medina for not testifying or providing an "affidavit describing exactly what information he provided his attorneys and their personal response." ROA.4733. While counsel's actions may be reasonably based on information supplied by the client, capital defense counsel must conduct an *independent* investigation into their client's background and social history in preparation for the sentencing phase, even when the client is uncooperative. *Rompilla*, 545 U.S. at 381–82. Medina and his family did not impede the investigation, they repeatedly attempted to contact and assist the defense but trial counsel were too busy trying other cases to meet with them until the eve of trial.

Relatedly, the district court faulted lay persons like Medina and his mitigation witnesses for not spontaneously volunteering from the witness stand information about Medina's chaotic home life or the murder of his best friend. ROA.4736–37. The district court also suggested that there is

no evidence Medina would have shared these stories before trial if he had been asked, or "that the witnesses would have been more forthcoming, had trial counsel asked the right questions." ROA.4735–37. But the record is clear that Medina and his family were forthcoming when postconviction counsel inquired into these matters. Trial counsel were responsible for inquiring into areas of potential mitigation, the burden was not on Medina and his family to comprehend the scope of potential mitigating evidence and spontaneously present it to the jury. *Rompilla*, 545 U.S. at 381–82.

Finally, the district court misapplied the legal standard for *Strickland* prejudice. The state court explained that trial counsel's punishment-phase performance did not prejudice Medina for two reasons. First, Medina's new evidence "is merely an enlargement upon" counsel's theme that Medina was "an essentially good person caught up in a bad environment." ROA.6987. The second was that the new evidence of Medina's chaotic family life and the murder of his best friend was "not compelling enough to afford relief." ROA.6986–87. The district court determined that the state court's legal conclusions were not objectively unreasonable. ROA.4734.

The state court conclusion that Medina's postconviction evidence was merely "more of the same" is factually unreasonable. For example, Medina's trial counsel recognized that a mental health evaluation was a prerequisite to constitutionally effective representation but failed to secure one. The postconviction evaluation demonstrating Medina's significant mental health disorder precipitated by trauma is qualitatively different from the trial evidence. Moreover, as in *Sears*, *supra*, counsel presented the jury with a false picture of a stable childhood home, while the postconviction evidence revealed a chaotic and destabilizing environment. Nothing remotely similar to this evidence was developed or presented by trial counsel, and the state court finding to the contrary was a patently unreasonable determination of fact that undoubtedly undermined the prejudice analysis.

The relevant inquiry is whether there is a reasonable probability that the addition of Medina's qualitatively different and stronger postconviction mitigation evidence would have prompted one juror to vote differently. *Wiggins*, 539 U.S. at 537; *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003). The state court and the court below unreasonably applied *Wiggins* by failing to ask and answer this question. Reasonable jurists

could thus debate whether the district court misapplied the standard for prejudice.

### iii. The state court's determination that trial counsel was not ineffective for failing to investigate and interview mitigation witnesses was legally and factually unreasonable.

In his federal petition, Medina argued that the state court fact findings were unreasonable in light of the state court record. ROA.1679–81. The district court did not address this argument.

The state court and district court found that Millin was exclusively responsible for the punishment phase. ROA.6982, 4732. The state record indicated that:

- Millin's notes are devoid of any social history, ROA.2010–13;

- the investigators dedicated just a few hours to seeking "character witnesses" after trial began, ROA.1972;

- all but one of Millin's witnesses were found on the same day as punishment-phase proceedings, ROA.1963, 2256, and the last was plucked out of the courtroom gallery, ROA.2262;

- none of Millin's witnesses were prepared to testify, ROA.1962–63, 2253–54, 2256–57, 2259, 2262;

- numerous other favorable witnesses were never contacted, ROA.2266, 2270, 2274, 2278, 2281, 2284, 2287, 2290;

- not a single expert was retained, ROA.2292; and

- Millin did not even request Medina's jail records so that he could permissibly argue that Medina posed no future danger while incarcerated, ROA.10746–47.

The state court nonetheless concluded that counsel's investigation was not deficient. ROA.7001. The district court agreed, noting that "this is simply not a case where trial counsel completely abdicated the duty to present a case against a death sentence." ROA.4731. Although both courts explained that Millin may have strategically decided not to present jail records or a mental-health expert to the jury, ROA.6983, 4736–37, neither court explained how Millin was reasonable for failing to consult either in the first place.

Additionally, as discussed in the preceding section, the state court finding of no prejudice was based on both unreasonable factual determinations and an unreasonable application of *Wiggins*.

