No. 23-70003

ANTHONY MEDINA,

*Petitioner-Appellant,*

v.

BOBBY LUMPKIN, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division,
No. 4:09-CV-03223

## RESPONSE IN OPPOSITION TO MOTION FOR A CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
 for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

KATIE ABELL
Assistant Attorney General
 *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
katie.abell@oag.texas.gov

*Counsel for Respondent-Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Respondent-Appellee*
> Bobby Lumpkin, Director
> TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent-Appellee*
> Katie Abell, Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner-Appellant*
> Anthony Medina

*Counsel for Petitioner-Appellant*
> Jim Marcus, Capital Punishment Clinic, University of Texas School of Law
>
> Federal Public Defender's Office for the Northern District of Texas:
> Jeremy Schepers, Supervisor, Capital Habeas Unit
> David Currie, Assistant Federal Defender
> Victoria Inojosa, Research & Writing Attorney

> s/ Katie Abell
> KATIE ABELL
> Assistant Attorney General
> *Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(2)(c), oral argument should be denied because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument."

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.............................i

STATEMENT REGARDING ORAL ARGUMENT........................ii

TABLE OF CONTENTS..............................................iii

TABLE OF AUTHORITIES........................................vii

INTRODUCTION..................................................1

STATEMENT OF JURISDICTON....................................1

STATEMENT OF THE ISSUES....................................1

STATEMENT OF THE CASE......................................2

STATEMENT OF FACTS.........................................4

    I.    The Murders.........................................4

    II.   The State's Trial Testimony.......................6

    III.  The Defense.........................................9

STANDARD OF REVIEW...........................................15

ARGUMENT....................................................18

    I.    Deference Under § 2254(d) Is Required for Claims that the State Court Adjudicated on Merits.....................18

    II.   Reasonable Jurists Could Not Debate the District Court's Denial of Medina's Ineffective Assistance of Trial Counsel (IATC) Claim Related to the Guilt-Innocence Phase of Trial...........................................23

**A.** Medina's claim that trial counsel was ineffective for failing to impeach certain prosecution witnesses is procedurally defaulted............................................................25

**B.** The *Strickland* standard...................................27

**C.** Trial counsel was not ineffective for failing to investigate.......................................................29

    1. Standard of review.....................................30

    2. Factual background....................................31

    3. Medina fails to demonstrate that trial counsels performance was deficient, or that he was prejudiced....................................34

**D.** Trial counsel was not ineffective for failing to impeach Juarez and Holmes...............................35

    1. Factual background....................................36

    2. Medina fails to demonstrate that trial counsel was deficient, or that he was prejudiced....................................................37

**E.** Trial counsel was not ineffective for failing to impeach witnesses with their criminal histories.............................................................39

**F.** Trial counsel was not ineffective for failing to request a limiting instruction...........................41

    1. Standard of review.....................................42

    2. Factual background....................................43

      3.      Medina fails to show that trial counsel was deficient, or that he was prejudiced............46

III.  Reasonable Jurists Could Not Debate the District Court's Denial of Medina's IATC Claim Related to the Punishment Phase of Trial.......................…..........47

      A.      The *Strickland* standard as it applies to punishment........................................................48

      B.      Trial counsel was not ineffective during the punishment phase of trial.................................50

          1.      Factual background...................................51

          2.      Medina fails to show that trial counsel was deficient, or that he was prejudiced............59

IV.  Reasonable Jurists Could Not Debate the District Court's Denial of Medina's Prosecutorial Misconduct Claims...................................................................65

      A.      The district court correctly separately considered Medina's prosecutorial misconduct claims.........66

      B.      Medina's claim that the State withheld certain statements and elicited false testimony is procedurally defaulted, and he fails to demonstrate cause and prejudice to overcome the default..............................................................69

      C.      Reasonable jurists cannot debate that Medina's *Brady* and false testimony claims are meritless...........................…..........................74

          1.      Medina fails to show that the State withheld material evidence.....................................76

i.      **Impeachment evidence for Juarez......76**

ii.     **Impeachment evidence for Holmes.....79**

iii.    **Impeachment evidence for Valadez....82**

iv.    **Impeachment evidence for Aguenta....82**

v.     **Impeachment evidence for Guy..........83**

vi.    **Witness(es) who saw a Black shooter................................84**

2.    **Medina fails to show that the State elicited false testimony..........................................85**

3.    **Medina fails to show materiality................87**

**CONCLUSION.................................................................89**

**CERTIFICATE OF SERVICE.......................................91**

**CERTFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.............................................................................91**

**CERTIFICATE OF ELECTRONIC CASE FILING.........................92**

# TABLE OF AUTHORITIES

**Cases**                                             **Pages**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ................................. 49

*Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011) .................................... 43

*Andrus v. Texas*, 140 S. Ct. 1875 (2020) ............................................... 48

*Ayers v. Belmontes*, 549 U.S. 7 (2006) .................................................. 49

*Baldwin v. Maggio*, 704 F.2d 1325 (5th Cir. 1983) ............................... 48

*Banks v. Dretke*, 540 U.S. 668 (2004) ............................. 70, 74, 83, 87, 88

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ........................... 16

*Beazley v. Johnson,* 242 F.3d 248 (5th Cir. 2001) ............................... 20

*Bilbrey v. State*, 594 S.W.2d 754 (Tex. Crim. App. 1980) ................. 78, 81

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................. 2,
    65, 66, 67, 68, 69, 70, 71, 74, 75, 76, 77, 80, 81, 87, 88, 89

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...................................... 75

*Broadnax v. Lumpkin*, 987 F.3d 400 (5th Cir. 2021) ........................... 23

*Brown v. Davenport*, 596 U.S. 118 (2022) .......................................... 75

*Buck v. Davis,* 580 U.S. 100 (2017) .................................................... 17

*Burger v. Kemp*, 483 U.S. 776 (1987) ................................................. 63

*Camacho v. State*, 864 S.W.2d 524 (Tex. Crim. App. 1993) ................. 46

*Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014) ............................. 75

*Carroll v. State*, 916 S.W.2d 494 (Tex. Crim. App. 1996) ................... 83

*Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) ............................... 18

*Chapman v. California*, 386 U.S. 18 (1967) ........................................ 75

*Charles v. Thaler*, 629 F.3d 494 (5th Cir. 2011) ............................. 43, 47

*Clark v. Johnson*, 227 F.3d 273 (5th Cir. 2000) ................................. 27

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ................................ 61

*Coleman v. Thompson*, 501 U.S. 722 (1991) ............................................ 26

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ............................................... 24

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) ................................. 31

*Evans v. Davis*, 875 F.3d 210 (5th Cir. 2017) ................................... 18, 23

*Ford v. Davis*, 910 F.3d 232 (5th Cir. 2018) ..................................... 70, 71

*Frazier v. Cupp*, 394 U.S. 731 (1969) ...................................................... 84

*Freeney v. Davis*, 737 F. App'x 198 (5th Cir. 2018) ............................... 21

*Galvan v. Cockrell*, 293 F.3d 760 (5th Cir. 2002) .................................. 28

*Gordon v. Braxton*, 780 F.3d 196 (4th Cir. 2015) .................................. 19

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ................................... 30

*Gutierrez v. Stephens*, 590 F. App'x 371 (5th Cir. 2014) ................... 25, 69

*Halprin v. Davis*, 911 F.3d 247 (5th Cir. 2018) ...........................16, 73

*Harrington v. Richter*, 562 U.S. 86 (2011) ....................................... 17, 24

*Hebert v. Rogers*, 890 F.3d 213 (5th Cir. 2018) ..................................... 22

*Holberg v. Davis*, No. 2:15-CV-285-Z, 2021 WL 3603347 (N.D. Tex. Aug. 13, 2021) ................................................................................................ 22

*Holberg v. Lumpkin,* 2023 WL 2474213 (5th Cir. Mar. 13, 2023).........21

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ...................... 26, 69

*Hummel v. Davis*, 908 F.3d 987 (5th Cir. 2018)...................................... 35

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002) ........................... 42, 61

*Johnson v. Williams*, 568 U.S. 289 (2013)............................................... 22

*King v. State*, 553 S.W.2d 105 (Tex. Crim. App. 1977) .......................... 46

*Kitchens v. Johnson*, 190 F.3d 698 (5th Cir. 1999) ................................ 49

*Knowles v. Mirzayance*, 556 U.S. 111 (2009)......................................... 24

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ....................................... 42

*Kyles v. Whitely*, 514 U.S. 419 (1995) ............................................... 74, 87

*Langley v. Prince*, 926 F.3d 145 (5th Cir. 2019) ..................................... 23

*Lewis v. Thaler*, 701 F.3d 783 (5th Cir. 2012) ........................................ 68

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005) ............................... 60, 62

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ......................................... 16, 17

*Moore v. Illinois*, 408 U.S. 786 (1972) ................................................... 82

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000) .......... 74, 78, 81, 85, 88

*Murray v. Giarratano*, 492 U.S. 1 (1989) ............................................... 21

*Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984) .................................... 28

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................. 65, 69, 75, 88

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) .................................. 18, 48

*Nelson v. Lumpkin*, 72 F.4th 649 (5th Cir. 2023) ............................. 68, 87

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) .................................... 20

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016) ................................. 73

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................. 27

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ..................................... 21, 22

*Parr v. Quarterman*, 472 F.3d 245 (5th Cir. 2006) ................................. 42

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) ......................................... 21

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ............................................ 49, 61

*Prible v. Lumpkin*, 43 F.4th 501 (5th Cir. 2022) .................................... 69

*Ramirez v. State*, 815 S.W.2d 636 (Tex. Crim. App. 1991) .................... 46

*Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) ..................................... 26

*Rhoades v. Davis*, 852 F.3d 422 (5th Cir. 2017) ..................................... 16

*Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998) .................................. 42

*Sandoval Mendoza v. Lumpkin*, 81 F.4th 461 (5th Cir. 2023) ......... 20, 21

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) ................................ 18

*Sheppard v. Davis*, 967 F.3d 458 (5th Cir. 2020) ............................. 22, 23

*Strickland v. Washington*, 466 U.S. 668 (1984) ...…........................24, 27, 28, 30, 35, 39, 46, 47, 48, 49, 50, 61, 62, 64, 65

*Strickler v. Green*, 527 U.S. 263 (1999) ................................................. 70

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999) .......... 26, 40, 73, 82, 83

*Trevino v. Thaler*, 569 U.S. 413 (2013) ...................................................... 3

*United States v. Agurs*, 427 U.S. 97 (1976) ..................................... 75, 87

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................ 75

*United States v. Stanford*, 823 F.3d 814 (5th Cir. 2016) ........................ 71

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004) .................... 74, 88

*Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984) ..................................... 20

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ................................... 21

*Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994) ...................................... 74

*Wiggins v. Smith*, 539 U.S. 510 (2003) ....................................... 30, 50, 60

*Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010) .......................................... 21

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1992) .............................. 28

*Williams v. Cain*, 125 F.3d 269 (5th Cir. 1997)..................................... 49

*Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994) ................................... 30

*Williams v. Taylor*, 529 U.S. 362 (2000) .......................................... 17, 72

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) .......................................... 22, 23

*Woodford v. Visciotti*, 537 U.S. 19 (2002) ............................................. 18

*Woodfox v. Cain*, 609 F.3d 774 (5th Cir. 2010)...................................... 62

*Woods v. Etherton*, 578 U.S. 113 (2016) ................................................. 24

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993) ........................................28

## Statutes

28 U.S.C. § 2244(d) ............................................................... 19

28 U.S.C. § 2253(c)(1)(A) ...................................................... 16

28 U.S.C. § 2253(c)(1)(A), (c)(2) ............................................. 1

28 U.S.C. § 2254(d) ...................................................16, 17, 18, 19,
   20, 21, 22, 23, 24, 48, 50, 67, 68, 75

28 U.S.C. § 2254(e)(2)(A) .......................................................72

28 U.S.C. § 2254(e)(2)(A)(ii) ..................................................72

28 U.S.C. § 2254(e)(2)(B) ..................................................72, 73

28 U.S.C. § 2254 ................................................................ 18

Tex. Code Crim. Proc. Art. 11.071 § 5 .........................25, 67, 69

Tex. Code Crim. Proc. Art. 24.05 ...........................................77

Tex. Gov't Code § 21.002 .......................................................77

## Rules

Fed. R. Evid. 802.............................................................38, 84

Fed. R. App. Proc. 34(a)(2)(c) ..................................................ii

Fed. R. App. Proc. 32(a)(5)–(7) ............................................91

Tex. R. Evid. 404..............................................................43, 45

Tex. R. Evid. 609(d) .............................................................78

Tex. R. Evid. 802...............................................................84

## INTRODUCTION

This is a federal habeas corpus appeal brought by Petitioner-Appellant, Anthony Medina, a death-sentenced Texas inmate. Medina was convicted of the capital murder of nine-year-old David Rodriguez and fifteen-year-old Diane Rodriguez during a retaliatory gang-related drive-by shooting. Medina seeks a certificate of appealability (COA) from the district court's denial of federal habeas relief. As shown, reasonable jurists could not debate any rejection, as either procedurally barred or meritless, of Medina's claims. A COA should be denied.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2253(c)(1)(A), (c)(2).

## STATEMENT OF THE ISSUES

1.     Would reasonable jurists debate the district court's rejection of Medina's claim that trial counsel was ineffective at the guilt-innocence phase of trial?

2.     Would reasonable jurists debate the district court's rejection of Medina's claim that trial counsel was ineffective at the punishment phase of trial?

3.    Would reasonable jurists debate the district court's rejection of Medina's claim that the State suppressed *Brady*[1] evidence and knowingly presented false testimony?

