# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 15, 2024

Lyle W. Cayce
Clerk

No. 23-70003

———————

Anthony Medina,

*Petitioner—Appellant,*

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division,*

*Respondent—Appellee.*

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-3223

———————————————————

Before Smith, Stewart, and Graves, *Circuit Judges.*

Per Curiam:[*]

Anthony Medina, a death row inmate, seeks a Certificate of Appealability ("COA") from the district court's resolution of his ineffective assistance of counsel claims and his constitutional claims. Because Medina does not show that jurists of reason could disagree with the district court's resolution of his claims, we DENY the petition for a COA.

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-70003

# BACKGROUND

## I. The Murders

On New Year's Eve there was a party going on at the Rodriguez family home in Houston, Texas. In the early morning hours of January 1, 1996, the adults were inside and most of the children were outside playing in the backyard. Nine-year-old David sat on the trunk of Veronica Rodriguez's car, and his fifteen-year-old sister Diane stood nearby. Around 2:30am, a car came down the dead-end street and, as it passed the house, used an assault rifle to spray the children with bullets. Both David and Diane died, and their cousin was injured. A witness to the shooting identified the hand holding the assault rifle as "white or Mexican" but definitely not "black."

About six months prior to the murders, someone had previously shot at the Rodriguez home, and the next day, someone painted gang-related graffiti on their garage. In two other incidents, someone vandalized Veronica Rodriguez's car, and another time someone threw a Molotov cocktail at their house. Although no one in the Rodriguez family belonged to a gang, the violence ultimately stemmed from Veronica's two-year relationship with Marco "Blue" Martinez, a member of the H-Town Crips ("HTC").

Throughout the time that Martinez dated Veronica, a gang war brewed between the HTC and its rival gang, La Raza ("LRZ"). The tension between the two gangs intensified after an HTC member killed an LRZ member. Personal animosity built between Martinez and Medina, an LRZ leader. This animosity led to the two exchanging a series of dirty looks, flashing gang signs, and threatening each other with weapons. There was no question that it was Veronica's relationship with Martinez that brought violence upon the Rodriguez house, culminating in the New Years murders. Although Veronica and Martinez were not home at the time of the murders, her marked car was parked outside the home which the children were dancing

No. 23-70003

around when they died from gunfire. The only people able to identify the shooter, came from those inside the car. The prosecution ultimately fingered Medina as the shooter, while the defense claimed Dominic "Flaco" Holmes, a Black "peewee" or junior member of the predominantly Hispanic LRZ gang, was the killer.

## II. Trial Testimony

Trial testimony revealed that at the same time the Rodriguez family met to celebrate the new year, Medina and his fellow LRZ gang members began to party at the house of Candelario "Candyman" Guerrero. Around 11:00pm, Medina and others went to a different party at the house of a former LRZ member, Michele "Chicona" Aguenta. While there, a dispute erupted when LRZ members accused another person of having a brother affiliated with the HTC. When that person looked as though he was going to hit another leader in LRZ, Medina brandished a gun. The LRZ members left after Chicona's brother put an end to the tension. Back at Candyman's house, around 2:00 or 2:30am, a group left Candyman's house to carry out the drive-by murders.

### A. The Prosecution

The prosecution's theory was that Medina left in James Moore's car, a non LRZ member, with Johnny "Pelon" Valadez, Alex "Slim" Perez, Veronica "China" Ponce, Scharlene "India" Pooran, and Holmes. Medina was the only leader in the car. Moore, the driver, Pelon, and Holmes, each of whom testified for the prosecution, admitted to being present in the car, and all identified Medina, Slim, India, and China as also being there. The gang members directed Moore to the Rodriguezes' street, stopping to allow Medina to get a semiautomatic assault rifle from the trunk of the car and

No. 23-70003

move to the front passenger seat. Moore, Pelon, and Holmes all testified at trial that Medina fired at the Rodriguez house.

Around 3:00 am, Medina and the other LRZ members returned to Chicona's house, and Medina told Regina Juarez that they had done a drive-by and he fired the gun. Medina bragged about the murder, and people saw him with the murder weapon. He pointed the gun at someone he suspected to have a brother who was in a rival gang, and shot the gun into the air before Chicona's brother restrained him in a headlock. The LRZ members left when Chicona's father fired a shotgun into the air and told everybody to leave.

After Medina's arrest, he called Regina Juarez and told her to get rid of the murder weapon which was at India's house. Regina, Holmes, Moore, and another gang member got rid of the gun. Medina also directed gang members to lay the blame on Holmes, and China and India helped with his plan. Specifically, China and India told Pelon to blame Holmes and that if Pelon told the truth they would come after his family or try to do something to him.