As set forth in Section A(2)(e), *supra* at 71–72, Medina sought discovery and evidentiary hearing concerning these allegations in state and federal court. The federal court denied his requests on the ground that Medina had not "met the requirements of § 2254(d)(1)." ROA.4751. For all the reasons set forth above, reasonable jurists could debate that conclusion.

**C.  This Court should certify an appeal of Medina's claim that the State's misconduct violated his right to due process.**

**1.  This is a substantial claim.**

Medina alleged that the prosecution's misconduct deprived him of due process by suppressing evidence favorable to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and by presenting false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

**a.  The State suppressed favorable, material evidence.**

A State's suppression of favorable evidence material to either guilt or punishment violates due process. *Brady*, 373 U.S. at 83. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The materiality analysis "is not a sufficiency of the evidence test." *Id*. at 434–35. A defendant need not show that, after discounting the inculpatory evidence in light of the undisclosed evidence, the State could not have obtained a conviction or death sentence with the remaining evidence. *Id. Brady* is violated when the favorable evidence could reasonably "put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435 (footnote omitted).

The State suppressed evidence that, collectively, casts doubt on Medina's guilt; inculpates Holmes; and devastates the credibility of critical State's witnesses.

### i. Witness(es) who saw a Black shooter.

The officers who interrogated Nacoste said that an eyewitness reported that the shooter was Black. ROA.2015–17. Nacoste's statement is corroborated by the HPD offense report. On January 2, 1996, the day after the shooting and before the police had any suspects, the lead detectives informed another HPD officer that "information had also been received that some black males may also be involved in this incident." ROA.1834.

Medina has never been provided with reports or notes identifying the witness(es) who said that the shooter was Black. This information is obviously favorable evidence because it exculpates Medina, inculpates Holmes, and impeaches Leon Guy, who testified that the hand of the shooter was "white or Mexican." ROA.1465–66.

### ii. Evidence impeaching Regina Juarez.

The State suppressed evidence impeaching Juarez, including:

### 1) An undisclosed deal for Juarez's testimony.

After the court granted Medina's pretrial discovery request for notice of deals between the prosecution and its witnesses, the prosecution denied having any. ROA.1995.

During the proceedings below, Juarez revealed for the first time that she testified against Medina pursuant to a deal to avoid prosecution. ROA.1579. Moreover, Juarez stated that, contrary to her trial testimony and consistent with her sworn statement to the police, she was not present when the guns were buried: her trial testimony was based on information presented to her by the prosecution. *Id.*

As Medina explained below, "Juarez only communicated with counsel intermittently and further factual development may not be possible without the intervention of this Court." ROA.3420. The State, however, was a party to the deal with Juarez and violated its constitutional duty—and the trial court's discovery order—to disclose it.

### 2) Statements or interview notes proving that Juarez lied under oath in her January 1996 witness statement or was prepared to lie at trial.

Juarez and other prosecution witnesses initially swore they had not seen the murder weapon since the night of the crime. Juarez told the

police to "go fish" in a bayou and, as described *supra*, HPD divers did so. Yet, she testified to a new gun burial story that came as no surprise to prosecutors. ROA.10151–54. Indeed, the prosecutors prompted witnesses to deviate from their sworn statements and tell the new story.

Medina has never seen any document—additional witness statements, the witnesses' grand jury testimony, notes from the prosecutors' pretrial meetings with the witnesses—contradicting the witnesses' sworn statements to the police. Had the State timely disclosed this evidence before trial, it would have notified the defense that Juarez was prepared to testify falsely.

> **3)**     **The State suppressed Juarez's rap sheet and then urged the jury to credit her testimony because she'd "never been in trouble before."**

Juarez had a rap sheet. ROA.1998–99. The criminal history of a State witness is indisputably *Brady* material, and the State is presumed to have knowledge of, and has a duty to disclose, any criminal history information available through "routine" checks. *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995). This information is not limited to merely

convictions but extends to parole status and deferred adjudication probation. *See Maxwell v. State*, 48 S.W.2d 196 (Tex. Crim. App. 2001).[9]

As noted, *supra*, Juarez's infractions included a threat to kill a witness against one of her friends facing criminal prosecution. The prosecutor who itemized which criminal histories were allegedly disclosed to the defense omitted Juarez's rap sheet. ROA.6825. The other prosecutor stood before the jury and urged them to believe Juarez because "she's never been in trouble before." ROA.10507.