## STATEMENT OF THE CASE

Medina was indicted, convicted, and sentenced to death in the 228th Judicial District Court of Harris County, Texas, for the capital murder of nine-year-old David and fifteen-year-old Diane Rodriguez. ROA.6556–58.[2] The Texas Court of Criminal Appeals (CCA) affirmed Medina's conviction and sentence on direct appeal. ROA.7939–57.

Prior to initiating federal litigation, Medina filed four state habeas applications. ROA.6446–559 (-01), 7118–41 (-02 & -04), 7672–7678 (-03). The CCA dismissed Medina's first,[3] third, and fourth state habeas applications for abuse of the writ. ROA.6445 (-01), 7114–17 (-04), 7667 (-03). Regarding the claims contained in his second state habeas application, the trial court made findings of fact and conclusions of law

---

[1]    *Brady v. Maryland*, 373 U.S. 83 (1963).

[2]    "ROA" refers to the record on appeal followed by the relevant page numbers.

[3]    The CCA dismissed Medina's first state habeas application as untimely but subsequently allowed Medina to file a second application that it denied on the merits. ROA.6445, 6529, 7114–17.

recommending that relief be denied. ROA.6949–7004. On September 16, 2009, the CCA denied Medina's application with written order adopting the findings and conclusions of the trial court and based on its own independent review of the record. ROA.7114–17 (-02).

On October 5, 2009, Medina filed a federal habeas petition. ROA.17–265. He subsequently filed an amended petition on May 31, 2011, in which he raised new claims. ROA.683–1047. The Director answered the amended petition arguing, in relevant part, that some of Medina's claims were procedurally defaulted because he failed to exhaust them in state habeas proceedings. ROA.1060–310. In light of the Supreme Court's consideration of *Trevino v. Thaler*, 569 U.S. 413 (2013), Medina filed a motion to stay the federal proceedings arguing that the Supreme Court's decision would dictate Medina's answer to some of the Director's procedural arguments. ROA.1375–83. Over the Director's objection, the district court stayed Medina's federal proceedings and ordered him to exhaust available remedies in state court. ROA.1389–402.

Medina then filed his fifth state habeas application. ROA.5598–903. On January 25, 2017, the CCA dismissed the subsequent application as an abuse of the writ. ROA.5569–95.

Medina returned to federal court and filed a second amended federal habeas petition, as well as a motion for discovery in which he sought an evidentiary hearing. ROA.1403–769. The Director answered, ROA.2619–871, and Medina replied, ROA.2924–3209. The district court denied Medina habeas relief, denied a COA, and denied his motion for discovery. ROA.4662–754. Medina then filed a Rule 59(e) Motion to Alter or Amend the district court's judgment. ROA.4758–792. The district court denied Medina's motion. ROA.4828–33. These proceedings follow.

## STATEMENT OF FACTS

The federal district court summarized the facts of the capital murder as follows:

### I.  The Murders

A New Year's Eve party ran late at the Rodriguez family's house in Houston, Texas. In the early morning hours of January 1, 1996, the adults gathered in a room to play dominos while most of the 15 to 20 children at the party played in the backyard. A few children went out front. Street lamps illuminated the foggy, misty night as the children danced and listened to music from the boombox on the top of Veronica Rodriguez's red Dodge Shadow. Nine-year-old David sat on the trunk of the car; his fifteen-year-old sister Diane stood nearby.

A car turned down the dead-end street at around 2:30 a.m. As it slowly passed, a person reached out the front passenger window—whose hand an eyewitness described as

"white or Mexican" but definitely not "black," [ROA.9658–59, 9667–68]—with an assault rifle. Bullets sprayed toward the children. Slugs hit Veronica's car, the Rodriguez's house, and the children. As the car drove away, David and Diane lay dead and their cousin injured.

The drive-by murders were only the last act in escalating violence aimed at the Rodriguez family. About six months prior to the murders someone had shot at their house. The next day someone painted gang-related graffiti on the Rodriguez's garage. [ROA.9595]. Later, someone vandalized Veronica Rodriguez's car as it sat outside their home. [ROA.9596]. Another time someone threw a Molotov cocktail at her house. [ROA.9822–23].

Gang warfare had brought the needless violence to the Rodriguez family. But no one in the Rodriguez family belonged to a gang. The violence stemmed from Veronica's two-year relationship with Marco "Blue" Martinez, a member of the H-Town Crips ("HTC").[]

Throughout the time that Martinez dated Veronica, a gang war brewed between the HTC and its rival gang, La Raza 13 ("LRZ"). LRZ was one of Houston's most violent street gangs. [ROA.10443–44]. Tensions intensified after an HTC member killed an LRZ member. Personal animosity particularly built between Martinez and Anthony "Creeper" Medina, an LRZ "cruz" (or leader).[4] The two men started by giving each other dirty looks, then flashing gang signs, and then threatening with weapons. Once, Martinez and a car load of other gang members drove by Medina's house flashing gang signs. Later, Medina drove by and did the same as Martinez was outside the Rodriguez house.

---

[4] Trial testimony established that a "cruz" was "a position below the top gang leader." [ROA.6950].

There was no question that it was Veronica's relationship with Martinez which brought violence upon the Rodriguez house, culminating in the New Years murders. Veronica's "house and her red Dodge were 'marked' . . . because of her association with [Martinez]." [ROA.6950]. But Martinez and Veronica were not home at the time of the shooting; Martinez had picked up Veronica and they had left before the LRZ members began their assault.

Veronica's marked car, however, was parked outside the Rodriguez's house. The children dancing around the car died in a hail of gunfire from a passing car.

No one outside the Rodriguez home could see the face of the person who fired shots that night. Positive identification of the shooter could only come from those inside the car, though statements people made after the killing and evidence relating to the gun provided useful circumstantial evidence as to the killer's identity. The prosecution eventually fingered Medina as the shooter. The defense would claim that Dominic "Flaco" Holmes, an African-American "peewee" or junior member of the predominantly Hispanic LRZ gang, was the killer.

## II.   The State's Trial Testimony

Testimony about the circumstances leading up to and following the murders provided integral context at trial. As the Rodriguez family met to celebrate the new year, Medina and his fellow LRZ gang members began partying at the house of Candelario "Candyman" Guerrero. Throughout the night, LRZ members, including Medina, would come and go from Candyman's house. At around 11:00 p.m., Medina and others went to a different party at the house of former LRZ member Michele "Chichona" Aguenta. A dispute erupted, however, when LRZ members accused another person of having a brother affiliated with HTC. When that person looked like he was going to hit another "cruz," Medina

brandished a gun. The LRZ members left after Chichona's brother put an end to the tension.

Medina returned to Candyman's house. At around 2:00 or 2:30 a.m. a group left Candyman's house to carry out the drive-by murders. The prosecution's theory was that Medina left in James Moore's[] car with Johnny "Pelon" Valadez, Alex "Slim" Perez, Veronica "China'" Ponce, Scharlene "India" Pooran, and Flaco. Medina was the only "cruz" in the car. The others were either not gang members or were young peewees.

Moore, who was not an LRZ member, had been drinking heavily before he drove the group around. Moore, Pelon, and Flaco—who each testified for the prosecution—all admitted to being present in the car. They all identified Medina, Slim, India, and China as being there also. [ROA.9850, 9981, 10081–82].

The gang members directed Moore to the Rodriguez's street. The car briefly stopped and Medina "got a Russian SKS semiautomatic assault rifle . . . from the trunk and moved to the front passenger seat." [ROA.6951]. Moore, Pelon, and Flaco would testify at trial that Medina fired at the Rodriguez house.[5]

---

[5]    Moore testified that Medina was sitting in the passenger seat. [ROA.9856]. While Moore did not initially see the gun, as he drove he saw "white flashes" from the blasts of gunfire. [ROA.9855–58]. Moore testified that he saw Medina draw the gun back into the car. [ROA.9856, 9894]. He also saw Medina with the gun when the group returned to Candyman's house. [ROA.9859–60, 9863–65]. Pelon testified that Medina fired at the Rodriguez house. [ROA.9985]. Pelon testified that Flaco was in the back seat. [ROA.9986–90]. Flaco testified that Medina was in the front passenger seat, [ROA.10083], and he saw Medina shoot from the front window. [ROA.10088]. On direct appeal, Medina argued that the evidence did not sufficiently show that he had formed the specific intent to kill. The Court of Criminal Appeals found that "[o]pening fire with an automatic rifle, at close range, on a group of people supports the conclusion that [Medina] acted with the specific intent to kill." [ROA.7943].

Medina and other LRZ members returned to Chichona's house at around 3:00 a.m.[6] Medina told Regina Juarez that they had done a drive by and that he had shot the gun. [ROA.10139, 10169]. Medina bragged about the murder as he told people that "he shot her and he saw that fat meat come off, or something like that." ROA.9992. People saw Medina with the murder weapon at Chichona's house. Medina pointed the gun at someone he suspected to have a brother who was in a rival gang. [ROA.9915]. A fist fight soon broke out. Medina cocked the assault rifle, shot it into the air, and began to cock it again when Chichona's brother restrained him in a headlock. Medina tried to scuffle with Chichona's brother and told him, "Let me go. You don't know who you're messing with." [ROA.9926]. The LRZ members left when Chichona's father came out of the house, fired a shotgun into the air, and "told everybody to get the hell out." [ROA.9927].

After his arrest, Medina called Regina Juarez and told her to get rid of the murder weapon which was at India's house. [ROA.10150]. Regina Juarez, Flaco, Moore, and another gang member disposed of the gun. Medina also directed gang members to lay the blame on Flaco. [ROA.10155–57]. Medina told Regina Juarez that he was trying to "change it around and make it look like . . . it's Flaco's fault." [ROA.10156]. China and India helped with Medina's plan. [ROA.9994–96]. China and India told Pelon to blame Flaco and "if [he] told the truth, that they were going to come after [his] family or try to do something to [him]." [ROA.9997].[7]

---

[6]     Regina Juarez corroborated the prosecution's theory of the case when she testified that she saw Medina return to Candyman's house with Flaco, Moore, India, and China. [ROA.10137].

[7]     China and India did not testify at trial. The prosecution elicited testimony from a police officer that they had both been arrested for aggravated perjury. [ROA.9577]. Trial counsel informed the jury that the charges stemmed from differences between their grand jury testimony and their original police statements. [ROA.9578]. The defense moved out of the jury's presence for the trial court to order "the State . . . to

## III. The Defense

The trial court had appointed John A. Millin and Gerald "Jerry" Guerinot to represent Medina at trial.[] The defense team crafted a case putting the blame for the killings on Flaco. The defense based this strategy on two primary themes: (1) Flaco had made incriminating statements and (2) Medina disclaimed being the shooter.[8] The defense supported these theories with testimony that Flaco told Medina's sister that the police "had to know it was him, but they had to find him before they could arrest him." [ROA.10207–08]. Flaco also told one friend that he "put them hoes to rest," [ROA.10238], and another friend that he made the hoes "lie down," [ROA.10252].

The defense had Slim testify that he had not left Candyman's house to do the drive-by. Also, Slim said that he did not see Medina with a weapon at Candyman's house. Slim claimed that neither Flaco nor Medina had claimed responsibility for the shootings. [ROA.10288].

---

give testimony of immunity to . . . China . . . and . . . India" because the defense had "talked to the lawyers for both" and, although they would otherwise "take the Fifth because of their pending charges of aggravated perjury," "their testimony would be that Flaco . . . told them that he was one that did it and not Mr. Medina." [ROA.10195–96]. The prosecution clarified that they had "no information whatsoever that either of them would say that Flaco said he did it." [ROA.10198]. In fact, China "gave three statements, all under oath, all different, and her last statement was that [Medina] admitted to her that he had done it." [*Id*.] The trial court denied the motion and India and China's testimony did not come before the jury.

[8] On direct appeal, Medina faulted the trial court for not delivering an accomplice-witness instruction for Flaco because "the evidence established that [Flaco] was [Medina's] fellow gang member, was with [Medina] during the offense, and helped conceal the murder weapon." [ROA.7950]. The trial testimony, however, established that Medina "did not announce his plans to [Flaco and the others in the car] and that the offense came as a complete surprise to them." [ROA.7951]. In fact, the occupants of the car "thought they were targets of the shooting." *Id*. Because of his gang membership and efforts to conceal the crime, however, the Court of Criminal Appeals found that Flaco was party to the offense. [ROA.7951–52].

Medina took the stand and testified that he did not participate in the crime. Medina claimed that he stayed at Candyman's house until around 3:30 a.m. Medina, however, testified that he saw a weapon in Moore's car and that Moore and Flaco left around the time of the killings.

The jury found Medina guilty of capital murder.

[ROA.4663–69].

The federal district court summarized the evidence presented at the punishment phase of trial as follows:

[T]he prosecution showed that the murders for which Medina was convicted were only a part of the brutally escalating violent acts he committed. The state habeas court provided a concise summary of the significant evidence presented by the State during the punishment phase:

- Edward Johnson testified that he and [Medina] skipped school almost daily after they met in 1991; that they took turns slashing the tires of 8 to 12 cars at a time; that [Medina] drove his SUV into other cars to damage them or to push them into street intersections; and, that they stole items from the cars after they smashed the windows with a sledgehammer.

- The State presented evidence that [Medina] was arrested on October 28, 1993, and that multiple counts of burglary of a motor vehicle were filed against [Medina] and his accomplice.

- Delberta Storz, probation officer, testified that [Medina] received five years probation for the offense of burglary of motor vehicle in

both cause nos. 678640 and 678641, and that motions to revoke [Medina's] probations were filed within ten months based on [Medina's] failure to comply with the terms of his probation.