### B. The Defense

The trial court appointed John A. Millin, and Gerald "Jerry" Guerinot to represent Medina at trial. The focus of their strategy was to place the blame on Holmes through two primary themes: (1) Holmes made incriminating statements, and (2) Medina disclaimed being the shooter. The defense supported this theory with testimony that Holmes told Medina's sister that the police "had to know it was him, but they had to find him before they could arrest him." Holmes had also stated to other friends that he "put them hoes to rest" and "made the hoes lie down."

The Defense had Slim testify that he had not left Candyman's house to do the drive-by, and that Slim had not seen Medina with a weapon at Candyman's house. Slim claimed that neither Holmes nor Medina claimed

No. 23-70003

responsibility for the shootings. Medina also took the stand and testified that he did not participate in the crime, but stayed at Candyman's house until around 3:30am, and that he saw a weapon in Moore's car and Moore and Holmes left around the time of the murders. The jury found Medina guilty of capital murder.

## III. Punishment Phase

There was a variety of evidence presented against Medina at the punishment phase, including that:

1. Medina and one Edward Johnson skipped school almost daily and slashed the tires on cars, and Medina drove his SUV into other cars to push them into the intersection or to damage them, and that they stole items from the cars after smashing the windows with a sledgehammer.

2. Medina was arrested in October 1993 on multiple counts of burglary of a motor vehicle, and Medina failed to comply with the terms of his probation.

3. Medina received ten years probation in December 1994 in four arson cases; Medina violated probation and was sentenced in these cases and the burglary cases.

4. Testimony from a sixteen-year-old Dante Medrano that Medina and another person committed a drive-by where bullets hit Medrano's house.

5. Rocio Pedrosa testified that she was shot at the Rodriguez house and had to have a three-hour surgery, was in the hospital for eleven days, and still had a colostomy bag at the time of the trial and needed further surgery. She also had not returned to school, had nightmares and flashbacks, and was afraid to be alone.

6. Jesus Rodriguez, the father of the deceased, was in the house when he heard the shots and ran outside after. He testified that his wife could not sleep and was sick and nervous after the shooting; that his son Francisco was different after the shootings, and his daughter Jennifer gave him a poem about her feelings.

The Defense presented evidence where: Medina's family members testified about his "childhood, his early speech impediment, his family relationships, his behavior, his church activities, his interaction with children and adults, his attendance at Bellaire Christian Academy, his protective attitude towards others, and their lack of knowledge of his gang activities."[1] The jury answered Texas' special issue questions in a manner requiring imposition of a death sentence.

## IV. Procedural History

Medina first raised twenty-two points of error on direct appeal. The Court of Criminal Appeals affirmed his conviction and sentence on October 6, 1999. Medina filed his first state habeas application on November 23, 1998, which was dismissed as untimely. With new counsel, Medina filed a second habeas application on November 21, 2001, raising fourteen points of error. The Court of Criminal Appeals denied relief on September 16, 2009. While the second habeas application was pending, Medina filed a third and fourth habeas application, which the Court of Criminal Appeals denied as an abuse of the writ.

_____

[1] A full discussion of the Defense's evidence is presented in the Argument section below.

No. 23-70003

On October 5, 2009, Medina filed his federal petition, and amended his petition on May 31, 2011. Respondent filed an answer and motion for summary judgment on January 17, 2012. Medina requested a stay while the Supreme Court considered a case addressing a petitioner's ability to overcome procedural barriers to habeas review. The district court stayed and administratively closed the case. While the stay was in effect, Medina filed a Second Amended Petition for a writ of habeas corpus on March 21, 2013, alleging fourteen grounds for relief. On August 13, 2013, the court reopened the case, only to issue another stay to permit Medina to exhaust at least one claim he had not raised in state court. The court permitted Medina to raise any issue needing exhaustion before returning to federal court.

On December 16, 2015, Medina filed his fifth state habeas application, which raised three issues: "(1) police and prosecutorial misconduct violated his constitutional rights; (2) ineffective assistance of counsel at the guilt/innocence phase of trial; and (3) actual innocence." On January 25, 2017, the Court of Criminal Appeals dismissed the application as an abuse of the writ.

The parties then returned to federal court and Medina argued that he had exhausted all claims. Medina also filed a motion for discovery and an evidentiary hearing. The district court found that Medina was not entitled to federal habeas corpus relief, and thus granted Respondent's motion for summary judgment, denied Medina's petition for the writ, and denied his motion for discovery. Medina now seeks review of the district court's denial of his habeas claims.