### iii.     Evidence impeaching Dominic Holmes.

The State withheld evidence impeaching Holmes, including:

#### 1)     An undisclosed deal in exchange for Holmes's cooperation with the State.

Before he was interrogated, Holmes appeared before a magistrate. The magistrate noted that "[Holmes] said the officers told him that if he

---

[9] The district court relied on the state court finding that witnesses cannot be impeached with juvenile convictions. ROA.4744. Juvenile adjudications are admissible if "the United States or Texas Constitution requires that it be admitted." TEX. R. EVID. 609(d). "Evidence that a witness … has a prior juvenile record is not relevant for purposes of showing bias or a motive to testify absent some plausible connection between that fact and the witness's testimony." *Irby v. State*, 327 S.W.3d 138, 147–49 (Tex. Crim. App. 2010). Juarez's terroristic threat against a witness was relevant to her willingness subvert criminal trials, which she did here to deflect blame from Holmes. Moreover, once prosecutors falsely told the jury that she had never been in trouble, they opened the door to Juarez's criminal history. *Redmond v. State*, 629 S.W.3d 534, 546 (Tex. App.–Fort Worth, Mar. 21, 2021).

told them what happened they would probably help him out and see what they could do for him. But no specific promise was made to him." ROA.1950.

Even if no State agent made a specific promise, the State must disclose inducements for Holmes's cooperation:

> A promise is unnecessary. Where, as here, the witness's credibility "was . . . an important issue in the case . . . evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it."

*Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (emphasis in original).

Subsequent events confirm that Holmes received leniency in exchange for his cooperation. First, the State dropped the capital charge against him. Second, though the prosecutor confirmed that Holmes was "guilty of tampering," ROA.10459, he was never prosecuted. Third, Holmes was guilty of perjury for swearing under oath to two irreconcilably inconsistent statements about the disposition of the murder weapon. But, unlike Ponce and Pooran, Holmes was never prosecuted.

### 2) Statements or interview notes proving that Holmes lied in his sworn statement or was prepared to lie at trial.

Prosecutors met with Holmes prior to trial and rehearsed a new story about the murder weapon that was irreconcilable with his sworn police statement. ROA.10093–94. Medina has never received any statement, interview notes, or other disclosure from the prosecution reflecting Holmes's pretrial inconsistent statements.

### 3) Holmes's statement to the police that Johnny Valadez had, or disposed of, the murder weapon.

Holmes and Juarez testified to disposing of the murder weapon on January 6th at Medina's direction. ROA.10094–95, 10150. But on January 10, Holmes told police that Valadez either had the gun or had disposed of it. ROA.1897. Although this information was buried in a police report, it was not documented in Holmes's January 10 statement. *Compare id. with* ROA.1885–87. The State has not disclosed any statement to police in which Holmes indicates that Valadez had the gun or disposed of it. If he thought that Valadez had the gun on January 10, Holmes could not have truthfully testified to burying it on January 6.

Evidence that Valadez helped dispose of the weapon also bolsters Nacoste's credibility. Before the weapons were recovered, Nacoste swore

that Holmes was the shooter and that Holmes and Valadez buried the gun somewhere in Westbury. ROA.1882. Valadez told Nacoste about burying the gun on January 3, 1996—several days before Medina purportedly directed the gang to dispose of the weapons. *Id.*, ROA.10150.

### 4) The State suppressed Holmes's criminal record.

On the day Holmes was arrested, the lead detectives searched for his criminal history and found none. ROA.1883. The detectives "then contacted the juvenile division and requested a name check on" Holmes. *Id.* Holmes had 11 arrests in the previous three years. *Id.* Holmes's prolific criminal record was not disclosed to Medina and, as the HPD report documents, was not publicly available.

### iv.      Evidence impeaching Johnny Valadez.

Valadez was charged with capital murder on January 11, 1996, ROA.1904; the charge was dropped after he gave a statement implicating Medina. Had the jury had heard that Valadez gave a statement implicating Medina only after being charged with capital murder, his credibility would have been called into question. Moreover, the absence of this evidence allowed the prosecution to argue, falsely, that Valadez had no need to inculpate Medina to get out of trouble. ROA.10516.

### v.     Evidence impeaching Maurice Argueta.

Argueta testified that Medina was involved in two altercations at his house (the Ingomar Way party house) and that he saw Medina fire the murder weapon close in time to the drive-by shooting. ROA.9913–27. The prosecution bolstered Argueta's credibility as a wholesome family-oriented person: "We kind of stick together.  You know, we try to be a real family.  We try to keep things—you know, be a family.  You know, just care about one another and help each other out."  ROA.9905–06. Argueta portrayed Medina as violent and put the gun in his hands close in time to the shooting.