- The State presented evidence that [Medina] received ten years probation on December 23, 1994, in four arson cases, cause nos. 9421844, 9421845, 9421846, 9421847, and that [Medina's] original probations for burglary of a motor vehicle continued with amended conditions.

- The State presented evidence that [Medina] violated the terms of his probation, and that his probation was revoked and he was sentenced in all six cases.

- Sixteen-year old Dante Medrano, a former South Side Syndicate Crips gang member, testified that [Medina] and Robert Lucio drove by Medrano's house in December, 1995; that Medrano heard gunshots and saw [Medina] hanging from the car window with a rifle; that bullets hit Medrano's house; and, that Medrano grabbed his father's .22 rifle and shot twice at the car.

[ROA.6955–56].[9]

---

[9]    The jury also heard testimony about the effect of the murders:

- Rocio Pedrosa testified that she was shot on New Year's Eve at the Rodriguez house; that she had a three-hour surgery on her destroyed colon, was in the hospital for eleven days, and still had a colostomy bag at the time of [Medina's] trial; that a future surgery was scheduled to replace the colostomy bag with an ileostomy tapedown; that she had not returned to school; and,

. . . The defense called seven witnesses, each of whom provided brief testimony about Medina's life. . . . The state habeas court summarized their testimony as follows:

- Verlan Pegues[, Medina's great-uncle,] testified about Medina's help and his good characteristics; that Medina had a speech impediment that he overcame; and, that Pegues had not seen Medina much since he was fourteen.

- Sherry Grien, Medina's aunt, testified about Medina's good qualities and stated that she did not have as much contact with Medina in the last couple of years.

- David Castro, Medina's cousin, testified that Medina lived in a gang area; that he was not aware of Medina having problems; that Medina was respectful and courteous to family members; and, that Medina helped Castro with house repairs.

- Eva Uribe, Medina's aunt, testified she picked up Medina and his sisters from the Bellaire Christian Academy when they attended; that Medina was involved in church; that he would protect Uribe's

that she had nightmares and flashbacks and was afraid to be alone.

- Jesus Rodriguez, father of complainants Diane and David, testified that he was in the house when he heard the shots from the drive-by shooting; that he ran outside and saw his daughter, his son, and Pedrosa; that his wife could not sleep and was sick and nervous after the shooting; and, that his son Francisco was different after the shootings and his daughter Jennifer gave him a poem about her feelings after the shooting.

[ROA.6955–56].

younger daughters; that he was respectful toward family members; that he would help his grandfather who had suffered a mild stroke; and, that Medina was a loving, caring person who took care of his son.

- Uribe testified that she was not really aware of Medina's gang involvement, but she eventually learned that Medina was in a gang.

- Antonio Hernandez Medina, Medina's grandfather, testified that Medina was intelligent, mechanically-inclined, and helpful to his relatives with errands and auto repairs, and that he interacted with children and was respectful to adults.

- Anthony Luna Medina, Medina's father, testified that Medina was a good child; that he spent a lot of time with grandparents; that he got along well with children in the family; that he helped his family; that he had a good relationship with his parents; and, that his relationship with his family stayed the same when he became a teenager. . . . Medina's father testified that he . . . learned about Medina's gang activities after he was arrested; that he knew that Medina had been previously arrested for being in a gang fight and knew that there were several gangs in the neighborhood; that there was nothing to indicate Medina's gang activity except his music and some of the people who came to the house; and, that Medina was a good person whom Medina loved.

- Golda Medina, Medina's mother, testified that she and her husband had been married

twenty-two years; that they had two daughters and [Medina]; that Medina was a good child, polite, respectful, and had no problems; that Medina worked with his dad and helped his grandfather; that Medina was good with children; and, that Medina's family loved him. . . . Golda Medina testified that Medina's change in behavior as he became a teenager was like most teenagers; that she learned about Medina's gang activity after the fact; that she and her husband talked to Medina after they learned about the gang activity and thought that it had an effect; that they always tried to do what was best for [Medina]; that he was a good kid who did some stupid and bad things but who tried hard to work and take care of his family and be more a part of his family and less a part of the gang; and, that they still loved him very much.

[ROA.6984–86]. In sum, Medina presented testimony "concerning [his] childhood, his early speech impediment, his family relationships, his behavior, his church activities, his interaction with children and adults, his attendance at Bellaire Christian Academy, his protective attitude toward others, and their lack of knowledge of his gang activities." [ROA.6956].

Counsel's closing argument first focused the jury's attention on the long incarceration Medina would serve if given a life sentence, and his ability to control his behavior in a controlled environment. [ROA.10744–47]. Trial counsel argued that the State had presented no testimony to show that Medina would be a danger while incarcerated. [ROA.10748–49, 10752–54].

The defense's argument then shifted to the mitigation special issue. The defense argued that the jury should

14

consider his intoxication at the time of the murder as a mitigating factor. [ROA.10754]. The defense also relied on residual doubt from the conviction to mitigate against a death sentence.[10] [ROA.10756]. Turning to the testimony from the punishment phase, trial counsel speculated that Medina's stuttering left a "psychological scar that . . . was healed only by his becoming . . . respected as a gang member . . . And who knows but something back in the past that nobody knows, that nobody testified to, put [Medina] on the road to where he ended up." [ROA.10757]. Trial counsel asked the jury "to take a look at Tony Medina, take a look at his family, and this young man here is a young man that doesn't deserve to die under the evidence of this case . . . so that he can be some good to the community in which[] he [is] going to be living, even if that community is the prison[.]" [ROA.10760–61].

The jury deliberated for two days during which time they apparently changed their vote repeatedly. [ROA.10786]. The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

[ROA.4719–23].

## STANDARD OF REVIEW

Medina seeks review of the district court's final judgment denying his petition for a writ of habeas corpus. However, "[b]efore an appeal may be entertained, [Medina] must first seek and obtain a COA" as a

---

[10] The State successfully objected when trial counsel argued that Medina "had a perfect record" while incarcerated because "[t]here's been no evidence of his behavior in the record about his being in jail." [ROA.10747]. Trial counsel then emphasized that the State bore the burden of proof and pointed to the absence of evidence showing bad behavior while incarcerated. [ROA.10747–49].

jurisdictional prerequisite. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); 28 U.S.C. § 2253(c)(1)(A).

A COA will issue only if Medina makes a substantial showing of the denial of a constitutional right, which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that)" the court below should have resolved the claim in a different manner or that this Court should encourage Medina to further litigate his claim in federal court. *Miller-El*, 537 U.S. at 335. At the COA stage, this Court limits its examination "to a threshold inquiry into the underlying merits of the claims, and ask[s] only if the District Court's decision was debatable." *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017) (citation and internal quotation marks omitted); *see Halprin v. Davis*, 911 F.3d 247, 254 (5th Cir. 2018).

"[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000). Under § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless adjudication of the constitutional claim by the state court (1) "'was

contrary to' federal law then clearly established in the holdings of" the Supreme Court; (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Finally, the COA determination "requires an overview of the claims in the habeas petition and a general assessment of their merits" but not "full consideration of the factual or legal bases adduced in support of the claims." *Miller-El*, 537 U.S. at 336; *see also Buck v. Davis,* 580 U.S. 100, 115 (2017).

In order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Richter*, 562 U.S. at 102. Indeed, this Court has recognized that § 2254(d) tasks district courts "with considering not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the

arguments and theories it could have relied upon." *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017). The state court's "ultimate decision" must be tested for reasonableness, not every individual point it makes or fails to make. *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]"). Section 2254 thus creates a "highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

## ARGUMENT

### I. Deference Under § 2254(d) Is Required for Claims that the State Court Adjudicated on the Merits.

Throughout his petition, Medina attempts to elude § 2254(d)'s relitigation bar. 28 U.S.C. § 2254(d). With respect to his exhausted claims, Medina argues, first, that reasonable jurists could debate whether the state court adjudicated his claims on the merits and, second, that reasonable jurists could debate the district court's application of § 2254(d). Mot.54–58, 78 (reincorporating the arguments as to claim two),

101 (same to claim three).[11] Specifically, Medina complains that the state court failed to comply with due process because that court denied his discovery and evidentiary hearing requests, thereby adjudicating his claims on a materially incomplete record. Mot.54–58 (citing *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015)). Therefore, Medina argues, the district court's application of § 2254(d)'s relitigation bar was improper because it "essentially created an irrebuttable presumption of a merits adjudication and rendered the Due Process Clause wholly inapplicable to state post-conviction proceedings." Mot.57–58. Finally, Medina complains the district court's application of § 2254(d) is debatable because the court only considered the ultimate decision made by the state court, not the state court's actual reasoning behind denying Medina's claims. Mot.58–71, 78–85.

To the extent Medina attempts to raise a due process claim challenging state habeas procedure, it is barred by the AEDPA statute of limitations because it was raised in supplemental briefing, not his initial federal petition, *see* 28 U.S.C. § 2244(d); unexhausted and procedurally

---

[11] "Mot" refers to Medina's Motion for Certificate of Appealability and Brief in Support and is followed by the relevant page numbers.

barred because it was raised for the first time in his federal proceeding, *see Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997); and not a cognizable constitutional claim, *see Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001); *Vail v. Procunier*, 747 F.2d 277, 277 (5th Cir. 1984). ROA.4237–38. Moreover, Medina wholly fails to demonstrate the state court record was *actually* materially incomplete or that the state court's decision was unreasonable. Rather, Medina generally challenges the CCA's failure to conduct an evidentiary hearing or grant his discovery requests. But the trial court entered findings of fact and conclusions of law in which it addressed Medina's evidentiary concerns and provided bases upon which it recommended the CCA deny his claims on the merits or otherwise dispose of his applications. ROA.6949–7004. In turn, the CCA denied habeas relief on the claims raised in Medina's initial state habeas application and dismissed his subsequent applications. ROA.5569–95 (-05), 6445 (-01), 7114–17 (-02 & -04), 7667 (-03).

Further, Medina's argument that § 2254(d) deference is inapplicable because of the state court's purported failure to permit evidentiary development is foreclosed by this Court's precedent. *See Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 472 (5th Cir. 2023); *see also*

*Freeney v. Davis*, 737 F. App'x 198, 204 (5th Cir. 2018); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Valdez v. Cockrell*, 274 F.3d 941, 948 (5th Cir. 2001). Indeed, the petitioner in *Sandoval Mendoza* relied on the Fourth Circuit's precedent, and this Court explicitly declined to adopt the Fourth Circuit's reasoning. 81 F.4th at 472.

Medina also argues § 2254(d) deference is inapplicable under *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Mot.55–56. But *Panetti* is inapposite. There, the Supreme Court explained that the state court's failure to provide the petitioner the process mandated by *federal law* was an unreasonable application of clearly established law. *Panetti*, 551 U.S. at 948–50, 952; *see also Holberg v. Davis*, No. 2:15-CV-285-Z, 2021 WL 3603347, at *26 (N.D. Tex. Aug. 13, 2021), *COA granted in part, Holberg v. Lumpkin*, 2023 WL 2474213, at *2 (5th Cir. Mar. 13, 2023). Medina cites no such antecedent constitutional right that the state court's adjudication of his claims violated. Indeed, the absence of *any* constitutional right to a state habeas proceeding necessarily means Medina cannot rely on any such right. *See Murray v. Giarratano*, 492 U.S. 1, 7–8 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). This

Court should reject Medina's argument. It is undebatable that § 2254(d) deference applies to the claims the state court adjudicated on the merits.

Medina also cites to the Supreme Court's opinion in *Johnson v. Williams*, 568 U.S. 289 (2013), to argue he rebutted the presumption that the state court adjudicated his claims on the merits. Mot.55. But *Johnson* is inapplicable because Medina does not argue or show that the state court "very clearly" "overlooked" the federal claims that the court resolved on the merits. *Johnson*, 568 U.S. at 303; *see Sheppard v. Davis*, 967 F.3d 458, 468–69 (5th Cir. 2020); *Hebert v. Rogers*, 890 F.3d 213, 221 (5th Cir. 2018). And his circular attempt to use *Panetti* to rebut the *Johnson* presumption fails because, again, he did not have a constitutional right to any particular process in state court.

Lastly, Medina relies on the Supreme Court's opinion in *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), to argue the district court erred in resolving his claims on grounds other than those relied upon by the state court. Mot.59. But the district court's resolution of Medina's claim was consistent with *Wilson*. First, the CCA rejected Medina's claims on the trial court's findings *and its own review*. ROA.7114–15. Therefore, even if *Wilson* was as limiting as Medina suggests, the district court's analysis

under § 2254(d) was not limited to only the trial court's findings. Moreover, *Wilson* did not overrule this Court's § 2254(d) precedent. *See Sheppard*, 967 F.3d at 467 n.5; *Langley v. Prince*, 926 F.3d 145, 163 (5th Cir. 2019); *Broadnax v. Lumpkin*, 987 F.3d 400, 416 (5th Cir. 2021).

As established, federal relief is barred unless Medina shows, "based on the state-court record alone, that any argument or theory the state habeas court could have relied on to deny relief would have either been contrary to or an unreasonable application of clearly established federal law." *Evans*, 875 F.3d at 217. Even under a threshold assessment, reasonable jurists could not debate the district court's denial of Medina's claims.

## II. Reasonable Jurists Could Not Debate the District Court's Denial of Medina's Ineffective Assistance of Trial Counsel (IATC) Claim Related to the Guilt-Innocence Phase of Trial.