## STANDARD OF REVIEW

For Medina to appeal the district court's denial of his claims, he "must first seek a [COA] from this court pursuant to 28 U.S.C. §

2253(c)(1)." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020). To obtain a COA, Medina "must demonstrate 'a substantial showing of the denial of a constitutional right.'" *Id.*; 28 U.S.C. § 2253(c)(2). If the district court denied his claims on the merits, Medina "must show that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* (citation omitted). For claims the district court denied on procedural grounds, Medina "must show that 'jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Id.* (quoting *Segundo v. Davis*, 831 F.3d 345, 350 (5th Cir. 2016)). "The COA standard is less burdensome in capital cases, as 'in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor.'" *Id.* (quoting *Clark v. Thaler*, 673 F.3d 410, 425 (5th Cir. 2012)).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") (28 U.S.C. § 2254) "requires a district court to defer to a state habeas court's determination of the merits of a prisoner's claims unless the state decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law . . .' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hughes v. Vannoy*, 7 F.4th 380, 386-87 (5th Cir. 2021). "[T]he state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 387 (quoting *Harrington v. Richter*, 562 U.S. 86, 103, (2011)). "When reviewing a state habeas court's decision under AEDPA's deferential standard of review, we review 'only the ultimate legal determination by the state court—not every link in its reasoning.'" *Charles*

No. 23-70003

*v. Stephens*, 736 F.3d 380, 387 (5th Cir. 2013) (quoting *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir.2013)). For claims not adjudicated on the merits in state court, we apply a de novo standard of review. *Nelson*, 952 F.3d at 658.

## DISCUSSION

Prior to discussing the merits of Medina's claims, we must first determine which level of review applies to which claims. Medina and the State argue about whether AEDPA's deferential review applies, and to which claims it applies. The "statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by [AEDPA]." *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011). The statute states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A federal claim will be deemed to have been adjudicated on the merits when, "in the absence of any indication or state-law procedural principles to the contrary," it has been presented to the state court and the state court has denied relief. *Harrington*, 562 U.S. at 99. "The presumption

may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100.

When making the evaluation under AEDPA, "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 102. AEDPA, "also requires that determinations of fact issued by state courts are 'presumed to be correct,' and that they not be disturbed unless an applicant rebuts the presumption with clear and convincing evidence." *Charles*, 736 F.3d at 395. We now turn to Medina's habeas application in state court.[2]

Medina's 2001 state court habeas action raised fourteen points of error. Of relevance here, Medina argued that he received ineffective assistance of counsel (claims 1 and 2); that the state withheld material evidence, and the state violated the law by giving deals to witnesses (claim 3). The state habeas court issued conclusions of law and an order, which the Court of Criminal Appeals adopted. Accordingly, because Medina's arguments were "presented to a state court, and the state court [] denied relief, it may be presumed that the state court adjudicated the claim on the merits." *Harrington*, 562 U.S. at 99. Medina argues that he has rebutted this presumption because "he requested discovery and an evidentiary hearing to resolve his fact-intensive claims in state court," and instead, the state court abdicated its role to the prosecutor. Medina's argument is without merit. In *Sandoval Mendoza v. Lumpkin*, we answered a similar question where

---

[2] This refers to Medina's second application in 2001, as his first application was denied as untimely, and the court appointed new counsel and permitted him to file a new habeas action without it being considered successive. This 2001 application is the one referred to throughout this opinion.

No. 23-70003

Mendoza asserted that "because he sought discovery in state court, but it was denied, the Texas Court of Criminal Appeals failed to provide him with due process and his claims were not adjudicated on the merits." 81 F.4th 461, 472 (5th Cir. 2023). Our court reiterated that:

> we have consistently held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." Such a requirement is supported neither by the plain text of Section 2254(d), which makes no reference to a full and fair hearing, nor by the legislative landscape against which AEDPA was passed, which involved excising from the pre-AEPDA version of Section 2254 references to a full and fair hearing. Further, "[w]here we have conducted an examination of whether an 'adjudication on the merits' occurred, we have looked at whether the state court reached the merits of the petitioner's claim rather than deciding it on procedural grounds."

*Sandoval Mendoza*, 81 F.4th at 472. (Internal citations removed and at times quoting *Boyer v. Vannoy*, 863 F.3d 428, 446 (5th Cir. 2017)) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001)). Accordingly, because the state court reached the merits of Medina's claims, they were adjudicated on the merits and AEDPA deference applies.[3] Thus, reasonable jurists could not debate whether the district court was correct in applying § 2254(d)'s relitigation bar. Next, we turn to the merits of Medina's claims.

Medina requests a COA to appeal the district court's denial of three claims: (1) his ineffective assistance of counsel claim at the guilt phase of his trial; (2) ineffective assistance of counsel claim at the punishment phase of

---

[3] Although the broad premise of Medina's claims were raised and thus adjudicated on the merits, certain "sub-claims" relating to specific witnesses were not raised. Those claims are procedurally defaulted and will be discussed in Section III.

his trial; and (3) the deprivation of due process for withholding evidence and presenting false testimony. We examine each claim in turn.

## I. Ineffective Assistance of Counsel

The Supreme Court has recognized that "'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)). The right to effective assistance of counsel is violated when the government "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Id.* Counsel "can also deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance[.]'" *Id.* The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* There are two requirements that must be met to prove ineffective assistance of counsel. First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* A defendant must make both showings to prove an ineffective assistance of counsel claim.