Unbeknownst to the jury, Argueta's résumé included convictions for assaulting one of his elderly relatives and misdemeanor theft. Argueta was also on probation for tampering with a government record. Argueta was indicted for possession of cocaine just six days before testifying for the State against Medina and, *hours before he testified*, Argueta was charged with sexually assaulting a woman as she lay sleeping with her children.[10] *See* ROA.2059–68.

---

[10] The district court deferred to the state court finding that Argueta could not be impeached with pending charges. ROA.4743. As explained, *supra* at 69, that finding misstated state and federal law.

### vi. Evidence impeaching Leon Guy

Leon Guy testified to seeing the shooter's "white or Mexican hand," excluding Holmes as a suspect. However, the jury never learned of his criminal convictions.

In 1981, Guy was sentenced to ten years in prison for burglary of a habitation. ROA.2083–84. He was granted shock probation and received ten years' probation, *id.*, but less than five years later committed a robbery. ROA.2086–87. In 1985, Guy was sentenced to twelve years in prison. *Id.* Guy was arrested in 1991 for delivery of cocaine sent back to prison. ROA.2089. Released from prison in 1993, Guy remained under correctional supervision and was on parole on New Year's Eve 1995, and likely subject to revocation for his admitted public intoxication.

Guy was not just a disinterested neighbor, he was a three-time felon and parolee facing possible revocation for being "dead drunk" in public. The absence of this evidence allowed the State to argue that Guy "ha[d] absolutely no motive to lie." ROA.10509.

### b. The prosecution knowingly elicited false testimony and impressions to neutralize forensic evidence inculpating Holmes.

Relief is warranted under *Napue v. Illinois* if the State knowingly elicits false testimony and "there is any reasonable likelihood that the false testimony could have affected the jury's verdict." 360 U.S. at 269–72. The testimony need not be "technically false, but merely leave the jury with a false impression." *See, e.g.*, *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977).

The *Napue* materiality standard is more favorable to a petitioner than the *Brady* materiality standard because "the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves a corruption of the truth-seeking function of the trial process." *United States v. Bagley*, 473 U.S. 667, 681 (1985) (internal quotation marks omitted).

As described, *supra*, Juarez now admits that she was not present when the guns were buried and her trial testimony to the contrary was based on information presented to her by the prosecution. The gun burial story materialized after Holmes's palmprints linked him to the murder

weapon. ROA.10093–94, 1574–75. According to Juarez, her testimony was false and the prosecution knew it was false.

Additionally, the prosecutor urged the jury to believe Juarez because "she's never been in trouble before." ROA.10507. This was false because Juarez had a criminal record for, *inter alia*, threatening to kill a witness prepared to testify against her friend.  ROA.1955, 1998–99.

> **c.    There is a reasonable probability that, but for the State's suppression of evidence, Medina would not have been convicted. Likewise, there is a reasonable likelihood that the State's knowing use of false testimony could have affected the outcome of Medina's trial.**

*Brady* materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Kyles*, 514 U.S. at 436. The Supreme Court has found *Brady* violations where the State failed to disclose impeachment evidence impugning the credibility of the State's "key witness," *Giglio*, 405 U.S. at 154–55, or that could have "significantly weakened" key eyewitness testimony. *Kyles*, 514 U.S. at 441, 453; *see also Banks v. Dretke*, 540 U.S. 668, 701–02 (2004) (holding that a *Brady* violation occurred because the State suppressed impeachment evidence that two "essential" prosecution witnesses had been coached by police and prosecutors before they testified material).

In the absence of any forensic evidence linking Medina to the crime, the trial turned on the credibility of the witnesses. ROA.1557. Cumulatively, the suppressed evidence and false testimony:

- Undermine the prosecution's effort to explain away the physical evidence linking Holmes to the murder weapon;

- Reveal that critical prosecution witnesses were testifying in exchange for their freedom from criminal prosecution;

- Discredit the false impression that the State's witnesses—including Holmes, Juarez, Valadez, Argueta and Guy—had no motive to lie;

- Discredit the false impression fostered by the prosecution that Juarez was "really credible" because "[s]he's never been in trouble before," ROA.10506–07;

- Devastate the credibility of the witnesses who identified Medina as the shooter, as well as Juarez's testimony that Medina allegedly admitted to being the shooter;

- Undermine allegedly impartial prosecution witnesses, including Leon Guy and Maurice Argueta, whose testimony supported the prosecution's circumstantial case against Medina and—with respect to Guy—exculpated Holmes;

- Reveal the prosecution's disparate treatment of witnesses who committed perjury.