Medina seeks a COA to appeal the district court's denial of his claim that trial counsel rendered ineffective assistance during the guilt-innocence phase of trial for failing to (1) investigate his case, (2) impeach certain prosecution witnesses, and (3) request a limiting instruction regarding extraneous offense evidence. Mot.48–51. Medina's claim (2) was raised for the first time in his 2015 subsequent state habeas

application, which was dismissed by the CCA, and is procedurally defaulted. *See infra* Section II(A). But Medina presented claims (1) and (3) during his initial state habeas proceedings, and the claims were rejected on the merits by the CCA. ROA.7114–17. The state court's rejection of Medina's claims (1) and (3) is entitled to AEDPA deference; thus, his claims must be reviewed under the "doubly deferential" standard of both § 2254(d) and *Strickland v. Washington*, 466 U.S. 668, 687–88, 690 (1984). *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (citing *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (same). Thus, in reviewing these claims, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101.

The district court correctly found Medina had not shown that the state habeas court was unreasonable for denying his adjudicated IATC guilt-innocence claims. ROA.4699–716. It correctly found that he failed to demonstrate the CCA's decision under *Strickland* was contrary to, or involved an unreasonable application of, clearly established federal law

or based on an unreasonable determination of the facts in light of the evidence presented. *Id*. And it correctly found that Medina failed to present claim (2) to the state court and is, therefore, not entitled to federal habeas review of that claim where he failed to demonstrate cause and prejudice to excuse his default. *Id*. For the following reasons, reasonable jurists could not debate the district court's denial of Medina's IATC guilt-innocence claims.

## A. Medina's claim that trial counsel was ineffective for failing to impeach certain prosecution witnesses is procedurally defaulted.

Medina complains that trial counsel was ineffective for failing to interview in preparation to, or actually, impeach Juarez and Holmes with prior sworn statements. Mot.49–51. This claim was raised for the first time in Medina's 2015 subsequent state habeas application, which was dismissed as an abuse of the writ by the CCA. ROA.5569–71, 5819–33. In doing so, the CCA rejected Medina's claim without addressing the underlying merits. *Id.*; *see* Tex. Code Crim. Proc. art. 11.071 § 5. "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F.

App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).

The federal procedural default doctrine precludes federal habeas corpus review of a procedurally defaulted claim unless the petitioner establishes "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). Medina fails to argue, much less demonstrate, cause and prejudice to overcome the default of this claim. Thus, this Court should consider the point waived. Medina has therefore failed to show that he is entitled to review of this claim. *See Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999). Nonetheless, under a threshold review, reasonable jurists would not debate the merits of this claim. *See infra* Section II(D). Therefore, this Court should deny a COA because "even if the district court's finding of procedural default is debatable, [Medina's] underlying constitutional claims are not." *See Reed v. Stephens*, 739 F.3d 753, 780 (5th Cir. 2014).

## B. The *Strickland* standard

*Strickland*'s two-prong test requires a petitioner to demonstrate counsel's performance was deficient and this deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687–88, 690. According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). And a defendant has the burden of establishing that he was deprived of effective assistance of counsel by a preponderance of the evidence. *Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). To establish deficiency, an inmate must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance applies. *Id.* at 689. To demonstrate prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As explained by the Supreme Court, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

A reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002) (citing *Strickland*, 466 U.S. at 689). Additionally, courts "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). Thus, courts "must be highly deferential" to counsel's performance. *Id.*; *see also Strickland*, 466 U.S. at 689.

Every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 562 U.S. at 102. Thus, trial counsel's strategic decisions are entitled to a strong degree of deference. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984); *see Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Williams v. Collins*, 16 F.3d 626, 632 (5th Cir. 1994). This Court has stated that a "court might even disagree with such a decision, viewing the case in hindsight, and still

determine that the decision was not so seriously inept as to have been professionally unreasonable." *Williams*, 16 F.3d at 632.

### C. Trial counsel was not ineffective for failing to investigate.

Medina first complains generally about trial counsel's investigation for the guilt phase of trial. Mot.48–53. He alleges that trial counsel was ineffective for failing to conduct a reasonable investigation to adequately prepare and present a defense at trial. Mot.46–51. Medina complains that trial counsel performed deficiently because he failed to investigate and subsequently introduce evidence from the following witnesses:

(1) Nacoste, who implicated Holmes, accurately reported that Holmes had buried the murder weapon, and heard Holmes confess to the shooting and plan to blame it on Medina or kill anyone who got in his way;

(2) Becerra, who could have testified that Holmes sought promotion within the LRZ for having pinned the shooting on Medina and threatened to kill Juarez and her family if she did not go along with it;

(3) Villanueva, who could have testified that Holmes confessed to the shooting;

(4) Crawford, who could have testified that Holmes repeatedly expressed a desire to avenge the death of Lopez and who saw Holmes with a long rifle shortly after the shooting; and,

(5) McNickles, who lived near the Rodriguez residence and saw a black man firing an AK-type rifle out of a car matching the description of Moore's that was driven by a black man wearing glasses.

Mot.48–49. All of this evidence was presented to the state habeas court by Medina through witness affidavits. ROA.4701–03.

### 1.   Standard of review

Counsel in a death-penalty case "has 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 691). The "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 521–22. Further, a petitioner who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). And where a petitioner complains counsel was ineffective for not calling a witness, the petitioner must name the witness, demonstrate the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show the testimony would have been

favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

### 2. Factual background

Counsel's strategy at trial was to blame the murder on Dominic Holmes. ROA.4699, 4703. At trial, witnesses in the car driven by Moore fingered Medina as the gunman. Moore, Valadez, and Holmes testified that Medina stuck the rifle out the front right passenger seat window and fired. ROA.9855–58 (Moore), 9985–90 (Valadez), 10088 (Holmes). Juarez testified that on the night of the shooting, Medina told her he had fired the rifle, but two months later, after his arrest, Medina told her to finger Holmes as the shooter. ROA.10139, 10155–56. Medina also wrote a letter to Pooran in which he fingered Holmes as the shooter. ROA.10423.

The defense's theory was that Moore and Holmes were at the New Year's Eve party, left the party in Moore's car, committed the drive-by shooting, and returned to the party. Medina's sister testified that after Medina was arrested, she had a telephone conversation with Holmes in which she testified that Holmes said: "[T]he cops weren't that stupid. They've got to know it's me, but they have to find me before they can take me in." ROA.10205–08. Domingo Valle testified that some days after the

shooting, Holmes said to him, "Yeah, man—excuse my language—I put them hoes to rest." ROA.10238.

Rene Reyna testified that about a week to ten days after the shooting, Holmes told her that he had "made them lay down," that is, killed the victims. ROA.10252. Alex Perez testified he never saw Medina leave the New Year's Eve party with Moore or anyone else. ROA.10280. And, testifying in his own defense, Medina said he saw Moore and Holmes leave the New Year's Eve party several times. ROA.10334–35.

On state habeas, the state court recognized that trial counsel's strategy was to place blame on others, including by presenting evidence that Holmes told others that he committed the offense. ROA.6981. The state court ultimately found that the evidence Medina complains counsel should have investigated and presented through Nacoste, Becerra, Villanueva, Crawford, and McNickles was either available to trial counsel before trial in offense reports or witness statements and corroborated the trial testimony or does not exculpate Medina, and, in fact, may have actually inculpated him. ROA.4703–04, 6980–81.

Trial counsel Guerinot submitted an affidavit in which he stated that he specifically did not call Nacoste to testify because Nacoste was

not credible, and the defense had other witnesses to shift the blame to Holmes. ROA.4703, 6980. The state habeas court found counsel's affidavit to be credible and endorsed counsel's strategic decision not to call Nacoste as reasonable under the circumstances. ROA.6980, 7001. The state habeas court also found that Becerra's and Villanueva's purported testimony would have fit into the narrative that Juarez provided at trial, and, thus, was before the jury. ROA.4704, 6981. And Crawford's and McNickles's purported testimony did not exculpate Medina and may have actually inculpated Medina as much as any other LRZ member. ROA.6980–81.

Ultimately, the state court found that the information Medina presented in the "postconviction affidavits is either information that does not exculpate [him] or is information that was presented at trial and rejected by the jury, as shown by the jury's finding of guilty." ROA.6981. Thus, the court concluded that Medina failed to demonstrate that trial counsel's investigative performance was deficient or prejudicial, and that counsel made reasonable strategic decisions. ROA.7000–01.

### 3. Medina fails to demonstrate that trial counsel's performance was deficient, or that he was prejudiced.

As demonstrated, trial counsel's investigation was constitutionally sufficient to support the reasonable strategic decisions that were made with respect to the evidence presented in support of the defensive theory that Holmes committed the underlying offense. Counsel presented six defense witnesses at guilt-innocence, including Medina. ROA.6952–54. Through those witnesses, and cross-examination of the State's witnesses, counsel made reasonable strategic decisions to support the defense's strategy to shift the blame onto Holmes. ROA.6975, 6981.

Medina is vague about any benefits that would have arisen from additional investigation and pretrial interviews of the State's witnesses, nor has he demonstrated by "any verifiable means . . . how those witnesses would have changed their trial testimony had counsel interviewed them." ROA.4701. Much of the complained-of testimony would not have fundamentally altered the evidentiary picture before the jury. ROA.4704. As the district court noted, "Medina's argument that trial counsel failed to 'present available, helpful evidence on the theory that it had adopted' is 'a difficult route by which to demonstrate

ineffective assistance.'" ROA.4704–05 (quoting *Hummel v. Davis*, 908 F.3d 987, 992 (5th Cir. 2018)). And even if the Court presumed deficiency, Medina has failed to show that had counsel presented the testimony of Nacoste, Becerra, Villanueva, Crawford, or McNickles, the result of his trial would have been different. *See* ROA.4701. While Medina argues this evidence would have undermined the credibility of the State's witnesses, he fails to demonstrate a reasonable probability of a different result. *See Strickland*, 466 U.S. at 694.

Medina fails to meet his burden under *Strickland* to show that counsel's performance was deficient or that he was prejudiced. For the reasons discussed, the state court's rejection of Medina's claim was reasonable, and reasonable jurists would not debate district court's denial of this claim. This Court should deny a COA.

## D. Trial counsel was not ineffective for failing to impeach Juarez and Holmes.

Next, Medina argues that trial counsel performed deficiently by failing to interview Holmes or Juarez which would have prepared counsel to impeach the witnesses at trial with their prior sworn statements. Mot.50. While this claim is undebatably procedurally defaulted,

reasonable jurists would also not debate the merits. *See* Section II(A). This Court should deny a COA.

### 1. Factual background

When initially interviewed by the police, Juarez stated that she "saw the gun by the banks of the bayou" and thought someone may have thrown it into the water. ROA.1910. At trial, Juarez testified that after the shooting, she was not sure whether the guns had been left at "Slim's house" or dumped in a bayou. ROA.10147–48. The next day, after Medina was arrested, she stated that she was present at Pooran's house when the guns were wrapped in plastic and thrown into the grass in an adjacent field. ROA.10153–54. Then, about two months later, police found the guns wrapped in plastic buried on property next to Pooran's house. ROA.9545. But Juarez explicitly denied burying the guns: "I didn't bury them. I didn't know nothing about that." ROA.10154.

During his initial interview on January 11, 1996, Holmes told police that he "ha[d]n't talked to [Medina] since this happened and [he didn't] know what [Medina] did with the A.K." ROA.1885–87. At trial, Holmes testified that on New Year's Eve, after the drive-by shooting, they got back to Candyman's house, and he did not see the gun after that.

ROA.10090–93. The next time he saw the guns "was when we was [sic] wrapping the guns," maybe about five or six days later. ROA.10094–95. He and some others, including Juarez, went to Pooran's house where they wrapped the guns in bags, took them to the side of Pooran's house in a field, and covered the guns with sticks, grass, and "stuff." ROA.10094–96. Holmes testified that he did not bury the guns in the ground or tape them, and he did not know whether someone else had done that later. ROA.10096–98.

### 2. Medina fails to demonstrate that trial counsel was deficient, or that he was prejudiced.

Medina complains that counsel should have cross-examined Juarez with her initial statement to police that the gun was likely in a bayou, but Juarez stated the same on the record at trial. *See* Mot.50; ROA.10153–54. Ultimately, she testified that she did not know where the guns were located after she helped discard of them in the field adjacent to Pooran's house. ROA.10147–48, 10153–54.

Medina also complains that Holmes's trial testimony was inconsistent with his prior sworn statement to police because he originally stated he did not know where the guns were located, and then he admitted to being involved in discarding the guns. Mot.50–51. Police

conducted an initial interview with Holmes on January 11, 1996. ROA.1885. At trial, he stated that about five or six days "after"—presumably, the shooting—he and the others wrapped and hid the guns. ROA.10094–95.

Taken in context of the entirety of the trial testimony, Medina's claim that Juarez and Holmes "lied under oath" is doubtful, therefore any impeachment by defense counsel may have been unsuccessful. First, any statement that Juarez and Holmes made to police is hearsay and depends upon the accuracy of the police scribe. *See* Fed. R. Evid. 802. Second, when considered together, the witnesses' statements to police and their trial testimony corroborate each other. It is reasonable to infer that neither Juarez nor Holmes knew what happened to the guns the night of the shooting, but at some point, after Medina's arrest, they went to Pooran's house to help dispose of the guns. Both witnesses admitted to witnessing or participating in wrapping the guns in bags and discarding them in the field adjacent to Pooran's house. ROA.10090–98, 10147–54. Both witnesses also denied burying the weapons in the ground. ROA.10096–98, 10154. While counsel may have been able to use the

witnesses' prior statements, he would not have necessarily shown that the witnesses committed perjury as Medina suggests.