The "proper standard for attorney performance is that of reasonably effective assistance." *Id.* In assessing the performance of counsel, the inquiry "must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Judicial scrutiny of counsel's performance must

be highly deferential." *Id.* at 689. The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* Accordingly, a court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. A defendant making the claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* There is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* Thus, "while '[s]urmounting Strickland's high bar is never an easy task,' '[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.' Both the Strickland standard and the AEDPA standard are 'highly deferential,' and 'when the two apply in tandem, review is 'doubly' so.'" *Charles*, 746 F.3d at 389 (internal citations and citation omitted). Medina first argues that counsel was ineffective at the guilt phase of his trial.

### A. Guilt Phase

Medina makes multiple arguments in raising his ineffective assistance of counsel claim including that counsel (1) failed to conduct a reasonable investigation, (2) failed to impeach witnesses, and (3) failed to request a limiting instruction. We take each argument in turn.

### i. Counsel's Investigation

No. 23-70003

Medina first argues that counsel was ineffective because counsel's investigation fell below an objective standard of reasonableness. Counsel "has 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted). The decision "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. The state adjudicated Medina's claims on the merits and found that counsel's performance was not deficient. Accordingly, our review is "doubly deferential" and asks only whether the "state court's application of *Strickland* was unreasonable under § 2254(d)." *Harrington*, 526 U.S. at 105.

Medina argues ineffective assistance of counsel because counsel: tried three other unrelated death penalty cases as well as a murder case and an aggravated sexual assault case while trying his case; on the eve of jury selection, counsel only made ten phone calls over two days and a visit to the crime scene; and of the twenty-eight people on the state's witness list, counsel contacted three. Specifically, Medina argues counsel provided ineffective assistance by failing to contact:

- Dallas Nacoste, even though he gave the police a statement implicating Holmes and reported that Holmes buried the murder weapon.
- Becerra, who would have testified that Holmes sought promotion within LRZ for pinning the shooting on Medina and threatened to kill Juarez and her family if she did not go along with the plan.
- Villanueva, who would have testified that Holmes confessed to the shooting.

No. 23-70003

- Crawford, Holmes, and Moore's friend, who could have testified that Holmes repeatedly expressed a desire to avenge the death of Lopez and saw Holmes with a long rifle shortly after the shooting.
- Carlos McNickles, who saw a black man firing an AK-type rifle out of a car matching the description of Moore's car.

First, the state court found that based on the affidavit of trial counsel, and the appellate record, counsel's caseload did not hinder preparation or investigation in Medina's case where trial counsel:

> prepared and filed pre-trial motions, employed an investigator, interviewed witnesses, obtained discovery from the state, reviewed the state's file, read the offense report, visited the scene of the offense, interviewed the applicant's family, talked with the applicant numerous times about the offense and pending trial, was familiar with the facts of the case and relevant law, presented evidence, vigorously cross-examined [the] state's witnesses, made objections, presented a reasonable defensive theory, and competently argued to the jury.

Second, the state court found that counsel's strategy at trial was to place the blame on others. The state court found that Nacoste's statement to the police where he stated that Holmes did the shooting, was available to trial counsel, and his habeas affidavit gives essentially the same version of the offense as that in his statement given to police. Counsel made a strategic decision not to call Nacoste to testify because his credibility was lower than other witnesses. As to McNickles, his statement that he saw a black man shooting a rifle does not exculpate Medina from the murder. As to Crawford, the habeas affidavit states that the LRZ gang had something planned for the HTC's, and such an assertion is just as incriminating to Medina as to anyone else. As to Becerra and Villanueva, counsel presented evidence through

No. 23-70003

Juarez that Holmes told others that he was the one who committed the murders.

Accordingly, the evidence that Medina argues should have been brought in or would have been brought in had counsel contacted or called the above witnesses was either: information counsel already had access to, a strategic decision not to call the witness, not information that would exculpate Medina, or already presented through other witnesses or evidence at trial. Medina has failed to show that counsel's performance was deficient, which requires "a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Thus, under the high level of deference we must afford the state court, we cannot say its application of *Strickland* was unreasonable, and reasonable jurists could not debate the district court's finding of the same. Because Medina fails on the first prong of *Strickland*, his claim cannot survive. We nonetheless move to the second prong, prejudice.