Finally, "the evidence withheld by the prosecutor in [Medina's] case carried within it the potential … for discrediting, in some degree, of the … methods employed in assembling the case against him." *Lindsey v.*

*King*, 769 F.2d 1034, 1042 (5th Cir. 1985). Because this was a close case, the suppressed evidence was material and the false testimony likely affected the outcome of the trial.

### 2. Reasonable jurists could debate the resolution of Medina's due process claim.

The district court segregated Medina's allegations into two claims based on whether they were exhausted in Medina's initial state proceedings. ROA.4741. When applying § 2254(d) to half of Medina's claim, the district court deferred to state court findings that the prosecutors and defense counsel credibly denied the existence of any suppressed evidence. ROA.4742–45. With respect to allegations exhausted in Medina's 2015 state proceeding, the district found that Medina failed to prove cause and prejudice to excuse the procedural default arising from the TCCA's non-merits dismissal. ROA.4746–48. Specifically, the court faulted Medina for failing to produce the evidence withheld by the state, ROA.4747–48, and characterized Medina's allegations as based "wholly on speculation and surmise." ROA.4748. Finally, the court faulted Medina for failing to discover the State's misconduct earlier. *Id.* The lower court's resolution of Medina's claim is debatable for multiple reasons.

### a. The district failed to consider the State's misconduct collectively.

*Brady* materiality analysis requires a cumulative assessment of the suppressed evidence. *Kyles*, *supra*. Not only did the district court split Medina's due process claim in half, it further subdivided the half-claims. 4742–46. The district court's analysis violated *Kyles* and is thus debatable.

### b. Medina pled one due process claim, to which § 2254(d) is inapplicable.

Medina pled a single due process claim in the district court after adding extensive evidence to the claim pled in the initial state habeas proceedings, including:

> the State suppressed evidence or presented false testimony relating to: (1) Regina Juarez's testimony in general, and specifically about the disposal of the murder weapon []; (2) deals the prosecution had with Flaco []; (3) deals the prosecution may have had with other witnesses, such as Johnny Valadez and Jamie Moore[]; (4) information the police received that indicated that the shooter was African American[]; (5) evidence that would impeach various witnesses[]; and (6) evidence about the shooter in the July 1995 driveby at the Rodriguez home.

ROA.4747.

This new evidence fundamentally altered Medina's claim, rendering it unexhausted. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

With the district court's permission, Medina presented his new claim to the Texas court, which dismissed it without considering the merits. Thus, Medina's claim was exhausted but there is no qualifying adjudication on the merits under § 2254(d).

### c. Even if Medina's due process claim is potentially subject to § 2254(d), there was no qualifying state court adjudication.

Medina incorporates by reference his argument, *supra* at 54–58, that the initial state court proceeding lacked the fundamental attributes of an "adjudication on the merits" for purposes of § 2254(d). The lower court's refusal to entertain or engage this argument based on the erroneous summary conclusion that it has "no basis in the law" is debatable.

### d. Even if the due process claim was subject to § 2254(d), § 2254(d)(1) and (d)(2) exceptions are present.

Medina argued in the court below that, even if § 2254(d) applied to this claim, the state court decision was both legally and factually unreasonable. ROA.1597–99; ROA.3427–28. The state court unreasonably applied *Kyles* by failing to cumulatively assess materiality. As described *supra*, the district court replicated the state court's error.

This error alone renders the district court's application of § 2254(d) to Medina's claim debatable.

The state court decision was also based on unreasonable credibility determinations. The prosecution-drafted affidavits of trial counsel contained statements flatly contradicted by the record. For example, to explain how defense counsel could have allegedly seen the criminal histories of the prosecution witnesses but not mentioned them on cross-examination, defense counsel stated that he reviewed the State's folder labeled "criminal histories" but opted to "impeach each witness on that witness's testimony and actions." ROA.6830. This post hoc assertion of strategy conflicts with defense counsel's actual trial strategy: to argue that defense witnesses were more credible than the prosecution witnesses with criminal histories. ROA.10482. This was not the only instance of a post hoc strategy squarely refuted by the record. *See, e.g.*, ROA.1638–39 (counsel's affidavit claimed a strategic reason failing to obtain Medina's jail records even though 20% of the defense closing argument was an unsuccessful effort to argue Medina's lack of dangerousness while incarcerated).