And, even if deficiency is presumed, Medina fails to show a reasonable likelihood of a different result. Regardless of how or when after the shooting the guns were disposed, witnesses at trial—other than Juarez and Holmes—fingered Medina as the shooter. ROA.4666. And Medina himself testified that, on New Year's Eve, he possessed and pulled a pistol during one confrontation and fired a rifle during a second, later confrontation. ROA.10326–27, 10355. Medina fails to demonstrate that had counsel interviewed Juarez and Holmes, he would have been better prepared to impeach each witness, would have, in fact, impeached Juarez and Holmes, and the result of Medina's trial would have been different. Ultimately, Medina fails to demonstrate that trial counsel was deficient, or that he was prejudiced. *See Strickland*, 466 U.S. at 689. Reasonable jurists would not debate that this claim is meritless.

### E. Trial counsel was not ineffective for failing to impeach witnesses with their criminal histories.

Medina also generally complains that trial counsel failed "to impeach witnesses with their criminal records or cross-examine them with pending charges or parole status." Mot.68. Here, Medina does not

specify which witnesses trial counsel should have impeached with their criminal histories, *see* Mot.68–69, but he does generally complain about Holmes's, Juarez's, Moore's, and Valadez's testimony. *See* Mot.66. Because this claim is inadequately argued, this Court should consider the claim waived. *Trevino*, 168 F.3d at 181 n.3. Even so, for the reasons discussed herein, this Court should deny a COA as to this claim.

During the state habeas proceedings, trial counsel said that he "reviewed the [State's] sub-file labeled 'Criminal Histories' and reviewed the criminal records or inquiries about the criminal records of numerous witnesses. Also the defense investigator ran criminal histories of the witnesses." ROA.6712. The state habeas court ultimately found that "trial counsel was aware of the criminal histories of the witnesses," "much of the witnesses' prior actions [were] inadmissible," and "trial counsel made the strategic decision to attempt to impeach each witness based on that witness's testimony and actions." ROA.6980.

The district court found that the state court's conclusions were reasonable, ROA.4707, and this decision is not debatable. As the district court correctly noted, "trial counsel cannot be deficient for not impeaching witnesses with bad acts and crimes which are inadmissible

under state law." ROA.4706. With respect to this claim, Medina has not alleged any specific criminal history with which any specific witness may have been impeached. *See* Mot.66–69. Therefore, he fails to show that counsel was deficient.

Further, Medina fails to demonstrate that had counsel impeached any witness with criminal history, the outcome of Medina's trial would have been different. The jury already knew that some witnesses had previously violated the law and that the witnesses were intricately entwined with gang culture suggesting a life of lawlessness. ROA.4706–07. Medina fails to demonstrate that any additional evidence about witnesses' criminal activity would have measurably changed the jury's assessment of their credibility. ROA.4706. For the foregoing reasons, the state court's rejection of Medina's claim was reasonable, and reasonable jurists would not debate the district court's denial of the claim. This Court should deny a COA.

### F. Trial counsel was not ineffective for failing to request a limiting instruction.

Finally, Medina alleges that trial counsel was ineffective for failing to request a limiting instruction on extraneous offense evidence related to the July 1995 gang-related attacks on the Rodriguez home. Mot.51.

Medina states that "counsel himself admitted that he was deficient for failing to request appropriate limiting instructions," therefore, he was prejudiced because he was deprived of the reasonable doubt standard Texas law requires before juries can consider extraneous offense evidence. Mot.51, 53 (citing ROA.1966). This Court should deny a COA as to this claim.

### 1. Standard of review

Counsel is not required to make futile motions or objections. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). Trial counsel cannot be deemed ineffective for failing to request an instruction when the petitioner was not entitled to that instruction under applicable state law. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (no deficiency in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998) (no deficiency in counsel's failure to seek admission of document the state court concluded was inadmissible); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (no prejudice where failure to make a meritless objection has no impact on outcome of the proceeding). Critically, a federal court cannot find counsel ineffective

where the state court has held the objection or motion the petitioner argues should have been made was meritless under state law. *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011).

Under Texas Rule of Evidence 404, extraneous-offense evidence may "be admissible . . . as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." Tex. R. Evid. 404. When a petitioner alleges prejudice from trial counsel's failure to raise an objection, he "must show there was a reasonable probability that the trial court would have granted it, or would have reversibly erred by refusing it." *Amos v. Thornton*, 646 F.3d 199, 219 (5th Cir. 2011) (internal quotations omitted). Therefore, Medina must demonstrate that had the complained-of instruction been requested, he would have been entitled to it, and that counsel's failure to request the instruction prejudiced the outcome of his trial.

### 2. Factual background

At trial, the State presented evidence of gang warfare targeting or near in proximity to the Rodriguez family home to place the New Year's Eve shootings into a greater context. ROA.4707. This evidence included testimony about (1) a July 1995 drive-by shooting at the Rodriguez house;

(2) a July 1995 incident where someone threw a firebomb at the Rodriguez house; (3) the painting of gang-related graffiti on the Rodriguez house; and (4) damage to Veronica Rodriguez's vehicle while parked outside of the Rodriguez house. ROA.2692–94, 4707. Other evidence adduced at trial showed that Medina was a member of LRZ; Martinez was a member of the HTC; the two gangs were at odds over the death of Hector Garcia; Martinez was the boyfriend of Veronica Rodriguez; Veronica lived in the Rodriguez family home; and that Martinez was a frequent visitor at the Rodriguez family home. ROA.2701. None of the testimony surrounding the July 1995 incidents at the Rodriguez house expressly inculpated Medina; rather the evidence was offered to place the escalating gang-related-incidents involving Medina's gang—LRZ—and the Rodriguez home into greater context. ROA.4707–08.

The CCA has twice considered and rejected a variation of this claim. Medina challenged the complained-of testimony on both direct appeal and during his state habeas proceedings. ROA.4708, 6979, 7000–02, 7954–56. On direct appeal, Medina argued that the trial court erred by allowing the testimony because the evidence constituted an inadmissible

extraneous offense under Texas Rule of Evidence 404. ROA.4708, 7954–56. The CCA found that trial counsel failed to preserve an objection on that basis, but, even so, the evidence was relevant to explain the context of the gang rivalry and further the State's theory that the Rodriguez home was a target of Medina's gang's violence, thereby having some tendency to show that Medina, an LRZ gang member, had a motive to shoot and kill persons at that house. ROA.4708, 7955–56.

On state habeas, Medina raised the instant IATC claim arguing that trial counsel was ineffective for failing to object to the testimony. ROA. 4708, 7000. Trial counsel filed an affidavit stating that he neglected to request limiting or reasonable-doubt instructions "regarding the numerous extraneous offenses that were introduced against Mr. Medina." ROA.7533. But the state habeas court, relying on the CCA's direct appeal opinion, held that "gang references and testimony were admissible as part of the circumstances surrounding the instant offense and were intertwined with the instant offense," therefore, counsel was "not ineffective for not lodging objections to the admission of relevant evidence." ROA.4708, 6979.

### 3. Medina fails to show that trial counsel was deficient, or that he was prejudiced.

The complained-of extraneous offense evidence was relevant to and admissible at Medina's trial. Even if not implicating Medina expressly, the evidence showed that Medina, a leader and member of the LRZ, had a motive for the New Year's Eve drive-by shooting at the Rodriguez house. As the district court noted, Texas "[s]tate law does not hold evidence to a reasonable-doubt standard or require a limiting instruction when the State relies on same-transaction contextual evidence." ROA.4711 (citing *Camacho v. State*, 864 S.W.2d 524, 534–45 (Tex. Crim. App. 1993); *Ramirez v. State*, 815 S.W.2d 636, 644 (Tex. Crim. App. 1991); *King v. State*, 553 S.W.2d 105, 106 (Tex. Crim. App. 1977)). The prosecution introduced no evidence and did not allege that Medina himself committed those extraneous acts; the evidence was introduced to show the tit-for-tat pattern of gang violence between LRZ and HTC that led to the murders. Because Medina would not have been entitled to a limiting instruction—had counsel requested one—trial counsel's performance cannot be deficient under *Strickland*.[12] ROA.6979, 7000–01.

---

[12] To the extent Medina attempts to amplify his claim by referring to counsel's admission that he did not request a limiting instruction, Mot.70, the admission is

Indeed, this Court cannot disregard the state court's holding that, as a matter of state law, Medina was not entitled to the instruction. *Charles*, 629 F.3d at 500–01. Further, Medina cannot demonstrate that, but for counsel's failure to request an instruction to which he was not entitled, the outcome of trial would have been different.

The state habeas court rejected Medina's claim because trial counsel was not ineffective for not lodging objections to the admission of evidence that was relevant to explain the context of an existing gang rivalry and to Medina's motive and intent on the night of the offense. ROA.6979. For the foregoing reasons, the state court's rejection of Medina's claim was reasonable, and reasonable jurists would not debate the district court's denial of the claim. This Court should deny a COA.

## III. Reasonable Jurists Could Not Debate the District Court's Denial of Medina's IATC Claim Related to the Punishment Phase of Trial.

Next, Medina seeks a COA to appeal the district court's denial of his claim that trial counsel rendered ineffective assistance during

---

irrelevant. *See Richter*, 562 U.S. at 109–10 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

punishment by failing to sufficiently investigate Medina's life before developing a sentencing-phase defense. Mot.73–78. Medina presented this claim during his state habeas proceedings, and it was rejected on its merits. ROA.7117. Therefore, § 2254(d) deference applies, and no reasonable jurist could debate the district court's denial of Medina's claim. A COA should be denied.

## A. The *Strickland* standard as it applies to punishment.

The general standard for assessing ineffective assistance of counsel is set forth in Section II(B), *supra*. As it relates to errors at the sentencing phase of a death-penalty trial, counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (internal quotations omitted). This obligation requires counsel "to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal*, 286 F.3d at 236 (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)). To that end, defense counsel "must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potentially mitigating themes." ROA.4718.

A sentencing strategy can be based on negating the State's future-dangerousness allegations, that is, based upon showing the petitioner's future peaceableness. *See Ayers v. Belmontes*, 549 U.S. 7, 15 (2006) (noting that "some likelihood of future good conduct [may] count as a circumstance tending to make a defendant less deserving of the death penalty"). Or a defense can be based upon evidence that a defendant has a mental defect, *see Penry v. Lynaugh*, 492 U.S. 302, 320 (1989), or faced childhood hardship, *see Abdul-Kabir v. Quarterman*, 550 U.S. 233, 239 (2007). Mental defect and childhood hardship evidence can be considered a two-edged sword; that is, "it may diminish [a defendant's] blameworthiness for his crime even as it indicates that there is a reasonable probability that he will be dangerous in the future." *Penry*, 492 U.S. at 324. But counsel is not necessarily ineffective for failing to present any such evidence. *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999); *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997). And counsel's strategy, unless rebutted, must be presumed sound. *See Strickland*, 466 U.S. at 690.

As to prejudice, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have

concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 534. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.

Furthermore, given the state court's rejection of Medina's IATC-punishment claim, Medina is entitled to federal habeas relief *only if* the state court's determination that Medina did not satisfy *Strickland* is objectively unreasonable under § 2254(d). *Richter*, 562 U.S. at 101. Therefore, under AEDPA, the district court's review of the state court's resolution of Medina's IATC-punishment claim was "doubly deferential." *Pinholster*, 563 U.S. at 190.

## B. Trial counsel was not ineffective during the punishment phase of trial.

Medina alleges that trial counsel was ineffective for failing to investigate and present evidence of his home life, school performance, and history of gang involvement and for failing to conduct a mental

health evaluation prior to developing a defensive strategy for the punishment phase of trial. Mot.73–78. Medina complains that trial counsel waited until just days before trial to begin a sentencing phase investigation, did not meet Medina's father until trial began or his mother until she testified during guilt-innocence, and, except for some brief pretrial discussion, failed to meet with any of the witnesses until partway through the sentencing phase. Mot.74. Further, Medina complains that trial counsel failed to obtain funding for a mental health evaluation until the eve of trial, and then failed to procure an evaluation, which would have shown that Medina suffered from post-traumatic stress disorder (PTSD). Mot.73, 77–78. This Court should deny a COA.

### 1. Factual background

Before the punishment phase began, the jury had heard "significant evidence showing that Medina was a violent man." ROA.4719. "Jurors knew that Medina recklessly fired an assault rifle into a crowd of youngsters in retaliation for a gang murder"; "that Medina was not just a gang member, but an important leader in the LRZ"; "other aggressive acts Medina committed against rival gang members on the night of the shootings"; and "that Medina, instead of showing remorse, attempted to

orchestrate a plan that would blame the murders on a subordinate gang member." *Id*. During its punishment case, the State "showed that the murders for which Medina was convicted were only a part of the brutally escalating violent acts he committed." *Id*. The State presented the following evidence during punishment:

- Edward Johnston testified he and Medina skipped school almost daily after they met in 1991; they took turns slashing the tires of 8 to 12 cars at a time; Medina drove his SUV into other cars to damage them or to push them into street intersections; and, they stole items from the cars after they smashed the windows with a sledgehammer.

- Medina was arrested on October 28, 1993, and multiple counts of burglary of a motor vehicle were filed against Medina and his accomplice.

- Delberta Storz, probation officer, testified Medina received five years probation for the offense of burglary of motor vehicle in cause numbers 678640 and 678641, and motions to revoke Medina's probations were filed within ten months based on Medina's failure to comply with the terms of probation.

- Medina received ten years probation on December 23, 1994, in four arson cases, and that Medina's original probations for burglary of a motor vehicle continued with amended conditions.