Any deficiency "in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. Medina must "affirmatively prove prejudice." *Id.* at 693. That is, Medina "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Medina argues that he was prejudiced because the jury did not hear from the mentioned witnesses that Holmes had confessed to the shooting and threatened other witnesses if they did not blame Medina. He claims the jury also did not hear from an eyewitness whose descriptions incriminated Holmes and Moore, not Medina, or that Holmes and Juarez lied under oath about the murder weapon. Medina fails to prove the result of his proceeding

would have been different. As established above, there was evidence presented at trial that Holmes confessed to the shooting, including testimony from Medina's sister, Domingo Valle, and Rene Reyna. All testifying that Holmes confessed to the shooting. Similarly, Alex Perez testified that he never saw Medina leave the New Year's Eve party. Accordingly, Medina fails to demonstrate that the result of the proceeding would have been different where the evidence he claims was missing, was already presented in another form or through other witnesses. We next turn to Medina's second argument.

### ii. Impeachment of Witnesses

Medina contends that he was rendered ineffective assistance of counsel because counsel failed to interview and subsequently impeach the state's key witnesses with their previous statements, and instead blindly lobbed accusations at the witnesses. He also argues that counsel failed to impeach Juarez and Holmes with their criminal histories or cross-examine them concerning their pending charges or parole status.[4] Our review is doubly deferential for the claim pertaining to criminal histories and is procedurally defaulted as to impeachment surrounding previous or inconsistent statements.[5]

Medina argues that Counsel should have impeached certain witnesses with their criminal records or cross examined them with pending charges or parole status. Medina fails to identify with specificity which witnesses Counsel should have impeached or cross examined, or how that would have

---

[4] Medina's state habeas petition did not argue that counsel was ineffective for failing to interview or impeach Jaurez and Holmes with prior sworn statements. Accordingly, this claim is procedurally defaulted.

[5] The procedural default doctrine is discussed in Section III.

affected the outcome of his trial. Accordingly, this claim is inadequately argued. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Hughes*, 7 F.4th at 390 (discussing prejudice prong) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (citations omitted)). Furthermore, even if this court were to consider it, the state court's application of *Strickland* was not unreasonable as it found that "much of the witnesses' prior actions [were] inadmissible," and the district court agreed, noting that most of the witnesses' criminal histories were juvenile records that could not be used for impeachment purposes under the Texas Criminal Rule of Evidence 609. Accordingly, Medina's impeachment argument fails to demonstrate that counsel was ineffective, that the state court's application of *Strickland* was unreasonable, or that reasonable jurists could disagree with the district court's determination. We now turn to Medina's final claim at the guilt phase.

### iii. Requesting a Limiting Instruction

Finally, Medina contends that counsel was ineffective because counsel himself admitted that he was deficient for failing to request appropriate limiting instructions regarding the July 1995 attacks on the Rodriguez home. Our review is doubly deferential. The state court found that the evidence concerning the Rodriguezes' home's being the target of Medina's gang "was relevant to explain the context of gang rivalries in which the offense occurred and has some tendency to show that applicant had a motive to shoot and kill persons at that house." Thus, it found that trial counsel was not ineffective for not lodging objections to the admission of the

relevant evidence of the July 1995 attacks. The state court also found that such evidence was relevant to Medina's intent and motive on the night of the offense, and such testimony was admissible as being part of the circumstances surrounding the instant offense and was intertwined with the instant offense. The district court noted that Texas law does not hold evidence to a reasonable-doubt standard or require a limiting instruction when the state relies on same-transaction contextual evidence. We cannot say jurists of reason would disagree.

The evidence presented showed the history of violence between the two gangs, evidence that could have implicated anyone in LRZ, not just Medina. Further, what the evidence showed about Medina, his being a gang member and having a grudge, was evidence that was already in the record. Accordingly, Medina fails to show deficiency, or prejudice, where he has not shown how it would result in a different outcome at trial. The state court's application of *Strickland* was not unreasonable, and jurists of reason would not disagree with the district court's resolution. Next, Medina argues that counsel was ineffective at the punishment phase of his trial.

### B. Punishment Phase

Medina argues counsel was ineffective at the punishment phase of his trial because a reasonable lawyer would have investigated Medina's home life, his school performance, and his history of gang involvement. Specifically, Medina argues that counsel (1) waited until the eve of trial to request and obtain funding for a mental health evaluation and then failed to procure one; (2) waited until days before trial to begin a sentencing phase investigation; and (3) did not prepare the witnesses or go over their testimony before calling them to the stand. Our review is doubly deferential.

At the punishment phase, "in investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2)

No. 23-70003

make an informed strategic decision that investigation is unnecessary." *Charles*, 736 F.3d at 389 (quoting *Higgins v. Cain*, 720 F.3d 255, 265 (5th Cir. 2013)). The Supreme Court has also stated that "trial counsel must not ignore 'pertinent avenues of investigation,' . . . or even a single, particularly promising investigation lead[.]" *Id.* at 390 (quoting *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (citation omitted)). At the prejudice inquiry, we ask whether "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Medina alleges that had counsel adequately investigated his background the following information would have been revealed:

- Throughout Medina's childhood, his father was always drunk, creating an unstable environment and his mother coped by self-medicating with marijuana.