### e. Reasonable jurists could debate whether the district court erred in blaming Medina for his failure to present evidence suppressed by the State.

In *Strickler v. Greene*, 527 U.S. 263 (1999), the Court found cause for a defaulted *Brady* claim when the default arose from: (1) the failure of the prosecution to produce the evidence; (2) the petitioner's reliance on the prosecution's open file policy; and (3) the State's assurances during the state habeas proceeding that the petitioner had received everything known to the government. *Strickler*, 527 U.S. at 289; *see also Banks*, 540 U.S. at 698 (continuing suppression of *Brady* evidence throughout state postconviction proceedings is cause for the failure to plead state misconduct claim in state court).

*Strickler* applies here. First, the State failed to produce pretrial statements from State witnesses inconsistent with their sworn police statements, deals with Holmes and Juarez, and eyewitness accounts describing the assailants as Black. Second, Guerinot's affidavit demonstrates reliance on the State's open file policy. ROA.1989. And third, the State insists that it made no deals with witnesses, ROA.1995, and its open file contained everything to which the defense was entitled.

ROA.6825. The state courts relied on the prosecutor's assertions to deny relief.

Medina exhausted all possible remedies to procure evidence within the exclusive control of the State, *see, e.g.*, ROA.3420, 1577, but the district court nonetheless blamed Medina for failing to produce it. ROA.4746–48. Reasonable jurists could debate whether the district court erred in doing so.

### f. Reasonable jurists could debate whether the district court erred in denying fact development for both Medina's due process claim and his cause and prejudice arguments.

The district court dismissed Medina's discovery requests relating to his due process claim as fishing expeditions based on "speculation alone." ROA.4748. It faulted Medina for failing to produce evidence from witnesses unwilling to voluntarily provide statements. ROA.4748. The court questioned Medina's diligence in pursuing *Brady* information. ROA.4748. Yet, the court refused to allow fact development on these issues. ROA.4751. The district court's order mischaracterized the state of the record and confused the burden of pleading with the burden of proof.

Medina's discovery requests were not speculative. He based them on law enforcement records, which describe witnesses who reported

seeing Black assailants, ROA.1576, and statements by prosecution witnesses that contradicted either their sworn statements, their testimony, or both. Likewise, the prosecutor stated on the record that, several months before trial, he and Holmes had rehearsed a story about the murder weapon that contradicted Holmes's sworn statement to the police. ROA.10093–96.

Medina is also not speculating about the prosecution's deals with star witnesses. Juarez said she had one. Shortly after he was arrested as the suspected shooter, Holmes told a magistrate that the police would "help him out" if he cooperated. These witnesses were guilty of perjury and tampering with evidence. The witnesses who failed to cooperate with the State were prosecuted and sent to prison for several years for the same or lesser crimes. These circumstances demonstrate the preferential treatment for witnesses who cooperated with the State.

Medina argued that any default could be excused because the State suppressed this information from trial to the present day. ROA.3425–27; 4454–55. Although Medina bears the burden of proof to excuse default, neither § 2254(d) or § 2254(e) bar him from developing and presenting evidence to show cause and prejudice. *Barrientes*, 221 F.3d at 768

(ordering an evidentiary hearing so petitioner may show cause for a procedural default).

Medina pled a substantial due process claim. Good cause for discovery exists where specific allegations show that the petitioner may be able to demonstrate entitlement to relief. *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997). Reasonable jurists could debate whether the district court erred in denying all fact development.

**D.  Conclusion.**

This Court should certify these claims for appeal.

Respectfully submitted,

*/s/ James Marcus*
James William Marcus
Capital Punishment Clinic
The University of Texas School of Law
727 E. Dean Keeton Street
Austin, Texas 78705
512-232-1475
512-232-9197 (fax)
jmarcus@law.utexas.edu

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

*/s/ David Currie*
David Currie
Assistant Federal Public Defender
david_currie@fd.org

Victoria Inojosa
Research & Writing Attorney
victoria_inojosa@fd.org

Office of the Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
214.767.2746
214.767.2886 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

*/s/ Jeremy Schepers*
Jeremy Schepers

## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point Century Schoolbook font using Microsoft Word software, (2) this document is 19,928 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Jeremy Schepers*
Jeremy Schepers