- Medina violated the terms of his probation, his probation was revoked, and he was sentenced in all six cases.

- Sixteen-year old Dante Medrano, a former South Side Syndicate Crips gang member, testified Medina and Robert Lucio drove by Medrano's house in December, 1995; Medrano heard gunshots and saw Medina hanging from the car window with a rifle; bullets hit Medrano's house; and, Medrano grabbed his father's .22 rifle and shot twice at the car.

- Rocio Pedrosa testified she was shot on New Year's Eve at the Rodriguez house; she had a three-hour surgery on her destroyed colon, was in the hospital for eleven days, and still had a colostomy bag at the time of Medina's trial; a future surgery was scheduled to replace the colostomy bag with an ileostomy tapedown; she had not returned to school; and, she had nightmares and flashbacks and was afraid to be alone.

- Jesus Rodriguez, father of complainants Diane and David, testified he was in the house when he heard the shots from the drive-by shooting; he ran outside and saw his daughter, son, and Pedrosa; his wife could not sleep and was sick and nervous after the shooting; and, his son Francisco was different after the shootings and his daughter Jennifer gave him a poem about her feelings after the shooting.

*See* ROA.6955–56; *see also* ROA.4720.

During the state habeas proceedings, trial counsel Guerinot submitted an affidavit explaining the defense's punishment strategy was "to present a picture of the defendant's background and home life to show

that he was not a future danger."[13] ROA.6713. Thus, counsel introduced evidence that despite being raised in proximity to gang violence, Medina grew up in a close, loving family, had positive traits, and did not pose a future danger. ROA.4732–33. Counsel called seven witnesses during the punishment proceedings:

- Verlan Pegues testified about Medina's help and his good characteristics; Medina had a speech impediment that he overcame; and, Pegues had not seen Medina much since he was fourteen.

- Sherry Grein, Medina's aunt, testified about Medina's good qualities and stated that she did not have as much contact with Medina in the last couple of years.

- David Castro, Medina's cousin, testified that Medina lived in a gang area; he was not aware of Medina having problems; Medina was respectful and courteous to family members; and, Medina helped with house repairs.

- Eva Uribe, Medina's aunt, testified she picked up Medina and his sisters from the Bellaire Christian Academy when they attended; Medina was involved in church; he would protect Uribe's younger daughters; he was respectful toward family members; he would help his grandfather who had suffered a mild stroke; he was a loving, caring person who took care of his son; and she

---

[13] In the defense's division of responsibilities, Mr. Millin prepared for the penalty phase. ROA.4721. At that time, Millin was suffering from terminal illness. ROA.4721, 4724. But, according to Guerinot: "Millin's terminal illness did not hinder his ability or his performance. He was able to perform his duties and thoroughly prepared the punishment phase of the case, presented the punishment evidence, and argued the punishment case." ROA.6711–12.

was not really aware of Medina's gang involvement, but she eventually learned that Medina was in a gang.

- Antonio Hernandez Medina, Medina's grandfather, testified Medina was intelligent, mechanically-inclined, and helpful to his relatives with errands and auto repairs; he interacted with children and was respectful to adults.

- Anthony Luna Medina, Medina's father, testified that Medina was a good child; he spent a lot of time with grandparents; he got along well with children in the family; he helped his family, had a good relationship with his parents, and his relationship with family stayed the same when he became a teenager. Medina testified that he learned about Medina's gang activities after he was arrested; he knew Medina had been previously arrested for being in a gang fight and knew there were several gangs in the neighborhood; there was nothing to indicate Medina's gang activity except his music and some of the people who came to the house; and, Medina was a good person whom Medina loved.

- Golda Medina, Medina's mother, testified she and her husband had been married twenty-two years; they had two daughters and Medina; Medina was a good child, polite, respectful, and had no problems; Medina worked with his dad and helped his grandfather; Medina was good with children; and, Medina's family loved him. She testified that Medina's change in behavior as he became a teenager was like most teenagers; she learned about Medina's gang activity after the fact; she and her husband talked to Medina after they learned about the gang activity and thought that it had an effect; they always tried to do what was best for Medina; he was a good kid who did some stupid and bad things but who tried hard to work and take care of his family and be

> more a part of his family and less a part of the gang; and, they still loved him very much.

*See* ROA.4721–22, 6984–86. Then, in closing, counsel first highlighted Medina's ability to control his behavior in a controlled environment like prison, arguing that the evidence did not tend to show that Medina would be a continuing threat to society. ROA.10744–51. Second, counsel argued there was sufficient mitigating evidence to warrant a life sentence rather than death, like Medina's age and his intoxication at the time of the offense. ROA.10754.

In support of this claim during the state habeas proceedings, Medina offered affidavits from sixteen individuals: friends and family who testified during punishment, friends and family who did not testify,[14] and experts. ROA.7595–96 (Eva Uribe), 7598–600 (Golda Medina), 7602–03 (David Castro), 7605–06 (Kim de la Cruz), 7608–10 (Samuel Gallegos), 7612–14 (Lilliam Lee Crowson), 7616–18 (Ruben Gallegos), 7620–21 (Verlan Pegues), 7631–40 (Dr. Paula K. Lundberg-Love), 7660–61 (Sherry Grein), 7663–64 (Tiffany Kimberlin), 6565–66 (Elaine Butler), 6568–69 (Catherine Uribe), 6571–72 (Tamara Crosby), 6600–03 (Charles

---

[14]    All of the individuals who did not testify at trial stated that they would have testified had Medina's attorneys asked them. ROA.4727.

Rotramel), 6605–06 (Charmin Tanner). These affidavits described, in relevant part, that Medina's father was absent and drank a lot; Medina's mother smoked weed during his childhood; Medina's parents had marital problems and fought; Medina's mother suspected his father of having an extramarital affair; Medina's mother was physically and sexually abused as a child, ran away from home, married and divorced several times, and was homeless at some points; Medina suffered from PTSD from a single traumatic episode where he witnessed the drive-by shooting of his best friend, an incident of which no one else knew; and there was a clash between Medina's home environment and the values of his school and church. ROA.2751–54.

Trial counsel described the defense's efforts to prepare for the punishment phase in an affidavit addressing Medina's claims. ROA.7016–19. The state habeas court found counsel's affidavit to be credible. ROA.6986. Counsel stated that before trial he "engaged the services of an investigator; interviewed witnesses; . . . visited the scene of the offense; interviewed [Medina's] family, and talked with the defendant numerous times about the offense and pending trial." ROA.7016. During interviews with Medina's family, "no family member

told the defense that the father drank or that the mother smoked marijuana or that the parents fought." ROA.7018. And "[t]he defense did not present a mental health expert for so-called psychological scars from a stutter[] that was cured and far-removed from the offense." *Id*. Rather, the "defense presented all the punishment evidence which was discovered and which [they] considered helpful to [Medina]." *Id*.

Ultimately, the state habeas court found that counsel "performed his duties and thoroughly prepared for punishment" by "interviewing witnesses, including Medina's family, presented evidence, and made argument." ROA.6982. Much of the information that Medina presented in the affidavits was presented to his jury or was merely an enlargement upon counsel's strategy to present evidence that Medina was essentially a "good person caught in a bad environment." ROA.6986–87. Some of the information presented in the affidavits was conclusory, vague, or inconsequential. ROA.6986. And Dr. Lundberg-Love's assertion that Medina suffered PTSD from "significant trauma suffered during childhood" was unpersuasive in light of extensive evidence that Medina "was a good kid who lived in a rough neighborhood and went wrong after he joined a gang at the age of thirteen." *Id*.

The state habeas court also found that counsel was unaware that Medina's father drank a lot or was absent, that Medina's parents fought, or that his mother smoked marijuana when Medina was a child. ROA.6986–87. Counsel "presented extensive punishment evidence to support the defensive theory that Medina would not be a future danger." ROA.6987. Thus, Medina failed to show that counsel was deficient in his punishment representation, or a reasonable probability of a different result had additional evidence been presented. ROA.7000–01.

### 2. Medina fails to show that trial counsel was deficient, or that he was prejudiced.

Medina argues that counsel was deficient because he conducted a "superficial and slipshod investigation." Mot.73. He further complains that counsel waited until the days before trial to begin a sentencing phase investigation, and he failed to meet with witnesses or go over their testimony before calling them to the stand. *Id.* at 73–74. The district court summarized the evidence that Medina complains should have been presented during punishment as focusing on three factors: (1) turmoil in the Medina household; (2) social stigma from childhood stuttering; and (3) witnessing the murder of his best friend. ROA.4734. Had trial counsel adequately investigated this evidence before trial and presented it to the

jury, Medina argues there is a reasonable probability that he would not have been sentenced to death. Mot.75.

Before counsel can be found deficient, counsel must have had notice that further investigation was warranted. *See Martinez v. Dretke*, 404 F.3d 878, 886 (5th Cir. 2005) (finding counsel effective when nothing in their investigation put them on notice that further investigation was needed and where defendant's family was unwilling or unable to assist); *Wiggins*, 539 U.S. at 523–25 (finding counsel deficient for not following up on information already in counsel's possession or readily available).

As noted, the record indicates that counsel did interview some— albeit not all—of the available punishment witnesses prior to their testimony. ROA.6986. During those interviews, he learned of Medina's supportive upbringing and loving family, as well as the influence of living in a rough neighborhood with gang activity. *Id*. Counsel presented evidence that Medina posed no problems growing up, ROA.10657, 10661, 10682, 10696–98, 10711, 10715; was polite, respectful, and good with both adults and children in his family and helped family members, ROA.10657, 10661, 10694, 10683–85, 10696–97; and was intelligent, mechanically inclined, and involved with church and private school,

ROA.10664–65, 10672, 10681, 10693. Counsel also presented evidence that when Medina began to get involved with gangs, his parents intervened and talked to him about it. ROA.10713.

The record was replete with this evidence during both the guilt-innocence and punishment phases of trial; as such, much of the complained-of evidence was actually presented during trial or would have merely been an enlargement upon that which was presented. *See* ROA.4733; *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007) (finding no *Strickland* error in the accumulation of additional good-character evidence when trial counsel presented similar mitigating evidence). Counsel was unaware that some of the alleged home-life problems existed, and the witnesses at trial failed to mention any of those alleged problems. ROA.4732–33, 6986–87; *see Johnson*, 306 F.3d at 252–53 ("This Court has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose.").

Additionally, evidence of childhood difficulties and mental defects are double-edge evidence that may be either aggravating or mitigating. *See Penry*, 492 U.S. at 324. Counsel must be given great leeway in his

determination about whether to present potentially aggravating evidence. *See Woodfox v. Cain*, 609 F.3d 774, 810–11 (5th Cir. 2010). Medina never told anyone about the alleged PTSD-triggering incident during which he saw his best friend killed in a drive-by shooting. ROA.4736. Nothing suggests that counsel had information from any source, much less Medina himself, that would prompt additional investigation into that event. ROA.4737. And while Medina's childhood stutter-related evidence was presented at trial, ROA.6986, counsel made a reasonable strategic decision not to focus on that evidence because the stuttering condition was cured and far-removed from the underlying offense. ROA.6983.

Counsel cannot be deficient when nothing in their investigation put them on notice that further investigation was needed. *See Martinez*, 404 F.3d at 886. As demonstrated, counsel made strategic decisions with respect to what punishment evidence to present and highlight to the jury to support his defensive theory, and those decisions must be viewed with the assumption that counsel was acting reasonably. *See Strickland*, 466 U.S. at 689. Medina failed to show that counsel performed deficiently.

And, even if deficiency is presumed, Medina fails to show prejudice. Much of the evidence Medina complains should have been presented may have been aggravating and acted to his detriment. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). A reasonable attorney would have to weigh the testimony about his parents' alleged fighting and substance abuse issues against showing the jury that Medina was a good individual with strong family support. ROA.4735.

The evidence about Medina's alleged childhood trauma and tumultuous household was weak. ROA.4735. No evidence showed that his parents physically, sexually, or emotionally abused him; and, instead, the record was replete with witnesses describing how supportive Medina's family, including his mother and father, was. Witnesses who did testify at trial and later submitted affidavits during the state habeas proceedings were not forthcoming about the alleged turmoil in the Medina household until after a death sentence was imposed. ROA.4735. Any assumption that the witnesses would have been more forthcoming had counsel probed deeper and asked more questions is purely speculative. And, that evidence still would have been weighed against the positive evidence about Medina's family life. *Id*. While a different

attorney may have come to a different conclusion about the punishment strategy employed, "[t]here are countless ways to provide effective assistance in any given case[.]" *Strickland*, 466 U.S. at 689.

Similarly, Medina fails to demonstrate that he was prejudiced by counsel's failure to present evidence of PTSD. The record demonstrates that Medina failed to describe the triggering incident to anyone before trial. ROA.4736–37. Medina's complaint that counsel should have presented evidence of this alleged incident is entirely meritless, as the only source for such information obviously was Medina, and Medina withheld that information from counsel—and apparently everyone else in his life. His complaint now that counsel should have investigated and presented evidence that he suffers from PTSD must fail, because there was no indication to anyone, but especially not to counsel, that Medina experienced this alleged traumatic incident. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

Following his investigation and the evidence uncovered, trial counsel pursued a strategy of challenging the State's future-dangerousness allegations in an attempt to avoid a death sentence.

Medina fails to show that any of the complained-of evidence about the alleged turmoil in his childhood home or his alleged mental-defect would have led to a different outcome. *See Strickland*, 466 U.S. at 687.