- He lived in a volatile environment, where one time his aunt locked herself, her children, and Medina in a bedroom while Medina's father threw his mother on the ground outside and banged her head on the sidewalk. His mother kept a gun under her pillow and threatened to shoot his father.

- Medina's parents were emotionally and physically absent throughout his childhood and other relatives recognized his need for support and a safe environment.

- His aunt, Eva Uribe, drove Medina to school in a different neighborhood because she was concerned about the environment he was growing up in.

- Medina's teachers did their best to support Medina, and Medina on one occasion rode his bike ten miles to spend the afternoon with one of his teachers.

No. 23-70003

- Medina and his friends routinely endured gang members chasing and shooting at them. Medina was targeted in a drive-by shooting, and his best friend pushed him out of the way and was killed instead. A postconviction mental health evaluation revealed that Medina suffers from PTSD.
- Medina sought protection from a gang and LRZ became a surrogate family.
- Medina's gang activity was connected with his trauma and basic need for love and acceptance.

At punishment, defense called seven witnesses who testified as follows:

- Verlan Pergues testified that Medina had a speech impediment that he overcame and had good characteristics.
- Sherry Grien testified that Medina had good qualities and she did not have as much contact with him in the last couple of years.
- David Castro, Medina's cousin, testified that Medina lived in a gang area, did not know Medina had problems, and that he was respectful and courteous to family members, and helped Castro with house repairs.
- Eva Uribe, Medina's aunt, picked Medina up from his Christian school, he was involved in church and would protect her younger daughters, Medina would help his grandfather who suffered a mild stroke and Medina was a loving and caring person who took care of his son, and she eventually learned Medina was in a gang.
- Antonio, Medina's grandfather testified that Medina was intelligent, and mechanically-inclined, and helpful with errands and auto repairs. Also that he was respectful to adults and interacted with children.

No. 23-70003

- Anthony, Medina's father, testified that Medina was a good child, got along well with children in the family and was a help to them, that he learned about Medina's gang activity after he was arrested, and knew there were gangs in the neighborhood, and that Medina was a good person whom he loved.

- Golda, Medina's mother, testified that she and her husband had been married twenty-two years, had three children, that Medina was good, polite, respectful, and had no problems. That Medina's change in behavior came when he was a teenager and she learned about his gang activity after the fact, that they always tried to do what was best for Medina, and Medina tried to work hard and take care of his family and be less part of the gang.

Reasonable jurists would not disagree with the district court's conclusion that Medina failed to state an ineffective assistance of counsel claim. First, in an affidavit submitted by counsel, they alleged that their strategy was to present a picture of Medina's background and home life to show that he was not a future danger. Counsel stated that "during the interviews no family member told the defense that the father drank, the mother smoked, or that they fought." Counsel further stated that they did not consider any jail records, which stated that the defendant had no discipline records, to be sufficiently mitigating in the circumstances, and that juries are typically not impressed with a no-problems jail record. Counsel also did not seek out who reported the crime because "how the police got to the defendant and the weapons in this case was not the relevant question." Counsel stated they did not present a mental health expert because Medina had a stutter which was cured and was far-removed from the offense.

Second, counsel must have been put on notice that further investigation or inquiry was warranted. *See Martinez v. Dretke*, (finding

counsel was not ineffective when nothing put them on notice that further investigation was needed where Martinez's family was unwilling or unable to help. "Moreover, nothing in counsel's personal and professional experience, in their interactions with Martinez, or in Martinez's conditions of confinement, put counsel on notice that further inquiry was warranted."). 404 F.3d 878, 886 (5th Cir. 2005). *See also Strickland*, 466 U.S. at 691 ("the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). Accordingly, where counsel was not put on notice of Medina's tumultuous family history, it cannot be said that he was ineffective. Similarly, Medina does not allege that he made his counsel aware of the shooting he witnessed of his best friend. As to the remaining evidence Medina claims would have been brought in, that evidence is primarily represented by testimony that was presented at the punishment phase, i.e. Medina's good character (multiple people testified as to his character), growing up in a neighborhood surrounded by gang activity (multiple individuals testified that they knew or later found out he was in a gang, or that his neighborhood had gangs), and his need for love and support (his parents testified about speaking to him after finding out he was in a gang and that they tried to do what was best for him and bring him back into the family). *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007) (finding no *Strickland* error where counsel presented similar mitigating evidence to what the defendant stated should have come in and amounted to ineffective assistance). Accordingly, even if counsel's performance was deficient, Medina fails to establish prejudice. Thus, the state court's application of *Strickland* was not unreasonable and reasonable jurists could not disagree with the district court's finding of the same. Medina's ineffective assistance of counsel claims fail, and this court will not grant a COA.