For the reasons discussed, Medina does not show that counsel's failure to discover and present additional family background or mental-defect evidence amounted to deficient performance, or that had counsel presented such evidence, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687, 695. Thus, the state court's rejection of Medina's claim was reasonable, and the district court's rejection of this claim is not debatable. This Court should deny a COA.

## IV. Reasonable Jurists Could Not Debate the District Court's Denial of Medina's Prosecutorial Misconduct Claims.

Last, Medina seeks a COA to appeal the district court's denial of his claims that the State erred by suppressing *Brady* evidence. Mot.86–97; *Brady*, 373 U.S. 83. Medina characterizes his claim as a single prosecutorial misconduct claim, in which he alleges the State violated his due process rights by suppressing *Brady* evidence and by presenting false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Mot.86. But Medina's allegations should not be treated as a single claim, as he presented his claims to the state court in different proceedings and

alleged the suppression of different "material" evidence. Therefore, the district court properly found some of Medina's *Brady* claims to be procedurally defaulted and the others to be meritless. This Court should deny a COA.

### A. The district court correctly separately considered Medina's prosecutorial misconduct claims.

Before addressing the merits of his prosecutorial misconduct claims, the district court evaluated whether Medina had exhausted them. The district court determined that Medina's *Brady* claims fell into two categories: (1) renewed *Brady* arguments made in his initial 2001 state habeas application, in which he alleged that the State withheld (a) material impeachment evidence for State witnesses and (b) evidence suggesting the existence of alternate suspects; and (2) new arguments alleging that the State withheld witness statements, files, and documents and presented false testimony in contradiction to the same. ROA.4740–41, 4746–47.

Medina raised the first of his *Brady* claims in his initial state habeas application which the CCA denied on its merits. ROA.7117, 7174–91. Following a stay in his federal proceedings to allow Medina to exhaust the second claim, Medina raised his new *Brady*/false testimony claim in

a subsequent state habeas application. ROA.5732–80. The CCA dismissed that application pursuant to Texas Code of Criminal Procedure article 11.071 § 5 as an abuse of the writ. ROA.5569–71 (-05).

The district court then addressed Medina's claims separately based on when the claims were presented to the state court and what evidence Medina alleged had been suppressed. ROA.4740–48. The lower court applied § 2254(d) review to the *Brady* claim that was adjudicated on the merits in state court, denied that claim on its merits, and found that the second *Brady*/false testimony claim was procedurally defaulted, and that Medina failed to overcome the default by demonstrating cause and prejudice.[15] *Id*.

Medina complains that the district court erred by treating his *Brady* allegations as separate and distinct claims and by applying § 2254(d). Mot.99–106. Medina argues the new evidence pled in the

---

[15] The district court found the following claims were procedurally defaulted: (1) Juarez's testimony and the disposal of the murder weapon; (2) deals the prosecution had with Holmes; (3) deals the prosecution may have had with other witnesses, such as Valadez and Moore; (4) information the police received that indicated the shooter was black; (5) evidence that would impeach various witnesses; and (6) evidence about the shooter in the July 1995 drive-by at the Rodriguez home. ROA.4747. Here, Medina challenges the district court's rejection of claims (1), (2), (4), and (5). *See* Mot.87–93, 99–102. The Director maintains that these claims are undebatably procedurally defaulted. But reasonable jurists would not debate that the claims are also meritless.

subsequent state habeas application fundamentally altered his existing *Brady* claim, rendering the entire claim unexhausted for § 2254(d) purposes. Mot.101. But *Pinholster* explicitly precludes this argument. *See Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012). As this Court explained, "the exhaustion requirement of § 2254(b) is a reinforcement of, rather than an escape hatch from, the rule that a federal habeas court's review is limited to the state court record." *Id*. Thus, a petitioner cannot avoid the deferential standard of AEDPA by doing exactly what *Pinholster* proscribed—and Medina attempts to do here—adding new evidence. For these reasons, the *Brady* claim raised in his subsequent state application challenging the suppression of different evidence, and supported by new evidence, was distinctly different from the *Brady* claim raised in his initial state application, and the claims must be treated separately. *See id*.; *Nelson v. Lumpkin*, 72 F.4th 649, 660 (5th Cir. 2023), *petition for cert. filed*, No. 23-635 (U.S. Dec. 22, 2023). Therefore, the district court properly held Medina's claims raised in his subsequent application were procedurally defaulted.

**B. Medina's claim that the State withheld certain statements and elicited false testimony is procedurally defaulted, and he fails to demonstrate cause and prejudice.**

As discussed, the CCA relied on Texas Code of Criminal Procedure article 11.071 § 5 to find that Medina's subsequent state habeas application was an abuse of the writ. ROA.5569–71. In doing so, the CCA rejected Medina's claims that the State withheld certain statements, files, and documents from the defense and subsequently elicited false testimony in contradiction to those statements in violation of *Brady* and *Napue* without addressing the underlying merits of the claims. *See* Tex. Code Crim. Proc. art. 11.071 § 5.

"A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez*, 590 F. App'x at 384 (quoting *Hughes*, 530 F.3d at 341). This procedural bar applies to Medina's claims contained in Sections IV(C)(1)(i), (ii), and (iv), and IV(C)(3). Indeed, the CCA's dismissal carries with it an implicit finding that the claims could have been raised earlier, which Medina was required to rebut with clear and convincing evidence. *See Prible v.*

*Lumpkin*, 43 F.4th 501, 515, 519 (5th Cir. 2022); *Ford v. Davis*, 910 F.3d 232, 235, 237 (5th Cir. 2018).

Under *Strickler v. Green*, 527 U.S. 263, 283 (1999), and the Supreme Court's subsequent decision in *Banks v. Dretke*, 540 U.S. 668 (2004), for a procedurally defaulted *Brady* claim, "cause" to excuse the default parallels the suppression component of a *Brady* claim while "prejudice" parallels "materiality." *See Banks*, 540 U.S. at 691. Thus, to overcome the procedural default of his claim, Medina must demonstrate that his default was caused by the suppression of evidence by the State and that the suppressed evidence was material. *See Strickler*, 527 U.S. at 283. The relevant inquiry is whether suppressed, material evidence *caused* the procedural default, not simply whether a *Brady* violation occurred. *Id.*

In the lower court, Medina argued "that the suppression of the evidence—during trial, during the initial round of state habeas, and insofar as it continued—should forgive his failure to raise the unexhausted portions of his *Brady* claim in his [original] state habeas application." ROA.4747. But the district court found that Medina failed to demonstrate cause and prejudice because the new allegations rested

"wholly on speculation and surmise," and Medina failed to show that the information was not previously available to him with the exercise of diligence." ROA.4748.

Now, Medina complains about the district court's attribution of fault to Medina for his failure to present the evidence earlier, arguing that he relied on the State's open file policy and the State failed to produce these statements. Mot.103–04. But Medina's claim is wholly conclusory, and he has failed to present any concrete evidence that the State actually suppressed—or elicited false testimony in contradiction of—any exculpatory statements. ROA.4747–48. And this Court has cautioned that it is "unwise to infer the existence of *Brady* material based upon speculation alone." *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (internal quotations omitted). Medina's conclusory assertions are plainly insufficient to rebut the presumption that he could have raised his claims earlier. *See Ford*, 910 F.3d at 235.

Further, as the district court noted, Medina fails to demonstrate that this claim was not previously available to him through the exercise of diligence because Juarez apparently admitted to postconviction counsel that she had given a statement before trial to the State and her

trial testimony thereafter was false. Mot.96–97; ROA.4748. Medina has sought discovery to substantiate his new prosecutorial misconduct claims and to establish cause and prejudice, but he has failed to demonstrate through competent evidence that he is entitled to discovery and that request has been repeatedly denied. ROA.1577–78, 4751. As Medina failed to develop the factual basis of his claims in the state court proceeding—and continues to seek discovery throughout his federal court proceedings—he pleads himself into, and must satisfy, § 2254(e)(2)(A)(ii).

Medina complains the district court erred by denying his requests for factual development, both for the merits of the underlying claim and to demonstrate cause and prejudice for the default. *See* Mot.104–06. But reasonable jurists would not debate the district court's denial of Medina's discovery requests. Medina has not established that the factual predicate of his claim could not have been discovered earlier, or at least during his original state habeas proceedings, if counsel had contacted Juarez. ROA.4227–28, 4748. And even if he somehow met the stringent requirements of § 2254(e)(2)(A), Medina would still not be entitled to evidentiary development under § 2254(e)(2)(B) unless he could show actual innocence—which he fails to do. (*Michael*) *Williams v. Taylor*, 529

U.S. 420, 436 (2000). Because he has provided no concrete evidence that such claims, even if developed, could demonstrate that no reasonable factfinder would have found him guilty of capital murder but for the alleged constitutional error, Medina is not entitled to evidentiary development of his claims. 28 U.S.C. § 2254(e)(2)(B).

And, to the extent Medina raises his complaint about the district court's denial of factual development as an independent ground for this Court to grant a COA, the COA requirement does not apply to appeals of the denial of evidentiary development. *See* Mot.104–06; *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018); *Norman v. Stephens*, 817 F.3d 226, 234 (5th Cir. 2016). Medina fails to demonstrate that the district court's denial of evidentiary development was an abuse of discretion. *Halprin*, 911 F.3d at 255.

Here, Medina fails to argue—much less demonstrate—cause and prejudice, therefore this argument should be considered waived, and his claims in Sections IV(C)(1)(i), (ii), and (iv), and IV(C)(3) subject to the procedural default. *See Trevino*, 168 F.3d at 181 n.3. For the foregoing reasons, the district court's default of this claim is not debatable. And

while the district court did not reach the merits of this claim, the claim itself is not debatable. *See infra* Section IV(C).

## C. Reasonable jurists cannot debate that Medina's *Brady* and false testimony claims are meritless.

To be entitled to relief under *Brady*, a petitioner must prove that (1) evidence favorable to the accused, because it is either exculpatory or impeaching, (2) was suppressed by the State, either willfully or inadvertently; and (3) was material. *Banks*, 540 U.S. at 691. Medina must show a "reasonable probability of a different result" in order to demonstrate the materiality of the allegedly suppressed evidence. *Id.* at 699 (quoting *Kyles v. Whitely*, 514 U.S. 419, 434–35 (1995)). Most of Medina's *Brady* allegations rest entirely on speculation and are wholly conclusory. This Court has warned that a federal habeas proceeding is not a fishing expedition, *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), and that a *Brady* allegation based on pure speculation is subject to dismissal as conclusory. *See Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). Conclusory allegations are insufficient to warrant discovery; the petitioner must set forth specific allegations of fact. *United States v. Webster*, 392 F.3d 787, 802 (5th Cir. 2004). Medina's conclusory assertions wholly fail to satisfy the standard.

Further, to prove a due process violation for the presentation of false testimony pursuant to *Napue*, the petitioner must demonstrate (1) the testimony in question was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material. *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014); *Napue*, 360 U.S. 264. Perjured testimony is material *only* when there is a reasonable likelihood that the false testimony could have affected the outcome of trial. *United States v. Agurs*, 427 U.S. 97, 103 (1976). The materiality standard for a false-evidence claim is less onerous than that of a *Brady* claim, but is equivalent to the *Chapman v. California*, 386 U.S. 18 (1967) harmless-error standard. *United States v. Bagley*, 473 U.S. 667, 678–82 (1985).

Finally, for Medina's *Brady* and false-testimony claims that were denied on the merits by the state court, he must show that the state court's finding was unreasonable. *See* 28 U.S.C. § 2254(d). Further, the Supreme Court has held that a federal court cannot grant relief unless it finds both that the state court's holding was unreasonable, and the petitioner shows harm under *Brecht*. *Brown v. Davenport*, 596 U.S. 118, 122 (2022); *Brecht v. Abrahamson*, 507 U.S. 619 (1993). For the following

reasons, this Court should deny a COA as to all of Medina's *Brady*/false-testimony claims.

> **1.  Medina fails to show that the State withheld material evidence.**

Medina complains that the State withheld material impeachment evidence for several key witnesses and evidence that witnesses saw a Black shooter. Mot.87–95.

> **i.  Impeachment evidence for Juarez**

Medina argues that the State withheld evidence of an undisclosed deal for Juarez's testimony, pre-trial interview notes proving that she lied at trial, and her criminal history. Mot.88–89. First, Medina argues the State had a deal with Juarez in exchange for her testimony and failed to disclose it. Mot.88. To substantiate his claim, Medina relies on a phone call made by Juarez to postconviction counsel in which Juarez allegedly told counsel she "testified against Medina pursuant to a deal to avoid prosecution." Mot.88. But this statement developed from the argument made in the lower court that Juarez said she "had to testify for the State or go to jail herself." ROA.1579.

Juarez was subpoenaed by the State to testify and, as such, was subject to sanctions should she fail to appear. *See* Tex. Code Crim. Proc.

Art. 24.05; Tex. Gov't Code § 21.002; ROA.2712–13. Aside from her statement that she had to testify or "go to jail herself," there is no evidence in the record of any deal between Juarez and the State. But it can be presumed that had Juarez not appeared to testify at Medina's trial, she would have been confined in jail for contempt of court. *See id*. This is not the type of "deal" as encompassed by *Brady*.

Second, Medina argues that he "has never seen any document . . . contradicting [Juarez's] sworn statement[] to the police," but he speculates that such a document exists because while Juarez initially swore she had not seen the murder weapon since the night of the crime, "she testified to a new gun burial story that came as no surprise to prosecutors." Mot.88–89. As noted, Juarez testified that after the shooting, she was not sure whether the guns had been left at "Slim's house" or dumped in a bayou. ROA.10147–48. The next day, after Medina was arrested, she was present at Pooran's house when the guns were wrapped in plastic and thrown into the grass in an adjacent field. ROA.10153–54. Then, about two months later, police found the guns wrapped in plastic buried on property next to Pooran's house. ROA.9545.