## II. Due Process Claims

No. 23-70003

Medina next alleges that the state deprived him of due process by suppressing evidence favorable to him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and by presenting false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and its progeny. The district court separately considered Medina's claims, finding some procedurally defaulted and others to be without merit. We begin with the claims the state court addressed on the merits, then move to all procedurally defaulted claims.

Under *Brady*, there is a due process violation when "the suppression by the prosecution of evidence favorable to an accused upon request . . . is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "A finding of materiality of the evidence is required under Brady." *Tassin v. Cain*, 517 F.3d 770, 780 (5th Cir. 2008) (citation omitted). The "touchstone of materiality is a 'reasonable probability' of a different result[.] The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citation omitted). A "'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (citation omitted). Thus, "there are three components of a true Brady violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Under *Napue* and its progeny, "a [s]tate may not knowingly use false evidence, including false testimony, to obtain a tainted conviction[.]" *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). A due process violation occurs when there is a "deliberate deception of a court and jurors by the

No. 23-70003

presentation of known false evidence," *Giglio v. U.S.*, 405 U.S. 150, 153 (1972), or when the state allows "untrue testimony to go uncorrected." *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998). To prove such a violation, Medina must demonstrate that "(1) the testimony was false, (2) the state knew it was false, and (3) the testimony was material." *Pyles*, 136 F.3d at 996.

In his Motion for COA, Medina argues that the state suppressed evidence of:

- Witnesses who saw a black shooter, specifically that he was never provided with reports or notes identifying the witnesses who said the shooter was black.
- Evidence impeaching Regina Juarez, including an undisclosed deal for her testimony, and statements or interview notes proving that she lied under oath in her witness statement. And that the state suppressed Juarez's criminal history.
- Evidence impeaching Holmes, including an undisclosed deal, statements or interview notes proving he lied in his sworn statement, lied at trial, and that the state suppressed his criminal record.
- Evidence impeaching Johnny Valadez, including the fact that his capital murder charge was dropped after he gave a statement implicating Medina.
- Evidence impeaching Maurice Argueta, including his past criminal history and pending charges.
- Evidence impeaching Leon Guy, including that the jury never learned of his criminal history.

Medina presented his claims in state habeas court as it pertains to (1) the criminal histories of certain witnesses that should have been used for impeachment, (2) evidence of an alternate suspect, (3) an undisclosed deal for Holmes and Valadez, and (4) false testimony of Maurice Argueta.

No. 23-70003

Because these were adjudicated by the state court on the merits, our review under AEDPA is deferential.

First, as to the criminal histories, the state habeas court found the affidavits of the prosecutors and Medina's counsel to be credible. There, counsel testified that he reviewed the state's open file including the file labeled criminal histories. The court found that the state disclosed criminal histories for approximately twenty-eight witnesses including the ones Medina mentions in his Motion for COA. Accordingly, the state court found that the state did not suppress these witnesses' criminal histories. Medina does not present "clear and convincing evidence" to rebut this finding. "The state court's factual findings are presumed to be correct, and the habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence." *Tassin*, 517 F.3d at 776. Accordingly, the state court's holding was not unreasonable, and a reasonable jurist could not disagree with the district court that Medina has not shown a *Brady* violation regarding suppression of criminal histories.

Second, Medina alleged that the state withheld any evidence as to an alternate suspect. In his state petition, Medina alleged that Mr. Evaristo informed the police that his daughter, Veronica, was dating a possible gang member, and believed that the LRZ gang was responsible for the shooting because his daughter told him a gang member from LRZ had just gotten out of jail and was going to kill one of her family members. Medina alleged that he was in jail until November of 1995, and this demonstrated that someone other than he wanted to kill Veronica's family members and had made a previous attempt. The state habeas court found that this information does not create an alternate suspect, as the July 1995 shooting was used to place the instant offense into context, not to prove Medina performed the shooting, it also found that Medina had not shown that the state withheld any evidence concerning the July 1995 drive-by. Medina has not presented clear and

convincing evidence to rebut this factual finding. Accordingly, the state court's holding was not unreasonable, and a reasonable jurist would not disagree with the district court's findings.

Third, as to any undisclosed deal for Holmes, Medina refers to the notes of the magistrate judge where they stated that Holmes was told by police that "if he told them what happened they would probably help him out and see what they could do for him. But no specific promise was made to him." However, the magistrate and the state habeas court found that no deal was made, and this was not an agreement that the state was required to disclose to the jury. Furthermore, the court found that this written notation by the magistrate was available to trial counsel. As to Valadez, the state habeas court found that the charge against Valadez was rejected for lack of evidence. In either instance, Medina does not present clear and convincing evidence to show otherwise. Accordingly, his *Brady* claim is without merit.