But Juarez explicitly denied burying the guns: "I didn't bury them. I didn't know nothing about that." ROA.10154.

Medina fails to demonstrate that any such document exists—and was withheld—in which Juarez contradicted her original story involving the guns. Juarez denied having any involvement in burying the guns, and it would be reasonable for the factfinder to assume that after the guns were discarded in the grass, someone else retrieved them and buried them. Both this and Medina's first claim that any deal existed are wholly speculative and conclusory. *See Murphy*, 205 F.3d at 814.

Finally, Medina complains that the State suppressed Juarez's "rap sheet" and then urged the jury to credit her testimony because she had never been in trouble before. Mot.89–90. Juarez was fifteen years old at the time of the offense and sixteen at trial. ROA.1998. In Texas, evidence of juvenile adjudications are not admissible for impeachment purposes, Tex. R. Evid. 609(d), and the exclusion of juvenile adjudications for impeachment purposes is constitutional where the party wishes to use the adjudication for general impeachment only, *see Bilbrey v. State*, 594 S.W.2d 754, 758 (Tex. Crim. App. 1980). Medina complains that the State opened the door to Juarez's criminal history when it falsely told the jury

that she had never been in trouble, and that the criminal history "was relevant to [Juarez's] willingness [to] subvert criminal trials." Mot.90 fn. 9. Even assuming Medina could have used the juvenile record to impeach Juarez, he fails to show that this evidence was "material" to his case and that the result of the proceedings would have been different. *See* Section IV(C)(3).

## ii. Impeachment evidence for Holmes

Medina next complains that the State withheld evidence of an undisclosed deal with Holmes, a statement or interview notes proving that Holmes lied or was prepared to lie at trial, Holmes's statement to police that Valadez had, or disposed of, the murder weapon, and Holmes's criminal record. Mot. 90–93.

With respect to a "deal," Medina speculates that because Holmes was never prosecuted for his involvement with the underlying offense—specifically, his alleged tampering with evidence—Holmes must have received leniency through some inducement to testify for the State. Mot.90–91. The factual basis for this claim was provided by a magistrate—before whom Holmes was brought pending criminal charges—who noted that "[Holmes] said the officers told him that if he

told them what happened they would probably help him out and see what they could do for him. But no specific promise was made to him." Mot.90–91 (citing ROA.1950). The magistrate, and ultimately, the state habeas court, found that the police, in fact, did *not* make a deal with Holmes. ROA.6959. Simply because Holmes was never prosecuted does not demonstrate the existence—or suppression—of any deal, much less the type of deal of which *Brady* requires disclosure.

Medina next complains that the State met with Holmes prior to trial and rehearsed a story about the murder weapon that was inconsistent with his sworn statement given to police and failed to disclose that information. Mot.92. The portion of the record cited by Medina indicates that Holmes had a conversation with the State prosecutors before trial, yet there is nothing in the record that suggests any written statement, interview notes, or other document exists requiring disclosure to the defense. ROA.10093–94.

Medina also complains that the State "buried" information that Holmes told police Valadez either had the gun or had disposed of it. Mot.92. Medina points out that this information was available to the defense in a police report but claims it was not documented in Holmes's

statement. *Id*. The police report indicates that officers told Valadez that Holmes stated Valadez "may have or disposed of the murder weapon in this offense." ROA.1897. Nothing in the record indicates Holmes gave the police this information on the same day he made his statement, ROA.1885–87, and, in any case, the information was available to and reviewed by the defense. ROA.6711. *Brady* does not require that prosecutors or investigators memorialize all investigative interviews. Medina's claims are wholly speculative and conclusory. As such, Medina fails to demonstrate that any such evidence or records exist and were withheld, or that they were both favorable and material to the defense. *See Murphy*, 205 F.3d at 814.

Finally, Medina argues that the State withheld Holmes's juvenile criminal history. Mot.93. As discussed, juvenile criminal history is not admissible for general impeachment purposes, and Medina fails to allege any other reason for which Holmes's juvenile criminal history should have been disclosed or would have been admissible. *See Bilbrey*, 594 S.W.2d 754.

### iii. Impeachment evidence for Valadez

Medina complains that the jury should have heard evidence that Valadez was charged with capital murder on January 11, 1996, but the charge was dropped after he gave a statement implicating Medina. Mot.93. Because this claim is inadequately argued, this Court should consider it waived. *Trevino*, 168 F.3d at 181 n.3. But, to the extent Medina alleges that the State withheld this evidence, the claim fails. Valadez's capital murder charge was contained in the offense report, which was disclosed to and reviewed by the defense. ROA.6711, 6842, 6846, 6959. Hence, the evidence was not withheld. *See Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). Further, Medina fails to demonstrate that the district court's denial of this claim was unreasonable. *See Davenport*, 596 U.S. at 122.

### iv. Impeachment evidence for Aguenta

Next, Medina alleges that the State withheld Aguenta's criminal history and pending criminal charges. Mot.94. Aguenta's criminal history was part of the State's file, which was available to and reviewed by the defense; the State did not withhold this evidence. ROA.6711, 6951; *see Moore*, 408 U.S. at 794–95. Per the pending criminal charge, Medina

complains the State failed to disclose that Aguenta was charged with sexual assault mere hours before he testified at Medina's trial. Mot.94. Even if pending criminal charges *may* be used in cross-examination where appropriate as Medina argues, *see* Mot.69 (citing *Carroll v. State*, 916 S.W.2d 494, 499 (Tex. Crim. App. 1996)), he fails to show that this evidence was material or that adding information about this pending criminal charge would create a reasonable probability of a different result in Medina's trial. *See Banks*, 540 U.S. at 699; Section IV(C)(3).

### v.    Impeachment evidence for Guy

Medina also complains that the "jury never learned of [Guy's] criminal convictions." Mot.95. Because this claim is inadequately argued, this Court should consider it waived. *Trevino*, 168 F.3d at 181 n.3. But, to the extent Medina is arguing that the State withheld Guy's criminal history, the claim is meritless. Guy's criminal records were part of the State's file, which was available to and reviewed by the defense. ROA.6711, 6957. Further, Medina fails to demonstrate that the district court's denial was unreasonable. *See Davenport*, 596 U.S. at 122.

### vi. Witness(es) who saw a Black shooter

Finally, Medina complains that the State withheld evidence—reports or notes—identifying the witness(es) who said that the shooter was Black. Mot.87. Medina states that the officers who interrogated Nacoste told Nacoste that an eyewitness reported the shooter was Black. Mot.87. During the state habeas proceedings, Medina offered an affidavit from Nacoste attesting to this information and evidence that the lead detectives informed another HPD officer that "some [B]lack males may also be involved in this incident." *Id.* (citing ROA.1834, 2015–17); ROA.7566.

While Nacoste's affidavit claims that an officer told him that the shooter was Black, nothing in the record supports the veracity of that statement. A police officer may lie or mislead a witness during an interrogation for investigative purposes. *See Frazier v. Cupp*, 394 U.S. 731, 736–37 (1969) (affirming legality of deceptive interrogation tactics by police). Thus, to the extent Medina argues Nacoste's affidavit is evidence that police had an eyewitness who stated the gunman was Black, the affidavit is inadmissible hearsay. *See* Fed. R. Evid. 802; Tex. R. Evid. 802.

Further, the defense had access to the other allegedly withheld evidence—that an HPD officer was told "some [B]lack males" may have been involved in the shooting. The offense report, which was turned over to and reviewed by defense counsel before trial, stated that police had information that "some [B]lack males" may have been involved in the shooting, and that LRZ had two documented Black members. ROA.1834, 6711.

And this information is unsurprising given that the driver of the vehicle Medina shot out of was Black (Moore) and that Holmes, who was in the backseat of the vehicle during the shooting, was also Black. Indeed, the offense report lists these two individuals by name. ROA.1834. None of this information was suppressed, nor does any of it support Medina's speculative allegation that there is some other, different report that identifies any eyewitness who described a Black shooter. *See Murphy*, 205 F.3d at 814. Medina fails to demonstrate that the district court's denial of this claim was unreasonable. *See Davenport*, 596 U.S. at 122.

> ### 2. Medina fails to show that the State elicited false testimony.

Medina also complains that the State elicited false testimony from Juarez to neutralize forensic evidence linking Holmes to the murder

weapon. Mot.96–97. Here, Medina states that Juarez "now admits that she was not present when the guns were buried and her trial testimony to the contrary was based on information presented to her by the prosecution." Mot.96. He argues that the "gun burial story" materialized only after Holmes's palmprints were linked to the weapon, Juarez's testimony was false, and the State knew. Mot.96–97. But, as described, Juarez's testimony at trial was that she was *not* present when the guns were buried. *See* Section IV(C)(1)(i). In fact, Juarez testified that she saw the guns the day after the shootings and Medina's arrest, she assisted with wrapping the guns in plastic and discarding them in a field next to Pooran's house, but she had no involvement in the burial and did not know anything about it. ROA.10147–48, 10153–54. Thus, any "new" admission that Juarez was not present for the gun burial is directly supportive of her trial testimony. Medina fails to demonstrate the State knowingly elicited false testimony or that the district court's denial of this claim on procedural grounds was unreasonable. *See Davenport*, 596 U.S. at 122.

### 3.    Medina fails to show materiality.

Medina failed to show that the State withheld any evidence in violation of *Brady* or knowingly elicited false testimony. But he also fails to show a reasonable probability of a different result if any of the allegedly withheld evidence had been presented to the jury, *Banks*, 540 U.S. at 699, or any reasonable likelihood that the false testimony could have affected the outcome of trial, *Agurs*, 427 U.S. at 103. Medina argues that, cumulatively, the "suppressed" evidence could have changed the outcome of a trial that "turned on the credibility of witnesses," Mot.98, and that the district court failed to conduct a cumulative assessment of the State's *Brady* misconduct in violation of *Kyles*. Mot.100; *Kyles*, 514 U.S. 419.

This Court has made clear that *Brady* claims are "specific to particular pieces of material evidence" rather than "specific to a particular stage of a proceeding." *Nelson*, 72 F.4th at 660. While *Kyles* requires a court to analyze the cumulative effect of all such evidence suppressed by the government, Medina has failed to demonstrate any *Brady* error. *See Kyles*, 514 U.S. at 421–23. Thus, no cumulative assessment need be conducted where Medina fails to demonstrate any

evidence was *actually* suppressed. *See* ROA.4748–49. Medina cannot show that the outcome of his trial would have been different because he fails to show the suppression of any material evidence. *See Banks*, 540 U.S. at 699.

The Director maintains that many of Medina's prosecutorial error subclaims are procedurally defaulted. *See* Sections IV(C)(1)(i), (ii), and (iv), and IV(C)(3). Further, mpoany of his arguments are wholly conclusory, speculative, and insufficient to entitle him to discovery, and for these reasons should be dismissed. *See Webster*, 392 F.3d at 802; *Murphy*, 205 F.3d at 814. Even so, Medina fails to prove the necessary components of either a *Brady* or *Napue* claim.

With respect to the claims that were raised in his initial state habeas application, which was denied on the merits, the state court found that: "based on the credible affidavits of [the prosecutors and trial counsel], that the witnesses' criminal histories were contained in a sub-file marked "Criminal Histories" in the state's file that was available for trial counsel to review; that trial counsel reviewed the State's file, including the sub-file with the witness's criminal histories; and, that trial counsel was aware of the contained criminal histories, including the

criminal records of Leon Guy, Maurice Aguenta, Dominic Holmes, and Johnny Valadez." ROA.6956–57. The CCA adopted the state court's findings and conclusions. ROA.7117. And the district court found the CCA's conclusions were reasonable. ROA.4746.

Further, as demonstrated, if this Court conducts even a threshold merits review of his procedurally defaulted *Brady* claims, Medina fails to show any violation of his constitutional rights. Medina failed to show that the State misled the jury, presented false testimony, or suppressed evidence that was material to his guilt or punishment. ROA.6989. Therefore, not only does he fail to overcome the procedural default of many of his subclaims, he also fails to prove a due process violation. Reasonable jurists would not debate the district court's denial of these claims.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests this Court deny Medina's application for a COA.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Katie Abell
KATIE ABELL
Assistant Attorney General
    *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
katie.abell@oag.texas.gov

*Attorneys for Respondent–Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served by email on the 5th day of April, 2024, to:

Jeremy Schepers
Federal Public Defender
525 S. Griffin St.
Suite 629
Dallas, TX 75202
Jeremy_schepers@fd.org

Jim Marcus
Capital Punishment Clinic
University of Texas School of Law
727 E. Dean Keeton Street
Austin, TX 78705
JMarcus@law.utexas.edu

s/ Katie Abell
KATIE ABELL
Assistant Attorney General
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with Federal Rules of Appellate Procedure 32(a)(5)–(7). In compliance with this Court's order granting the Respondent's motion for leave to file an extra-length brief not to exceed 20,000 words, this document contains 19,981 words and was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO, 14 points, Century Schoolbook.

s/ Katie Abell
KATIE ABELL
Assistant Attorney General
*Counsel of Record*

**CERTIFICATE OF ELECTRONIC CASE FILING**

I certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the electronic submission has been scanned with the most recent version of Symantec Endpoint Protection and was reported free of viruses.

<u>s/ Katie Abell</u>
KATIE ABELL
Assistant Attorney General
*Counsel of Record*