Fourth and finally, as to potentially false testimony of Maurice Argueta, although raised in his initial state habeas petition that "the jury was never informed of Mr. Argueta's hesitation in identifying Mr. Medina and was thus left [with the impression that Argueta could identify him with confidence.]" Medina did not argue this in his motion for COA and so we need not consider it. The remainder of Medina's claims were not raised in his initial state habeas petition and are accordingly procedurally defaulted. We turn to those claims next.

## III. Procedurally Defaulted Claims

The State argues that certain of Medina's claims are procedurally defaulted and accordingly need not be considered. Medina's claims that the

No. 23-70003

state (1) withheld evidence that the shooter was black;[6] (2) withheld evidence that could be used to impeach Jaurez, that Jaurez had an undisclosed deal, and her prior sworn statements amounting to false testimony; (3) withheld criminal history of Jaurez and Valadez; and (4) made Holmes give false statements,[7] are procedurally defaulted as he did not raise them in his initial state habeas petition.

---

[6] Even if this court were to assume this to be not procedurally defaulted, Medina cannot show materiality. Medina must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[.]" *Tassin*, 517 F.3d at 780 (citation omitted). As previously mentioned, the defense presented ample evidence pointing the finger at another person (Holmes, a black man) as the shooter. Accordingly, even if this evidence was withheld, it does not undermine confidence in the verdict. Medina fails to demonstrate that the district court's denial of this claim was unreasonable.

[7] Even if we were to reach the merits of this claim, Medina would fail. As to Holmes, Medina argues that counsel should have impeached him regarding his testimony about the gun, specifically that Holmes initially told police that he did not know where the gun was, then at trial testified to being involved in discarding the gun. During his initial interview with the Police Holmes told the police that he hadn't talked to Medina and did not know what he did with the gun. At trial, Holmes testified that after the shooting he did not see the gun after getting back to Candyman's house, up until they were wrapping the gun to be buried.

The state court found that counsel was not ineffective based on the reasonable, strategic decision concerning impeachment. We cannot say this was an unreasonable application of *Strickland*. The district court found the same. Holmes' testimony is not technically inconsistent, such that it warrants impeachment. Holmes testified, both in his initial statement, and at trial, that he did not see the gun after the shooting, once they were back at Candyman's house. At trial he stated he saw the gun five or six days later, when it was being wrapped. This means counsel could have made the strategic decision not to impeach Holmes, because it is possible that Holmes did not know what happened with the gun until almost a week after the shooting. Accordingly, Medina has not shown that counsel's performance was deficient. Even if we were to assume deficiency, Medina has failed to show prejudice because witnesses' testimony other than Holmes' identified Medina as the shooter, and Medina himself admitted to possessing a rifle that night.

No. 23-70003

Medina raised a generalized version of these claims for the first time in his federal petition, and the court stayed the proceeding to allow him to exhaust them in state court. Medina then raised these claims in his 2015 state habeas petition. The Texas Court of Criminal Appeals relied on Tex. Code. Crim. Pro. 11.071 § 5 to find that his petition was an abuse of the writ.

Under federal procedural default doctrine, a federal court may not review a procedurally defaulted claim unless the petitioner establishes "cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). A dismissal pursuant to Article 11.071 "is an adequate and independent state [ground for the purpose of imposing a procedural bar in a subsequent federal habeas proceeding.]" *Gutierrez v. Stephens*, 590 F. App'x 371, 383-84 (5th Cir. 2014). Thus, to overcome his procedural default for these claims, Medina must show cause and prejudice. *Id.*

Cause to excuse a procedurally defaulted *Brady* claim parallels the suppression component of a *Brady* claim, and prejudice parallels materiality. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Thus, Medina must demonstrate that his default was caused by the suppression of evidence, and the suppressed evidence was material. Medina has failed to demonstrate either cause or prejudice, and instead, Medina argues that he relied on the open file policy held by the state. However, as established above, such a claim is not supported by evidence and fails to establish that the state withheld any evidence or that they elicited false testimony. Medina then argues that the district court erred by not permitting discovery. Medina, however, was not

No. 23-70003

entitled to discovery where his claims were purely speculative.[8] Our court has held that it is "unwise to infer the existence of *Brady* material based upon speculation alone." *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (internal quotations omitted); *see also Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (stating that "speculation about the suppression of exculpatory evidence" cannot support a *Brady* claim) (citation omitted). For the same reasons, even for Medina's *Napue* defaulted claims, he fails to demonstrate cause and prejudice where his allegations are purely speculative. Accordingly, Medina's claims are procedurally defaulted, and jurists of reason would not find it debatable whether the district court was correct in its procedural ruling, or whether the petition states a valid claim for the denial of a constitutional right.

## CONCLUSION

Jurists of reason would agree with the district court's resolution of Medina's claims, none of which state any constitutional violation. Accordingly, we DENY Medina's petition for a COA.

---

[8] Accordingly, because Medina was not entitled to discovery, jurists of reason would not disagree with the district court's resolution of this claim.